IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MARK CHRISTESON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 4:04CV-08004-DW |
| vs. | ) | |
| | ) | *This is a Capital Case.* |
| DONALD ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## <u>UNDER A SENTENCE OF DEATH</u>

COMES NOW Mark Christeson, an inmate at the Potosi Correctional Center under a sentence of death, by and through counsel, Eric W. Butts and Philip M. Horwitz, and pursuant to 28 U.S.C. § 2254, files his petition for a writ of habeas corpus challenging his conviction and sentence of death. In support of this petition, petitioner state as follows:

### PROCEDURAL HISTORY

Mark Christeson and Jesse Carter were charged in the Circuit Court of Maries County with three counts of first degree murder. Mr. Christeson and Mr. Carter were charged with the murders of Susan Brouk and her two children, Kyle Brouk and Adrian Brouk. Mr. Christeson pled not guilty as charged. Because of publicity associated with the trial, the case was tried in Vernon County on a change of venue.

In exchange for Jesse Carter's testimony against Mark at trial, the state agreed to waive the death penalty and file no further charges against him.

Petitioner testified at the guilt phase of trial.

Following conclusion of the guilt phase, the jury returned its verdict of guilty in the first degree as to the murders of Susan, Kyle, and Adrian Brouk. Following conclusion of the penalty phase evidence, the jury returned verdicts of death on all three counts. Thereafter, the trial court imposed sentence in accordance with the recommendation of the jury.

Petitioner appealed to the Missouri Supreme Court from the conviction and sentence imposed. The appeal was docketed under No. SC82082 and reported at *State v. Christeson*, 50 S.W.3d 251 (Mo. banc 2001), *cert. denied*, 122 S.Ct. 406 (2001).

Petitioner then pursued post-conviction relief pursuant to Missouri Rule 29.15. The trial court denied petitioner's motion and issues raised. The Supreme Court for the State of Missouri affirmed the trial court's denial of post-conviction relief, denying all issues raised by petitioner. Said appeal was docketed as Case No. SC85329 and reported at *Christeson v. State*, 131 S.W.3d 796 (Mo. banc 2004).

Mr. Christeson moved this Court for appointment of counsel pursuant to *McFarland v. Scott*, 512 U.S. 849 (1994). The Court subsequently granted the motion and appointed the undersigned counsel.

Petitioner was convicted and sentenced to death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution for each of the reasons set forth below.

## INTRODUCTORY FACTS

At trial, Kay Hayes and Joy Lemoine, Susan Brouk's sisters, testified that their last contact with Susan, Kyle, and Adrian, had been on January 30 and 31, 1998. They had expected the Brouk's to come to Kay's house for dinner on Sunday, February 1, 1998, but they did not arrive. Ms. Hayes did not become concerned until Tuesday evening when she attempted to contact Ms. Brouk at home, and there was no answer. Later, family members went to Ms. Brouk's home and discovered that the Brouk's Bronco was missing along with the television and VCR from inside the Brouk's house. That evening, officers from the Maries County Sheriff's Department responded to the family's inquiries, searching the Brouk's home and securing the premises. The Maries County Sheriff's Department conducted a preliminary search of the trailer and the immediate surroundings, which produced no clues to the Brouk's whereabouts

3

The next morning, officers of the Missouri Highway Patrol conducted a helicopter search surrounding the Brouk's residence and located a body floating in a pond near the Brouk's residence. Upon further investigation, the Missouri Highway Patrol located the bodies of Ms. Brouk, Kyle, and Adrian in the pond. A further search of the area around the pond revealed blood spatters, shoe impressions, and tire tracks.

On Saturday, January 31, 1998, petitioner and his cousin, Jesse Carter, were living in the home of a relative, David Bolin, in an area near Vichy, Missouri. On Sunday morning, February 1, 1998, after David Bolin left for work, Mark and Jesse decided to run away from home, and drove to the Brouk residence. Jesse testified at trial that on the morning of February 1, 1998, he and Mark went to the Brouk's trailer and that he tied up Adrian and Kyle while Mark took Susan into one of the bedrooms. After sexually assaulting Susan, Mark and Susan then returned to the living room where Jesse tied Susan's hands with a yellow rope. One of the children, Adrian, then recognized Jesse and called his name. Following Adrian's statement, Jesse and Mark took the Brouk's television, VCR, and other items and put them in Susan's Bronco. Jesse and Mark then put Susan, Adrian, and Kyle in the Bronco and drove to a pond near the Brouk's residence. Jesse testified that at the pond Mark cut Susan Brouk's

4

throat and that they then both drowned or suffocated both Adrian and Klye Brouk. Mark and Jesse then threw Susan Brouk into the pond where she drowned.

Mark Christeson also testified during the guilt phase of his trial. He testified that in February, 1998, when he was 18, he had been living at the home of a relative, David Bolin, for five years. On January 31, 1998, he and Jesse talked about running away to California, where they had relatives. The next day, Mark and Jesse went hunting in the woods. When they returned home a few hours later, Jesse again asked Mark if he still wanted to run away, and Jesse advised Mark that he had obtained a car for their trip to California. Jesse then drove the Brouk's Bronco to the Bolin home where Mark joined Jesse with his belongings, and the two of them left for California. As they were leaving, their aunt saw the two boys driving away, and called her husband to tell him that the boys had run away from home. Later that day, David Bolin called the Maries County Sheriff's Department and advised them that Mark and Jesse had run away from home.

As the police conducted their investigation in Missouri, Mark and Jesse were driving from Missouri to California. On the way, they sold several items of Ms. Brouk's property to pay for food and gas. One of the two also pawned a 16 gauge shotgun taken from David Bolin's home at a pawn shop in Amarillo, Texas. Mark and Jesse were arrested shortly after their arrival in California by a detective with the

Case 4:04-cv-08004-DW   Document 10   Filed 08/05/05   Page 5 of 52

Riverside County Sheriff's Department who recognized them from a flyer that had been circulated by law enforcement officials.

A medical examiner's autopsy report showed that Susan and Kyle Brouk had died from drowning. The report concluded that Adrian Brouk had died from suffocation. DNA testing performed by the Missouri State Highway Patrol established that genetic material recovered from Susan's body and from the sheets in one of the bedrooms matched Mark's genetic profile. Firearms identification testing established that the 16 gauge shotgun the boy's pawned in Texas was the one that fired a shell that was found on the bank of the pond in which the Brouk's were found.

The jury returned verdicts of guilty of first degree murder as to each of the three counts in which Mark was charged. Penalty phase testimony presented by the prosecution consisted of a witness who testified that he was sexually assaulted by Mark when the two of them shared a jail cell in February, 1999 and Ms. Brouk's younger sister, Joy Lemoin, who presented victim impact testimony. Defense counsel called Mark's mother, aunt, and a former girlfriend, all of whom testified about Mark's troubled and abusive upbringing. Defense counsel also called Dr. Wanda Draper, a psychologist who specialized in child development. Dr. Draper testified that Mark's mother, a manic depressive, was sick when Mark was born and provided no care for him during the early stages of his life. Throughout his life, Mark's mother

6

continued to reject him, due in part, because Mark's father was Ms. Christeson's brother-in-law. Mark was told by his mother when he was 7 years old that her husband was not his father. Dr. Draper also testified that during the course of his childhood, Mark was transferred from one relative to another as Mark's mother continued to reject him, and had on several occasions, physically and verbally abused him. On many occasions, Mark's mother would physically beat Mark until her husband, Bill Christeson, would intervene. During Mark's childhood, his father and only care giver, died. Afterwards, Mark's mother continued to reject him and ignored him throughout his life. Mark's aunt testified that following the death of Mark's father, Mark became withdrawn and showed no emotion, often times refusing to talk.

Mark's mother, Linda Christeson, testified that she was manic depressive and had been in a mental hospital at various times throughout her life. She acknowledged that she first told Mark that her husband wasn't really his father when Mark was 7 or 8 years old. She also acknowledged that after her husband, Bill, had died, she essentially stopped caring for Mark and his brother, Billy, and allowed them to do whatever they wanted. Mark eventually moved to the home of his relative, David Bolin, where he lived with Jesse Carter.

At the conclusion of the penalty phase, the jury found 4 aggravating circumstances in the murder of Ms. Brouk: that the murder was committed during the

7

unlawful homicide of her daughter, Adrian; that the murder was committed during the unlawful homicide of her son, Kyle; that the murder was committed during the perpetration of rape; and that the murder involved depravity of mind and was, therefore, outrageously and wantonly vile, horrible, and inhumane. The jury found 3 aggravating circumstances in the murders of Adrian and Kyle: that the murders were committed during the unlawful homicide of their mother; that the murders were committed during the unlawful homicide of each other; and that the murders involved depravity of mind and where, therefore, outrageously and wantonly vile, horrible, and inhumane. The jury returned verdicts of death on all three counts.

At the sentencing hearing, the trial court overruled the new trial motion filed by petitioner's counsel and then sentenced Mark to death in accordance with the jury's verdicts.

## I.

**Petitioner was denied his right to a fair and impartial jury under the Sixth, Eight, and Fourteenth Amendments to the United States Constitution when the trial court sustained the state's challenge for cause to a potential juror who had stated that his view on the death penalty would not substantially impair his ability to participate in the deliberative process in the penalty phase as required by Missouri law.**

During the jury selection process, many of the state's challenges for cause to prospective jurors were granted by the trial court. That was contrary to well

Case 4:04-cv-08004-DW   Document 10   Filed 08/05/05   Page 8 of 52

established law.  In *Wainwright v. Witt*, 469 U.S. 412 (1985), and *Adams v. Texas*, 448 U.S. 38 (1980), "a jury may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a jury in accordance with his oath."  In one of those cases where the state's challenges for cause were sustained by the trial court, the trial court acted in violation of petitioner's rights.

During voir dire, the following exchange took place between the prosecution and prospective juror Thompson:

> **Mr. Ahsens:** Mrs. (Sic) Thompson, same question, sir.  Having reached the final point of decision–and let me turn it around on you–could you vote for life in prison without parole?
> **Venireperson Thompson:**  Yes.
> **Mr. Ahsens:** Could you vote for the other alternative of the death penalty?
> **Venireperson Thompson:**  Yes.

**Mr. Ahsens:** Is there any hesitation, sir?  You seem to be thinking about that as you were getting ready to answer, and certainly giving something some thought is often a good idea.

> **Venireperson Thompson:** It would be hard.
> **Mr. Ahsens:** Okay.  Would it be fair to say you have some uncertainly about one or the other of those penalties?
> **Venireperson Thompson:** Uncertainty about death.

(T. 268-29).[1]

---

[1]"T." represents trial transcript; the number thereafter refers to the page of the transcript.

9

The prosecutor then renewed his questioning of prospective juror Thompson, asking him to assume that he was the foreperson of the jury and asking whether or not he could serve as the foreperson and announce the death verdict. Prospective juror Thompson acknowledged that he could not serve as a foreperson and announce the verdict. During the defense voir dire, the following exchange took place between defense counsel and prospective juror Thompson:

> **Ms. Leftwich:** One more, Mr. Thompson. I missed you for a minute. Okay, again, are you telling me–you talked to Mr. Ahsens previously about the death penalty. I think you finally indicated that you wouldn't be–you didn't think you [could] sign a verdict form imposing the death penalty; is that correct?
> **Venireperson Thompson:** Yes.
> **Ms. Leftwich:** Could you–Could you consider the death penalty after you had found someone guilty of one, two or three first degree murders?
> **Venireperson Thompson:** Yes.
> **Ms. Leftwich:** Okay you will be able to consider it?
> **Venireperson Thompson:** (Nods head).
> **Ms. Leftwich:** Is that yes?
> **Venireperson Thompson:** Yes.

(T. 318-19).

A careful review of the voir dire of prospective juror Thompson clearly shows that the trial court abused its discretion. Although Thompson initially expressed some reservation regarding the death penalty, he subsequently acknowledged that he could consider the death penalty in his deliberations. While Thompson expressed an unwillingness to act as foreman, that is not required of each juror who takes the oath.

10

The prosecutor's question of Mr. Thompson in which he asked him to assume that he was the foreperson, is not only not relevant as to whether or not an individual can sit as a juror, but was clearly designed to exclude an individual not predisposed to vote for death. The trial court's subsequent statements of its reasoning sustaining the prosecutor's motion to strike Mr. Thompson for cause completely misstates established law, and ignores the exchange between defense counsel and venireperson Thompson. The United States Supreme Court stated in *Lockhart v. McCree*, 476 U.S. 162, 176 (1986)(emphasis added):

> It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases **so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law**.

Clearly, venireperson Thompson clearly stated that he was willing to set aside his own beliefs in deference to the rule of law. In order to properly exclude a juror from sitting in a capital case, their views must prevent or substantially impair their ability to deliberate. The "prevent or substantially impair" language must be understood in the context of the Missouri capital punishment scheme. Under that scheme, no juror is ever required to impose death. *State v. Perry*, 790 S.W.2d 243, 246 (Mo. banc 1970). Thus, a prospective juror need not be able to conceive of

11

circumstances in which he or she would impose death, or agree to impose death, as long as she or he agrees to consider both possible punishments.

The exclusion of prospective jurors whose views on the death penalty will not prevent or substantially impair the performance of their duty as jurors violates a defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution because it denies such defendants a trial by an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 (1985).

Finally, it must be noted that error in improperly excluding a prospective juror because of his or her views on the death penalty is never harmless when death is imposed, and the erroneous exclusion of a single prospective juror requires reversal of the sentence. *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045 (1987); *Davis v. Georgia*, 429 U.S. 122 (1976). Petitioner's rights as guaranteed by the United States Constitution were violated by the trial court's error in excluding for cause juror Thompson.

## II.

**Although the Eighth Amendment does not require proportionality review of a death sentence, when the state provides such a review, the procedure must comply with the due process clause of the Fourteenth Amendment. The Missouri Supreme Court's**

12

**application of Missouri's statutorily mandated proportionality review violated petitioner's due process rights.**

Missouri has established a statutory requirement for proportionality review of a death sentence by the Missouri Supreme Court. Mo.Rev.Stat. 565.035.3 (1986). The court is required to conduct a comparative review and determine "whether the sentence of death is excessive or disproportionate to the penalty in similar cases, considering the crime, the strength of the evidence, and the defendant." When a state provides a right of review, the state must comply with the Due Process Clause of the Fourteenth Amendment. *Evitts v. Lucy*, 469 U.S. 387, 401 (1985). At a minimum, due process requires that one have meaningful notice of the procedures to be followed and a meaningful opportunity to be heard.

The Missouri Supreme Court's proportionality review of petitioner's sentence of death violated petitioner's due process rights because he did not have an adequate and meaningful notice of the procedures to be followed. First, the statute does not define similar cases and petitioner was given no notice beforehand as to what cases or types of cases the court may consider similar to his.

Second, petitioner was given no notice as to the standard to be applied by the court during the course of its proportionality review.

13

Third, while the statute seems to require the court to compare death penalty cases with all homicide cases, including those where the death penalty was sought and not obtained, as well as those where the death penalty was not sought at all, the Missouri Supreme Court simply compared petitioner's case to "similar cases in which the court previously affirmed sentences of death." In fact, in its opinion, the Missouri Supreme Court declined to compare the sentence given to Jesse Carter to that of petitioner. By doing so, the Missouri Supreme Court conducted a traditional review whether the crime justified the punishment as opposed to a comparative review.

It is important to note that there were two participants in this offense, and conflicting testimony as to the specific actions committed by Mark Christeson and Jesse Carter. Clearly, Jesse's inconsistent testimony throughout the guilt phase, and the reasonable questions surrounding his competency should have caused the Missouri Supreme Court to consider his sentence in reviewing that received by Mark Christeson.

It is clear that the imposition of the death sentence as to petitioner is disproportionate to that of his co-defendant. In addition to the clearly disproportionate nature of petitioner's sentence to that of his co-defendant, there are numerous reported Missouri cases of defendants who murdered individuals, but who received life sentences, such that the disproportionate nature of petitioner's sentence

14

is also established by case law.  The Missouri Supreme Court refused to consider any similar type cases in its determination of proportionality as mandated by Mo.Rev.Stat. § 565.035.3(3).

Given the heightened degree of scrutiny required in death penalty cases, the Missouri Supreme Court's proportionality review violated petitioner's due process rights. *Harris v. Blodgett*, 853 F.Supp. 1239 (D.Wash. 1994), *affirmed*, 64 F.3d 1432 (9th Cir. 1995).

### III.

**Admission of state's Exhibit 36, a graphic photograph of the bloody head of Susan Brouk, violated petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in that said photograph was needlessly inflammatory and deprived petitioner of a fair trial and due process of law.**

Admission of state's Exhibit 36, which depicted Susan Brouk's head with the scalp pulled back from her head, violated petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in that said photograph was needlessly inflammatory and deprived petitioner of a fair trial and due process of law.  Admission of state's Exhibit 36, an autopsy photograph of Susan Brouk's head with the scalp pulled back, violated petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments in that it was prejudicial and served only to inflame the passions of the jury.

15

Dr. Dix, the medical examiner, testified about the autopsies he performed on Susan, Adrian, and Kyle Brouk. The state then introduced Exhibit 36 and asked Dr. Dix what it showed. Dr. Dix testified that this was a photograph of the top of Susan's head after the scalp has been reflected or moved back and forward to show that there is some blunt impact or impact injuries to the top of her head. The photograph showed bleeding below the scalp on the top of her skull, and both on the top and on the right side of the skull. (T. 911). Dr. Dix went on to conclude that Susan Brouk had died from drowning and that the cuts she had received on her neck, while causing substantial bleeding, would not have caused death by itself. (T. 914-15). There was no testimony introduced at trial that Susan Brouk was struck in the head. In fact, Jesse Carter testified that Mark Christeson had struck Susan Brouk in the chest knocking her to the ground. The photograph, therefore, did not depict any injury alleged to have been caused by Mark or Jesse.

The photograph shown was a gruesome sight, made so solely by the medical examiner having surgically removed Susan Brouk's scalp. The only possible legitimate justification for an exhibit such as Exhibit 36 would be if it showed the condition of the body when found or showed the cause of death. Exhibit 36 showed neither. There was no question that Susan Brouk died from drowning, and not from

16

a head injury.  The prejudicial impact of this exhibit was overwhelming, and resulted in the denial of petitioner's constitutional rights.

## IV.

**The trial court's refusal to conduct individual voir dire after it learned that many people on the jury panel had read a recent news article containing prejudicial information about petitioner violated petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

On August 26, 1999, immediately before voir dire, the trial court discovered that the local paper, the *Nevada Daily Mail*, published an article the night before about Mark Christeson's case.  (T. 21).  The court noted that, because of the article, they would have to deal with publicity on voir dire.  (T. 21).  Defense counsel advised the court that the article referred to Mark being brought to the courthouse in shackles and leg irons, to Jesse Carter's statements, to the manners of death of the Brouks, and to hearsay statements that the court has previously excluded following a suppression hearing.  (T. 23-24).  Defense counsel had previously requested individual voir dire, and renewed their request for individual voir dire.  The court denied the request.

During their voir dire, despite defense counsel's reasonable requests for individual voir dire, the trial court insisted that voir dire proceed in groups of potential venire persons.  In the first panel, Gary Ashby, Shelby Brandt, John Campbell, Colleen Clark, and Harold Cole acknowledged having learned about the

17

case before them by reading the *Nevada Daily Mail* news article the night before. Notwithstanding a clear indication that many of the potential jurors had received information about the case from the newspaper and, in fact, some information that would not be presented to the jury because of the court's prior evidentiary ruling, the court refused individual voir dire.

It became clear as the voir dire progressed that many of the jurors had either read the news article or had heard about items contained in the news article by speaking with other members of the panel. The trial court further refused to allow questioning of the venirepersons as to what they had read. By refusing to allow individual voir dire, and by refusing to allow counsel to question the jurors as to what they had read, counsel was prevented by having any information as to whether or not the jurors would be prejudiced by the information. Further, by insisting that voir dire take place in groups and not individually, the court ensured that jurors who had not been exposed to the prejudicial article in the newspaper would receive that same prejudicial information.

Had there been individual voir dire, trial counsel would have been in a position to thoroughly question the individual jurors regarding pretrial publicity and whether or not any of them were effected by the publicity, or if the prejudicial and false

18

information contained in the article would taint their view in the decision making process.

## V.

**The state prosecutor's prejudicial and inflammatory statements made during voir dire denied petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

An accused is entitled to a fair trial and the state must not deprive him of it. *State v. Tiedt*, 206 S.W.2d 524 (Mo. banc 1947); *Berger v. United States*, 295 U.S. 78 (1935). Prosecutorial misconduct is unconstitutional when it so infects the trial with unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

During voir dire, the prosecutor questioned the jurors in a highly prejudicial and inflammatory manner. One of the most glaring and inflammatory statements made by the prosecutor was, over objections, that in the penalty phase "you're no longer interested in whether the defendant is guilty or not guilty; you have already made that decision." (T. 257, 457-58). This statement is prejudicial not only because it presumes petitioner was guilty, but also because it misstates the law. Courts have recognized the role of residual doubt in the penalty phase and the impact of that

19

residual doubt in deciding on a life or death sentence. *State v. Cheney*, 967 S.W.2d 47, 60 (Mo. banc 1998).

The prosecutor also misstated the law when he told jurors, "The defense will present to you evidence or argue factors that they feel make the death penalty inappropriate." (T. 69); "It is very likely in it's case that there will be evidence from both sites (sic) in the second part." (T. 68); "You then have to decide whether mitigating circumstances which are offered by the defense outweigh it." (T. 261); "You understand too that the defense does not have to prove those mitigating circumstances beyond a reasonable doubt or any other way." (T. 264); and "Any mitigating circumstances that are presented by the defense . . . they will present that evidence, you will decide whether you believe it or not." (T. 369). These statements resulted in a shifting of the burden of proof, and impermissibly and incorrectly told the jury that the defense had an obligation to present evidence in mitigation of the death penalty. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Frances v. Franklin*, 471 U.S. 307 (1985). The prosecutor also inserted his personal opinion when he advised the jury that the local prosecutor, Mr. Garrabrant, "Is a well-trained and experienced prosecutor. Murder is, however, unusual in Vienna, Missouri, so he has wisely asked for our help." (T. 41-42). This comment that Mark's case was an unusual case and that the prosecutor was wise in asking for the attorney general's assistance,

improperly suggested that the state had compared Mark's case to others and found it important or unusual. It further implied to the jury that the prosecutor had some sort of personal knowledge that caused him to conclude that Mark was deserving of the death penalty.

The prosecutor similarly violated Mark's constitutional rights when it told the jury that the governor had personally signed into law the statutory aggravating circumstances that would be submitted during the case. To somehow suggest that the governor had personally approved of the statutory aggravating circumstances is improper. These repeated inflammatory misstatements of the law by the prosecutor resulted in a denial of Mark's constitutional right to due process and a fair trial.

## VI.

**The trial court erred in admitting in the penalty phase extensive evidence of petitioner's alleged post-arrest sexual assault of another inmate in violation of petitioner's right to be free from cruel and unusual punishment and to due process of law in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.**

During the penalty phase of the trial, the prosecutor introduced evidence of petitioner's alleged sexual assault of a fellow inmate housed in the Vernon County Jail in early 1999. (T. 1547-48) This inmate, Mike Wagner, testified that Mark had assaulted him during the time they shared a cell and had threatened his father with

21

harm if Mike told anyone what happened. Mr. Wagner testified at trial that Mark had assaulted him on two occasions during the time he was in jail. On cross-examination, Mr. Wagner admitted that he did not immediately advise anyone in the jail of the assault and did not yell or ask to be transferred when the assault allegedly occurred. In the state's closing argument, it argued over objection, "There is a pattern here. Two incidents really. You have Mark Christeson leading a weak man, Jesse Carter, into murder. You have Mark Christeson since he's been in the jail coercing, threatening, and coercing a man . . . threatening and coercing Mike Wagner into sodomy. This man prays on the weak." (T. 1723).

These statements by the prosecutor, and the evidence presented by the prosecutor through Mike Wagner and others regarding the alleged assault were irrelevant, and highly prejudicial and in violation of petitioner's constitutional rights. This evidence was presented by the prosecutor solely to inflame the passions of the jury, and cause the jury to return a finding of death based not on facts and circumstances surrounding the deaths of Susan, Adrian, and Kyle Brouk, but rather on uncharged, unproven conduct alleged to have been committed by petitioner.

**VII.**

**Petitioner was denied his rights as guaranteed by the Eighth Amendment and the Due Process Clause of the Fourteenth**

22

**Amendment through the submission of penalty phase Instruction s 22, 25, and 28, which did not require the jury to unanimously find the existence of non-statutory aggravating circumstances beyond a reasonable doubt in considering those aggravators in imposing a sentence of death.**

During the penalty phase of petitioner's trial, the state offered and the court submitted, Instructions 22, 25, and 28. Instruction 22 reads as follows:

Instruction 22

As to Count I, if you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 21 exists, then you must decide whether there are facts and circumstances in aggravation of punishment which, taken as a whole, warrant the imposition of a sentence of death upon the defendant.

In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial, including evidence presented in support of the statutory aggravating circumstances submitted in Instruction 21. If each juror finds facts and circumstances in aggravation of punishment that are sufficient to warrant a sentence of death, then you may consider imposing a sentence of death upon the defendant.

If you do not unanimously find from the evidence that the facts and circumstances in aggravation of punishment warrant the imposition of death as defendant's punishment, you must return a verdict fixing his punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

(L.F. 533).[2]

---

[2]"L.F." refers to legal file of petitioner's direct appeal. Instruction 22 refers to Count 1. The same instruction appears for Counts 2 and 3 as Instructions 25

The majority of the evidence presented during the Court's penalty phase instruction concerned petitioner's alleged sexual assault of Mike Wagner while incarcerated at the Vernon County Jail. This instruction then authorized the jury to consider that evidence in its consideration of the death sentence. The instruction erroneously did not inform the jury that the state was required to prove the non-statutory aggravators beyond a reasonable doubt, that all 12 jurors had to agree on each non-statutory aggravator, and if they did not unanimously find beyond a reasonable doubt as to each aggravator, then they could not consider that circumstance in returning their verdict of death.

The Missouri Supreme Court in *State v. Storey*, 856 S.W.2d 657 (1992), noted the importance of having each juror instructed that the state must prove non-statutory aggravators unanimously beyond a reasonable doubt in order to cure the inherent unreliability of consideration of uncharged criminal activity. Instructions, 22, 25, and 28, as given, are directly contrary to the United States Supreme Court's holdings in *Zant v. Stephens*, 462 U.S. 862 (1983), and *Furman v. Georgia*, 408 U.S. 238 (1972). Because the instructions did not require unanimity in finding an aggravator, or require that the aggravators be found beyond a reasonable doubt, they did not provide for a

---

(L.F. 537) and 28 (L.F. 541). Only Instruction 22 is set forth so as not to unnecessarily burden the Court with duplicative language.

24

narrow focused review by the jury of the evidence received at trial. Absent an instruction that required the jury to find these aggravators beyond a reasonable doubt, it is possible that some jurors took the evidence presented at the penalty phase into account while applying a lesser standard of proof.

The evidence of the alleged sexual assault was much more than prejudicial. It is important to note that the state did not even file charges based upon the allegations, yet the jury was instructed to consider the evidence in deciding whether or not to sentence petitioner to death. This evidence was crucial to the prosecution argument that petitioner prayed upon others, not only in his argument that petitioner had coerced Jesse Carter into assisting him the murders of Susan, Kyle, and Adrian Brouk, but that petitioner had then preyed upon Mark Wagner while in jail.

Courts have long noted that evidence of an arrest or a prior bad act is inherently unreliable and long required instructions to be given to juries concerning the consideration of that evidence in arriving at its verdict at trial. Because Instructions 22, 25, and 28 did not guide the jury in assessing and considering the uncharged conduct, it is more than likely that the jury returned its verdict of death based not upon a finding of facts beyond a reasonable doubt. Petitioner's sentence of death was thereby imposed in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

# VIII.

**The Eighth and Fourteenth Amendments require that statutory aggravating circumstances that subject one to the death penalty must, 1) be sufficiently defined to distinguish between those who are and are not eligible for the death penalty; 2) narrow the class of persons subject to the death penalty; and 3) guard against the arbitrary and capricious imposition of death. Petitioner's Eighth and Fourteenth Amendment rights were violated because the statutory aggravators submitted in his case were overly broad, confusing, and duplicative.**

During the penalty phase of petitioner's trial, the state submitted Instructions 21, 24 and 27, the statutory aggravating circumstances. Instruction 24 provided, in part, that the jury was to:

INSTRUCTION NO. 24

In determining the punishment to be assessed under Count II against the defendant for the murder of Adrian Brouk, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exist:

1. Whether the murder of Adrian Brouk was committed while the defendant was engaged in while the defendant was engaged in the commission of another unlawful homicide of Susan Brouk.

2. Whether the murder of Adrian Brouk was committed while the defendant was engaged in the commission of another unlawful homicide of Kyle Brouk.

3. Whether the murder of Adrian Brouk involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant killed Adrian

26

Brouk as part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for all human life.

(LF535-36).[3]

The jury found, as to Count 1, as to two separate circumstances, that Mark had killed Susan Brouk while engage in the commission of the unlawful homicide of Adrian and Kyle Brouk. (LF557). As to Count 2, the jury found, as to two separate circumstances, that Mark had killed Adrian while engaged in the commission of the unlawful homicide of Susan and of Kyle. (LF558). As to Count 3, the jury found, as to two separate circumstances, that Mark had killed Kyle while engaged in the commission of the unlawful homicide of Susan and Adrian. (LF559). And, as to both Counts 2 and 3, the jury found that the murder involved depravity of mind because Mark had killed that person as part of the plan to kill more than one person. (LF558-59). In its weighing process, the jury thus considered as two and three different circumstances that Mark killed more than one person in each incident charged. Clearly, the weighing process was skewed towards death. The duplication of aggravators allowed the jury to count each count multiple times in arriving at its

_____

[3]The text of Instructions 21 and 27 are similar with respect to the challenged language, except that circumstances 1 and 2 of each of the instructions refer to the other two homicide victims. The depravity of mind circumstance in Instructions 24 and 27 is similar, but in Instruction 21, different facts are alleged as the basis for that circumstance. Only Instruction 24 is set forth to avoid unnecessary duplication.

sentence of death. Instruction No. 21 also allowed the jury to find depravity of mind as to Mark based upon the conduct of Jesse. Instruction No. 21 then relieved the state from its burden of proof as to the murder of Susan Brouk. *Sandstrom v. Minnesota*, 442 U.S. 510 (1979), *State v. O'Brien*, 857 S.W.2d 212 (Mo. banc 1993).

An individualized decision is essential in capital cases. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), *State v. Ferguson*, 887 S.W.2d 585 (Mo. banc 1994). Under this mandate, all of the above aggravators were improperly submitted. The aggravators allowed the jury to not only consider each murder but then to weigh each murder multiple times. Even though petitioner was charged separately in three counts, the statutory aggravators allowed the jurors to return a finding of death based not just upon the individualized conduct for each event, but to consider the same conduct multiple times as it weighed each statutory aggravator.

Section 565.032.2 RSMo provides that the jury shall consider whether certain statutory aggravating circumstances have been proved beyond a reasonable doubt. Among those circumstances are whether "(2) a murder in the first degree offense was committed while the offender was engaged in the commission or attempted commission of another unlawful homicide" and "(7) the murder in the first degree was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." Here, the state submitted the same conduct as two separate

28

circumstances on Count 1 and three separate circumstances on Counts 2 and 3. In effect, alleging the conduct charged in each count as separate aggravating circumstances, and through the instruction allowing the jury to consider the killing of three people in returning its verdict of death as to each individual.

Because Instructions 21, 24, and 27 were duplicative and allowed the finding of multiple aggravating circumstances, as well as to find the depravity of mind aggravator based upon the conduct of another, the jury's decision making process was skewed towards death. Although § 565.032.1(1) RSMo notes that it is only necessary for the jury to find one valid aggravating circumstance in order to find a defendant eligible for death, the jury then, under § 565.021.1(3) RSMo considers whether the evidence in mitigation outweighs the evidence in aggravation in returning its sentence of death. The Missouri statutory scheme requires then that the jury must find, to impose death, that the aggravating circumstances outweigh the mitigating circumstances. Because the above duplicative aggravators skewed the jury's decision making process towards death, petitioner's sentence of death violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## IX.

**Petitioner was denied his right to due process under the Fourteenth Amendment and his right to a fair and impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United**

**States Constitution because of improper arguments made by the prosecutor during guilt and penalty phase of petitioner's trial.**

In Missouri, the jury has the primary responsibility of assessing and declaring punishment in all criminal cases. Arguments that appeal to the jurors' personal fears, threats, and intimidation infringe up their responsibility and violate petitioner's rights to due process prior to the assessment of punishment. Throughout the guilt phase of petitioner's trial, the prosecutor argued his personal opinion and irrelevant and unproven facts to the jury. The prosecutor engaged in a far ranging inflammatory argument concerning the sexual assault of Susan Brouk:

> "Well, I think probably on the way over there, they thought about what they were going to have to do." (T. 1464). "On her daughter's bed? I find that incredible." (T. 1497). "Folks, I guess what kind of bothers me the most when you look at this, let's examine what happened to Susan Brouk and her children." (T. 1501). "Then again, you know, I guess what bothers me was Susan Brouk was violated sexually." (T. 1501). "She was violated sexually. I've heard some people call rape murder of the human spirit." (T. 1501-02).

These arguments were without basis in fact, and argued the prosecutor's personal beliefs and feelings. The arguments called on the jury to credit the prosecutor's position as a member of the Attorney General's staff, and give these arguments more weight than the evidence that was presented in the trial.

30

The prosecutor continued and argued clearly contrary to the law:

> In order to find the defendant not guilty, you must believe him. (T. 1503, 04).

This shifting of the defendant's burden is impermissible and denied Mr. Christeson his constitutional rights.

The prosecutor continued with his improper argument, bolstering witness testimony and calling into question the conduct of the defense:

> What is the suggestion here, that Jesse Carter did this by himself? I don't know . . . can you imagine that that person would even come up with that idea? (T. 1503-04). You know, there is an old saying in the law business that prosecutor's like to give you the big picture and defendants like to nitpick on details. I think that's what we are kind of seeing here. (T. 1495).

The prosecutor also argued improperly that the jury could consider evidence that the prosecutor said would be presented in the penalty phase during its deliberations in the guilt phase of petitioner's trial:

> One of the first things you consider is who has the most to lose? The defendant does. If he's convicted, we are going to go on with the trial and you already know I am going to ask you for the death penalty. He has a great deal to lose and every reason to lie. (T. 1468).

This argument clearly called into question petitioner's testimony on the stand explicitly stating that petitioner was lying, not because of any evidence presented in the case, but because the prosecutor would request the death sentence if petitioner

31

was found guilty during the guilt phase. This statement, of course, also implies that the prosecutor knows Mark is guilty and calls upon the jury to not consider the evidence in arriving at its verdict.

Finally, over repeated objection, the state compared the statements of petitioner's co-defendant, Jesse Carter, to the story of the crucifiction in the four gospels of the New Testament.

> You know, there is an old story I heard one time about the four gospels of the Bible. And all of the describe the crucifiction . . . of Chris. And in one of those, they tell you that there was a sign on the cross above Jesus' head that said, "Jesus Christ, King of the Jews." And there was another - in another one of the gospels that says the sign reads, "Jesus of the Jews." And in the third gospel, it said, "Chris of the Jews." And the fourth gospel doesn't mention the sign at all.

Courts have repeatedly condemned excessive references to the Bible. Here, the prosecutor was clearly calling on the jury to do God's will and convict petitioner. The prosecutor's directive to the jury to convict petitioner violated his rights to due process under the Fourteenth Amendment and the right to a fair and impartial jury under the Fifth, Sixth, and Eighth Amendment to the United States Constitution.

The prosecutor continued with his relentless improper comments during the penalty phase of petitioner's trial. In the penalty phase, prosecutors must refrain from striking foul blows and must do nothing to make a sentencing decision a product of passion or prejudice. *Eddings v. Oklahoma*, 455 U.S. 104, 108 (1982), O'Connor, J.

Case 4:04-cv-08004-DW   Document 10   Filed 08/05/05   Page 32 of 52

concurring. Greater scrutiny is required in penalty phase because of the qualitative differences between death and all other punishments. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). The prosecutor's penalty phase argument was replete with foul blows, and denied petitioner his constitutional rights.

At every possible opportunity, the prosecutor injected emotion and improper argument into his penalty phase argument. The prosecutor stated, over objection,

> It is harder - hard as it may be for you, imagine how hard it might be for Judge Darnold if he has to make it alone. (T. 1714).

This argument explicitly stated that petitioner was worthy of death, and that if the jury returned unable to decide on death, that then the death sentence would fall to Judge Darnold. This argument is clearly improper and diminishes the jury's decision making process. It is just as likely that had the jury not been able to reach a decision regarding death, that Judge Darnold would have sentenced petitioner to life in prison.

The prosecutor continued to inject his personal opinion into the penalty phase argument:

> Again, I tell you, this is the worse case in our society - the crime in our society - murder in the first degree. (T. 1715).

Courts have routinely noted that prosecutors may not call a case "the worst" since it improperly suggests that an officer of the court and an elected official of the state has determined, from its comparison of this case to others not before the jury, that this

Case 4:04-cv-08004-DW   Document 10   Filed 08/05/05   Page 33 of 52

case is the worst. This argument tells the jury that the prosecutor has somehow engaged in some sort of analytical review of all of the cases in the State of Missouri, and concluded that petitioner's case was the worst case. This argument diminishes the jury's responsibility, and relies upon a juror's perception that the prosecutor somehow has knowledge of a case not possessed by the jury. The argument called upon the jury to disregard its reasoned decision making process in arriving at a sentence of death.

The prosecutor also argued facts not presented to the jury, stating:

I suggest to you that Jesse Carter would have done whatever Mark Christeson would have told him to do. He was 17 years old. His mental abilities, I think, were obvious. (T. 1721).

A lot of people have come up rough. John Paul Jones, remember during the Revolutionary War, was an orphan. Yet, he was a famous military leader in the United States Navy. Abraham Lincoln lived in a one room cabin, and he was president of the United States.

The prosecutor also repeatedly misstated applicable law, telling the jury, over objection:

I submit to you that your duty is to come back with that verdict (death) on all three counts. (T. 1713). And coming up rough, even with a bad family situation, is not an excuse for murder . . . it does not excuse murder. It does not temper murder or reduce its severity. (T. 1722). I am sorry folks. What you have heard about Mark Christeson isn't good enough. (T. 1725).

34

The prosecutor was well aware that mitigating evidence presented by petitioner at the penalty phase was, in fact, "an excuse for murder." Courts have routinely recognized that mitigating evidence presented during a capital case penalty phase was sufficient evidence to overcome a sentence of death. The prosecutor clearly acted to diminish the mitigation process and assure the jury that mitigating evidence should not be even considered by them in arriving at their sentence of death.

Finally, the prosecutor injected his personal opinions as to the crime:

> You know, another thing is - that I submit to you is tragic in this process is that the family farm you see along Highway 63 in this photograph no longer belongs to the Brouk family. The only little part of it is that section of trees where you see the arrow pointed to where Susan Brouk lived . . . you know, that is the only part of this family's history that is left of it. And it is marred by murder . . . the impact on this family is - what little of the land they grew up on, their heritage is marred. (T. 1711-12).

Victim impact evidence is introduced to reflect the victims' losses, not what th prosecutor believes the losses to be. These personal opinions of the prosecutor are irrelevant and improper.

These improper arguments of the prosecutor throughout the guilt and penalty phase of petitioner's trial so infected the trial so as to call into question the jury's verdict. As a result of the prosecutor's improper statements, petitioner was denied his constitutional rights to due process and a fair trial.

35

**Trial counsel was ineffective for failing to call Kyle, Amber, and Amanda Burgess, and Christopher Pullen as witnesses to testify about Jesse Carter's violent behavior, reputation for selling drugs and reputation for stealing which would have impeached his credibility, thereby violating petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

During the trial, Jesse portrayed petitioner as primarily responsible for the crimes. The prosecutor also argued Jesse was mentally challenged and was only involved in the crimes because Mark led him to commit the acts. (T. 1721). According to the prosecutor, Jesse would have "never" committed these acts "on his own" (T. 1721).

Jesse testified at trial that it was Mark's idea to have sex with the victim, Susan Brouk (T. 964-65, 969). Jesse testified that Mark told him to tie Ms. Brouk's hands while Mark sexually assaulted her.

Jesse further testified that it was Mark's idea to kill Ms. Brouk and her children (T. 981). He testified Mark kicked Ms. Brouk in the stomach, and when she fell to the ground, Mark cut her throat (T. 987-88).

In regard to Kyle Brouk's death, Jesse testified Mark was completely responsible. He testified Mark cut Kyle's throat, then held his head underneath the

water for five to six minutes (T. 991). Jesse testified his involvement was limited to pushing Kyle's body into the pond after he was killed (T. 990-91).

Similarly, he testified his involvement in Adrian Brouk's death was limited to holding her feet while Mark held her neck under water until she drowned (T. 992-93).

Throughout the trial, the prosecutor relied on Jesse's version of the crime and stressed to the jury Jesse was psychologically limited and committed crimes with Mark only because he was led to do so. According to the prosecutor, Jesse was not capable of acting on his own and it was Mark's influence that led to murders (T. 1723-24).

During the state post-conviction hearings, Amanda Burgess, who in the past dated Jesse, placed into question Jesse's ability to tell the truth. While they were dating, Jesse was often violent and hit her hard enough to cause bruises (Ex. 18 at 9-10).[4] Ms. Burgess testified Jesse made unwanted sexual advances against her and even threatened her with a knife when she refused. At the hearing, she described an incident where Jesse tied her hands together, then pulled down her pants, but stopped due to her sister entering the room (Ex. 18 at 13-14). She further testified that after

---

[4]"Ex." refers to exhibits introduced into evidence during post-conviction relief hearing.

Jesse was incarcerated he wrote a letter to her threatening to kill her if she became romantically involved with anyone else (Ex. 18 at 15).

At the hearing, Kyle Burgess testified that he and Jesse lived in the same neighborhood and that he had a reputation for stealing, selling drugs, and fighting (Ex. 19 at 9, 13-14). Jesse often threatened to attack Kyle, and on one occasion, attacked Kyle with a knife (Ex. 19 at 11-12).

Christopher Pullen testified at the hearing that Jesse tried to sell drugs to him. He further testified that Jesse had a reputation for fighting and often threatened people (Sept. R. T. 34).[5]

It is clear that if the above evidence was presented at trial, it would have severely discredited Jesse's testimony and the prosecutor's theory that Jesse was less culpable than Mark, and merely a follower. There was no reasonable strategy for trial counsel's failure to present this evidence, and the failure to do so falls below an objective standard of reasonableness as required under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## XI.

**Trial counsel was ineffective for failing to elicit pertinent information from Dr. Patricia Carter that would have cast doubt as to Jesse Carter's credibility at trial, thereby violating petitioner's**

---

[5]"R.L.F." refers to post-conviction relief legal file

38

**rights under the Sixth , Eighth, and Fourteenth Amendments to the United States Constitution.**

During the guilt phase, Dr. Patricia Carter, a psychologist, was called as a witness by defense counsel prior to trial. Prior to trial, she conducted a competency to testify evaluation of Jesse Carter and, therefore, had useful information regarding Jesse's mental status. During the evaluation, Jesse told Dr. Carter, "that his spirit could leave his body and that he uses this power to check on his family while he is in jail" (L.F. 456). Although this highly unusual information and pertinent information appeared in Dr. Carter's report, there was no mention of it.

During trial, the thrust of defense counsel's examination of Dr. Carter focused on Jesse's lack of involvement with the crime. There was no trial strategy for failing to question Dr. Carter regarding Jesse's severe mental instability. A reasonably competent attorney would have used this information to impeach the lead witness for the prosecutor.

When trial counsel was questioned during the state post-conviction regarding his failure to question along these lines, he gave no explanation for the failure. As a result, trial counsels was ineffective and violated Mark's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Case 4:04-cv-08004-DW   Document 10   Filed 08/05/05   Page 39 of 52

## XII.

**Trial counsel was ineffective for failing to present testimony of individuals during the penalty phase of trial who would have testified that petitioner was hard working, trustful, not aggressive and worked well with others, and evidence of petitioner's sexual and verbal abuse, thereby violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

There were numerous relatives who testified during the state post-conviction hearing who would have testified during the penalty phase of trial regarding Mark's positive attributes if requested to do so. David Bolin, Mark's uncle, would have testified that Mark was like a brother to his three daughters. (Ex. 10 at 9, 21). He never saw Mark became violent and he trusted him. (Ex. 10 at 13, 29). He testified that Mark helped care for David Bolin's father when he became wheelchair bound. (Ex. 10 at 19-20). Laura Bolin, one of David Bolin's daughter would have testified that she often tried to get Mark in trouble when he first moved in with her family, however, he never became angry or upset with her. (Ex. 13 at 7, 8). She and her two sisters eventually developed a close relationship with Mark. (Ex. 13 at 9-10).

Joseph Bolin, a cousin to Mark, would have testified that Mark worked for him in his pallet hauling and repair business. (Ex. 11 at 6-9). He testified Mark was an excellent employee and worked long hours. (Ex. 11 at 11, 18-19). There was often

40

large amounts of cash at the business and Mark never took any of the money. (Ex. 11 at 15-17). He testified Mark was never violent or aggressive. (Ex. 11 at 19).

Kevin Bolin and Carmen Bolin would have testified they often helped Mark with his homework and never saw him lose his temper. (Ex. 8 at 7-10, Ex. 12 at 9).

Debbie Bullock attended school with Mark. (Ex. 16 at 6-7). She testified that he was never violent, was truthful and always respectful. (Ex. 16 at 7). Similarly, Chester Brockover, another friend from school, testified Mark never lost his temper, and was not violent or aggressive. (Ex. 7 at 9).

Melissa Kenny, a past teacher for Mark, testified he worked diligently on his assignments and was not disruptive in class. (Ex. 26 at 7-10).

David Bolin's sister, Kathleen Craig, would have testified that Mark was sexually abused at a very young age. She testified that she remembered walking into a room when Mark was a baby and she saw his mother's mouth on his penis. (Ex. 6 at 10-11). She distinctly remembered this occurrence because it was "pretty disgusting." (Ex. 6 at 11). In addition to the sexual abuse, there was verbal abuse by his mother. She remembered his mother calling him names such as "little bastard" and "little SOB." (Ex. 6 at 11). She further testified she never saw Mark lose his temper or become violent. (Ex. 6 at 16-18).

41

If trial counsel were diligent, they would have presented the above evidence, which would have allowed the jury to consider Mark's non-violent and non-aggressive character for mitigation purposes during the penalty phase. However, defense counsel's strategy was to focus solely on the dysfunctional circumstances in which Mark was raised and the impact of Mark's father's death on him. (H.T. 274-75).[6] Trial counsel testified that she never considered having Mark's family testify about his positive attitudes as mitigating evidence. (H.T. 274-75).

Although trial counsel presented some mitigating evidence, clearly there was substantial evidence available that was not presented. As such, trial counsel was ineffective and violated Mark's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to United States Constitution.

## XIII.

**Trial counsel was ineffective for failing to present all available mitigating evidence during the testimony of Dr. Draper, a child psychologist, thereby violating petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

During the penalty phase of trial, Dr. Draper, a child developmental psychologist, testified regarding Mark's difficult family history and specific traumatic

---

[6]"H.T." refers to transcript of proceedings during post-conviction relief hearing.

instances that would mitigate punishment. However, trial counsel failed to completely and fully present evidence of the true gravity of Mark's childhood.

In particular, trial counsel failed to present evidence regarding Mark's father's schizophrenia, his mother's mental disabilities, his severe learning disabilities, and the sexual abuse he suffered.

A large portion of mitigating evidence was available through the description of Mark's father's mental disabilities. This evidence was extremely important in that it demonstrated a biological link between Mark's own mental disabilities and his natural father. John Christeson had numerous hospitalizations at state mental facilities and, in particular, served five years at Fulton State Hospital. This occurred in 1957 when John Christeson was charged with stealing and found not guilty by reason of insanity due to schizophrenia. (Ex. 42 at 122; Ex. 43 at 2,8, 17). In 1987, John Christeson was charged with burglary and stealing and was found not competent to proceed to trial. (Ex. 43 at 8, 15-16). Evidence was also available that showed his father was mildly retarded, was treated with anti-psychotic drugs for hallucinations, and was totally disabled. (Ex. 42 at 109, 123, 129, 134, Ex. 43 at 5, 18).

Similar evidence was available that would have demonstrated Mark's mother had disabilities. She was learning disabled, and a guardianship or conservatorship

would have been appropriate because of her inability to function for herself or her children. (Ex. 37 at 6, 10, 26).

Trial counsel also failed to present evidence relevant to Mark's own learning disabilities for mitigation purposes. Mark's standardized testing in grades seven through ten consistently placed him in the lowest percentile rank in the country. In eighth grade, his reading score percentile rank was in the bottom 2%, and his math was in the bottom 3%. (Ex. 35 at 5). Certainly, these facts would have been relevant for mitigation purposes.

In addition to above evidence regarding learning disabilities, there was also evidence of physical and sexual abuse that was not presented at trial.

Dr. Draper testified during the state post-conviction hearing that when Mark was sixteen months old, he was treated for second degree burns on his face and shoulders. The treating physician suspected child abuse. (H.T. 63). There was also evidence of sexual abuse that was not presented to the jury. This involved Mark's mother grabbing his testicles to wake him up. (H.T. 71-72). There was also evidence of Mark's mother's male companions forcing Mark on numerous occasions to perform oral sex with them. During one of these instances, Mark tried to flee and in the course broke him arm. (H.T. 72-73). Clearly, these instances greatly, impacted Mark's childhood and should have been presented to the jury.

44

There was also available evidence that would have demonstrated Mark's poor and unhealthy living conditions. Mark lived in Bolin Hill, which consisted of about eleven trailer homes in poor condition with approximately thirty-five people living there. Some people actually lived in a bus. The area was in very poor condition and was described as a "big junkyard where people lived in and amongst the junk and the chicken yards and the animal pens." (H.T. 87). Once again, this information would have been relevant for mitigation purposes.

Although trial counsel did present some mitigating evidence, it failed to present the most significant evidence of Mark's traumatic childhood. Therefore, trial counsel was ineffective and violated Mark's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## XIV.

**Trial counsel was ineffective for failing to properly object during the penalty phase regarding the prosecutor's argument that petitioner did not accept responsibility for the crime and the prosecutor's references to the Bible during the guilt phase of trial, thereby violating petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Although Mark testified during the guilt phase of trial, he chose not to testify during the penalty phase. (T. 1399-1424). During the penalty phase argument, the prosecutor improperly commented on Mark's right to remain silent. The prosecutor

45

argued as follows: "This man maintains the lie that he told you from the witness stand. To this moment, he does not acknowledge responsibility for these acts. He maintains that lie. I think you ought to consider that." (T. 1722).

This argument was clearly intended for the jury to draw an adverse inference to Mark's right not testify. This error was compounded by the failure of trial counsel to offer an instruction preventing the jury to draw an adverse inference to his right to remain silent.

In addition to the above improper argument, the prosecutor injected religion into his guilt phase rebuttal argument. The prosecutor used religious parallels to explain the discrepancies in Jesse Carter's testimony. He compared statements made by Jesse to the story of the crucifixion in the four gospels of the New Testament. (T. 1497-99). He then argued that although Jesse's testimony varied, the deaths still occurred and, therefore, should be believed. Although trial counsel objected to some of the arguments, counsel failed to fully preserve his objections.

By failing to properly object to the above arguments, counsel was ineffective and violated Mark's right under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

**Trial counsel was ineffective for failing to remove juror Conner from the jury panel due to his firm belief that the sentence of death was justified in this case, thereby violating petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

It is well established that a prospective juror in a death penalty case must be able to consider imposing a sentence other than death. In the present case, trial counsel allowed juror Conner to serve as a juror even though he was committed to a sentence of death. This was clear error and trial counsel were ineffective by allowing this to occur.

During voir dire, venireperson Cole stated he believed in the philosophy of "an eye for an eye." (T. 99, 101). He believed the death penalty was the appropriate punishment for murder (T. 101), and that defense counsel would "have to come up with something pretty good" to impose a sentence other than death. (T. 104).

During the questioning of Cole, juror Conner nodded his head to signal he agreed with Cole's statements. (T. 104). When trial counsel specifically asked juror Conner whether he agreed with Cole's statements, he responded, "yeah…the part here where he was talking about being responsible for your own actions. (T. 106). He further stated: "Because if they did it, I'm just saying whatever. If they did it once, they can do it again, and so, I mean, it doesn't matter if they are sick or not, because

47

to me they're not going to get better." (T. 105). Clearly, these statements demonstrated juror Conner's agreement with Mr. Cole's statements and his pre-disposition to impose the death sentence.

During the state post-conviction hearing, trial counsel had no explanation for failing to remove juror Conner from the panel. (H.T. 244). A reasonably competent attorney would not have allowed juror Conner to participate in deciding Mark's fate and, therefore, trial counsel was ineffective and violated Mark's rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## XVI.

**Trial counsel was ineffective for failing to submit a 1) "no adverse-inference" instruction; 2) failing to request a "death is never required" instruction after each verdict director; 3) failing to object to the disjunctive verdict directors; and 4) failing to object to the aggravator instruction that allowed punishment based on the conduct of Jesse Carter, thereby violating petitioner's rights under the Sixth, Eighth, And Fourteenth Amendments to the United States Constitution.**

Mark Christeson testified in the guilt phase of trial, but did not testify during the penalty phase (T. 1399-1424, 1596-1682). Although Mark chose to remain silent, trial counsel failed to request a "no adverse-inference" instruction, which is commonly used when a defendant does not testify.

48

The Fifth Amendment requires a judge to give a "no adverse-inference instruction when requested by a defendant to do so." *Carter vs. Kentucky,* 450 U.S. 288, 300 (1981). In this case, it was reasonable for the jury to expect Mark to testify, especially since he had already testified during the guilt phase. There was simply no logical reason for not requesting this instruction. Trial counsel admitted she did not even consider requesting the instruction. (H.T. 350-51). This failure was clearly prejudicial and counsel was ineffective by failing to properly instruct the jury.

Trial counsel also failed to properly follow the standard Missouri jury instructions when there is more than one count of first-degree murder. Instruction MAI-CR3d 313.46A informs a jury that it is never required to impose the death sentence. The Notes On Use in the Missouri Approved Instructions direct the above instruction to be repeated after each murder count. However, in the present case, this scheme was not followed in that the instruction was only given once.

Trial counsel was not aware the instruction was required to be repeated after each count. (H.T. 347-48). The omission of the instruction was prejudicial to Mark in that the jury did not have a clear understanding it could impose a sentence other then death. As a result, trial counsel was ineffective for failing to properly instruct, thereby violating Mark's constitutional rights.

Another instructional error occurred when trial counsel allowed they jury to convict Mark of first-degree murder if either Mark of Jesse Carter had acted with deliberation. (Instruction Nos. 6, 9, 12 and their related converses, Instruction Nos. 7, 10 and 13, L.F. 507-08, 512-518). These instructions did not require the jury to deliberate solely on petitioner's deliberation.

In *State v. Ferguson,* 877 S.W. 2d 585 (Mo. banc 1994), the Missouri Supreme Court reversed a conviction of first-degree murder because the verdict director allowed the jury to consider the deliberation of the defendant <u>or</u> co-defendant. The failure of trial counsel to object to this instruction fell below the customary skill and diligence a reasonably competent attorney would have exercised.

Trial counsel was also ineffective when it failed to object to Instruction No. 21. This instruction allowed the jury to find the depravity of mind aggravator as to Susan Brouk's death based on the deliberation of Mark or Jesse. The instruction guided the jury to find depravity, ". . . if you find that defendant and the other person killed Susan Brouk after she was bound or otherwise rendered helpless by the defendant or the other person." (L.F. 531). Clearly, this instruction erroneously allowed the jury to impose the death sentence based on Jesse's acts and not solely on Mark's. *See State v. Isa*, 850 S.W.2d 876, 901-03 (Mo. banc 1993) (where death sentence was reversed because the instruction allowed the jury to consider her co-defendant

50

husband's conduct when assessing her punishment). Trial counsel could not explain the failure to object to this instruction. (H.T. 356-58). A reasonably competent attorney would have objected to the use of this instruction and the failure to do so violated Mark's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

WHEREFORE, petitioner prays that the Court grant him relief to which he may be entitled in this proceeding.


/s/ Philip M. Horwitz
Philip M. Horwitz, #22662
8000 Bonhomme, Suite 213
St. Louis, Missouri 63105
(314) 727-2337
(314) 727-1636 - Facsimile
E-mail: PMHLTH1@aol.com

/s/ Eric W. Butts
Eric W. Butts, #2761
720 Olive Street, Suite1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: ewbtts@sbcglobal.net

Attorneys for Petitioner


I, Mark Christeson, declare under the penalty of perjury, that the foregoing is true and correct.


_____
Mark Christeson


51

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2005, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Mr. Stephen D. Hawke, Assistant Attorney General, P.O. Box 899, Jefferson City, Missouri 65102.

/s/ Eric W. Butts
_____

Eric W. Butts, #2761
Attorney for Petitioner Mark Christeson
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: ewbtts@sbcglobal.net

52