IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

_____
                                    )
MARK CHRISTESON                     )
                                    )
                                    ) CASE NO. 04-8004-CV-W-DW
VS.                                 ) KANSAS CITY, MISSOURI
                                    )
DON ROPER                           )
_____ )


EVIDENTIARY HEARING ON ABANDONMENT
BEFORE THE HONORABLE DEAN WHIPPLE
JANUARY 20, 2017


APPEARANCES:

For the Petitioner:          MR. JOSEPH J. PERKOVICH
                             P.O. BOX 63928
                             New York, NY  10008
                             (Appearing by telephone)

For the Petitioner:          MS. JENNIFER MERRIGAN
                             P.O. Box 63928
                             Philadelphia, PA  19147
                             (Appearing by telephone)

For the Respondent:          MR. MICHAEL J. SPILLANE
                             Missouri Attorney General's Office
                             P.O. Box 899
                             Jefferson City, MO  65102

Also present:  Codi Potts, paralegal


Transcribed by:              BARBARA BARNARD, RPR, CRR
                             Official Court Reporter
                             400 East 9th Street, Room 8420
                             Kansas City, Missouri  64106
                             (816)512-5622


Proceedings recorded by mechanical stenography; transcript
produced by computer.

1      *(Petitioner not present.)*

2           THE COURT:  Good morning.  Please be seated.

3      We'll call Case No. 04-CV-8004, Mark A. Christeson,

4      petitioner, versus Donald Roper, Superintendent of Potosi

5      Correctional Institution.

6           Are petitioners ready to proceed?  Do I have attorneys for

7      the petitioners, Ms. Merrigan and Mr. Perkovich, on the phone?

8           MR. PERKOVICH:  Yes, Your Honor, we are.

9           THE COURT:  Are you ready to proceed?

10          MR. PERKOVICH:  We are.  I must apologize.  We're having

11     a slight difficulty, at least I am, hearing very clearly, so I

12     will just apologize in advance if we ask for things to be

13     repeated.  We'll certainly listen as intently as possible.

14          THE COURT:  I wonder if they're picking up on my mic or

15     on that phone.  Do we know?

16          MS. MERRIGAN:  There's a bit of an echo, Your Honor.

17          THE COURT:  It must be just through the phone.

18          COURT REPORTER:  It is, just through the phone.

19          THE COURT:  All right.  So you're just hearing me

20     through the phone.

21          COURT REPORTER:  Maybe that will help.

22          THE COURT:  Is that helping, or did we cut them off?

23     No, that's worse.

24          *(Phone connection cut off.)*

25          MR. PERKOVICH:  Hello.  We're back.

1          THE COURT:  All right.  We're back.  Tell me who's on

2     the other end of this phone.

3          MR. PERKOVICH:  Your Honor, this is Joseph Perkovich.

4          MS. MERRIGAN:  And this is Jennifer Merrigan.

5          THE COURT:  Good morning.

6          MR. PERKOVICH:  Good morning.

7          MS. MERRIGAN:  Good morning.

8          THE COURT:  Ma'am, sir, are you ready to proceed?

9          MR. PERKOVICH:  Well, yes, Your Honor, we are.  And I

10    trust that the state has called witnesses that the state would

11    like to examine.

12         THE COURT:  That's correct.  And you filed a motion for

13    exclusion of witnesses.  Is that correct?

14         MS. MERRIGAN:  Yes, Your Honor, we did.

15         THE COURT:  Does the state have any objection to

16    invoking the rule?

17         MR. SPILLANE:  Your Honor, there's no objection to

18    invoking the rule.

19         THE COURT:  Can you hear that?

20         MR. PERKOVICH:  Yes, Your Honor.  Thank you.

21         MS. MERRIGAN:  Yes, Your Honor.

22         THE COURT:  All right.  Rule for exclusion of witnesses

23    will be invoked.  Any witnesses the government intends to

24    call -- except your first witness.  Who's going to be your first

25    witness?

1          MR. SPILLANE:  My first witness will be Mr. Horwitz,

2     Your Honor.

3          THE COURT:  Okay.  How many do you have, just two?

4          MR. SPILLANE:  Just two, Your Honor.

5          THE COURT:  All right.  Now --

6          MR. SPILLANE:  I was going to say, if the Court likes,

7     Your Honor, I can approach so I'm closer to the phone if they

8     have difficulty hearing.

9          THE COURT:  You may need to do that.

10     Now, wait a minute, Mr. Horwitz.  Just stand right there.

11     We're still making a record here.

12     Now, I'm -- Ms. Merrigan or Mr. Perkovich, are you intending

13     to call any witnesses?

14          MR. PERKOVICH:  Your Honor, we're not able to call

15     witnesses today due to the time span involved from the ordering

16     of this hearing.  We will address the witnesses that the remand

17     considers to be of most importance -- of course, the state has

18     considered as well -- with regard to the questions concerning

19     the conduct of Mr. Christeson's attorneys at and around the time

20     of the petitions that line in this case.

21     We have, as the Court is aware and the state is aware,

22     sought discovery in connection with the conduct of the two

23     appointed attorneys at the time.  Without such discovery, our

24     capacity to call other witnesses who would have firsthand

25     knowledge with regard to the questions at hand relating to their

1    conduct is profoundly limited, so we will proceed with that

2    record and address the called witnesses today.

3         THE COURT:  All right.  Now, the only other question, do

4    you have Professor Fox in the room with you?

5         MR. PERKOVICH:  We do not have Professor Fox, Your

6    Honor.

7         THE COURT:  Okay.  I know he's not a witness today.  But

8    if this continues on, I anticipate he'll be a witness.

9         MR. PERKOVICH:  That's correct, Your Honor.  We very

10   much would like to call him as a witness, as we put forward in

11   the motion filed yesterday, doc 161.  To reschedule his

12   commitments precluded him from participating on this notice.

13   Again, we would very much like to call him as a witness should

14   this continue.

15        THE COURT:  Thank you.  All right.  I've granted your

16   motion for exclusion of witnesses.

17     Now we have this petitioner's motion to limit scope of prior

18   counsel's testimony.  What's the government's position on that?

19        MR. SPILLANE:  Your Honor, I don't intend to ask them

20   anything that I believe will go beyond the scope of the remand,

21   but I would certainly invite the Court to stop me if it feels

22   that I do.

23        THE COURT:  All right.  Are you satisfied with that?

24        MR. PERKOVICH:  Your Honor, that is a reasonable

25   stipulation.  Of course, you know, our concern is the

1   difficulties in attorneys maintaining their fiduciary duty and

2   their enduring confidentiality obligations in connection with

3   testimony relating to an adverse position to their former

4   clients is a very fraught one.  That's been reflected in the

5   litigation to date.  That's why we sought briefing on this

6   issue.

7        However, we appreciate the state's stipulation to that.  Of

8   course, if issues arise beyond this relatively targeted scope

9   that we are contemplating today, we will certainly brief those

10  concerns along the way.

11       THE COURT:  Thank you.  All right.  Well, here's what

12  I'm contemplating.  I've read your briefs and your motion for

13  limited scope, but the basic rule is when you attack prior

14  attorneys, you waive that confidentiality.  Why do you think

15  that hasn't been waived?

16       MR. PERKOVICH:  Well, Your Honor, at most, it's a

17  limited waiver.

18       THE COURT:  Well, that's your idea.  Now, don't start

19  that silliness.

20       MR. PERKOVICH:  Well, Your Honor --

21       THE COURT:  You don't cite me any case law in the 8th

22  Circuit that says that.

23       MR. PERKOVICH:  Well, Your Honor, we would submit

24  briefing, if afforded the opportunity, with regard to the

25  limited scope of the waiver, but we believe that that is the

1    legal position.  Of course, the judge may disagree with that.

2            THE COURT:  Thank you.  All right.  Thank you.

3        Now, are you ready to proceed?  Anything else we need to do

4    before we hear from prior --

5            MR. SPILLANE:  Your Honor, I would like to stipulate to

6    the admission of their exhibits and have them stipulate to the

7    admission of mine.  That will save some time if the other side

8    agrees.

9            THE COURT:  Could you hear that?

10            MR. PERKOVICH:  Yes, Your Honor, and we do mutually

11    stipulate as we move forward.  We appreciate that from the

12    state.

13            THE COURT:  All right.  Stipulation for admission of

14    exhibits by both sides will be approved by the Court.  And do

15    you -- I'm assuming each side knows what that is.  I don't know

16    what --

17            MR. SPILLANE:  May I approach, Your Honor?

18            MR. PERKOVICH:  That's a good point, Your Honor.  And so

19    along the way, of course, if an issue arises outside of what was

20    listed and what we are disclosing to the state, then I submit

21    that we address that as the proceedings go forward.

22            THE COURT:  All right.  Okay.

23            MR. PERKOVICH:  Your Honor, I have two points I'd like

24    to raise before we start.  One is we just want to be certain

25    that we take the steps to expedite the transcript, its

1   completion of provision, so we want the record to note that.

2   And, of course, as a practical matter, expect to address that

3   with the reporter and/or personnel of the Court upon conclusion.

4           THE COURT:  I understand.  All right.  We can discuss

5   that with the court reporter.

6           MR. PERKOVICH:  Thank you, Your Honor.

7           Also I do need to note before we proceed that as the Court's

8   aware, the 8th Circuit has remanded the matter for these

9   proceedings for this evidentiary hearing concerning the issues

10  that have been introduced already.  As the Court is also aware,

11  on appeal, it is a granted certificate of appealability

12  addressing several issues and appeal as of right with regard to

13  the denial of statutory counsel pursuant to 18 U.S.C. 3599.

14          So given the pendency of the appellate issue with regard to

15  the denial of Mr. Christeson's counsel, we lodge our objection

16  to the proceedings going forward without that issue having been

17  addressed by the appellate court.

18          Further, given that this is an evidentiary hearing

19  concerning a 2254 case, Rule 18(c) applies with regard to

20  provision of counsel in connection to the 3599 appointment.

21          THE COURT:  Say that last part again?

22          MR. PERKOVICH:  Yes.  Rule 18(c) of the rules governing

23  cases under 2254 apply when we set forward this issue in our

24  brief and under document 161, the motion to reschedule.  So with

25  regard to the provision of counsel, that is tied to the enduring

1   problem in relation to the denial of counsel under 3599 that is

2   currently pending in the 8th Circuit.

3           THE COURT:  I understand.  But now you understand the

4   8th Circuit directed me to hold this very limited hearing as to

5   the conduct of prior counsel period.

6           MR. PERKOVICH:  Yes.

7           THE COURT:  And that's what we're going to do.

8           MR. PERKOVICH:  Oh, yes, Your Honor, we're aware of

9   that.  To be clear, we're making our record for the benefit of

10  the 8th Circuit for the pendency of this appeal.  We understand

11  that you have your marching orders from that court.

12          THE COURT:  You have that correct.  All right.  Anything

13  else?  Anything else we need to do before we ask the government

14  to call a witness?

15          MR. SPILLANE:  Yes, Your Honor.  I believe his paralegal

16  has a copy of all of his exhibits which she might want to give

17  you so the Court can follow along.  Oh, you already did?

18          MS. POTTS:  Yes.  I wrote them on a sheet for her.

19          COURTROOM DEPUTY:  I have the index, but not the

20  exhibits.

21          MR. SPILLANE:  Right.  If you gave him the exhibits, he

22  could follow along during the testimony if you have a copy.

23          MS. POTTS:  I just don't have the numbers yet.

24          MR. SPILLANE:  Okay.  I have a copy of mine if the Court

25  would like them so it can follow along.

1          THE COURT:  Okay.  All right.

2          MR. SPILLANE:  Thank you, Your Honor.

3          THE COURT:  When you have them numbered --

4          MR. PERKOVICH:  Your Honor --

5          THE COURT:  The government -- state of Missouri has

6     handed me a copy, an index of their exhibits.

7          MR. PERKOVICH:  Right.

8          THE COURT:  And your paralegal has a set of them.

9          MR. PERKOVICH:  Uh-huh.

10          THE COURT:  But you don't.

11          MS. POTTS:  I don't have anything that I can turn in to

12     you yet.

13          MR. SPILLANE:  I emailed those to opposing counsel

14     yesterday or the day before.  He should have them.  If not, I

15     can hand a copy to the paralegal.

16          MS. MERRIGAN:  Your Honor, we would just like to clarify

17     that these were the exhibits that were filed with the Court and

18     the exhibit list that was filed with the Court yesterday.

19          MR. PERKOVICH:  Right.

20          THE COURT:  Counsel, are they?

21          MR. SPILLANE:  Yes, they have them.

22          THE COURT:  Yes.  Counsel advises yes.  These are the

23     ones that were filed with the Court yesterday, and he said he

24     emailed you a copy.

25          MS. MERRIGAN:  Then we do have those.

1          THE COURT:  Okay.  All right.  Now we're ready to

2     proceed.

3          MR. SPILLANE:  Yes, Your Honor.

4          THE COURT:  Call your first witness.

5          MR. PERKOVICH:  Yes, Your Honor.

6          MR. SPILLANE:  I call Mr. Philip Horwitz.

7      *(Witness sworn.)*

8          MR. SPILLANE:  Your Honor, may I approach following the

9     witness?

10         THE COURT:  Yes.

11         MR. SPILLANE:  And with the Court's permission, I'll

12    hand a copy of these exhibits to the witness so he can follow

13    along when I ask questions to which they are relevant.

14         THE WITNESS:  Thank you, sir.

15         THE COURT:  Are you going to stay up here to ask

16    questions?

17         MR. SPILLANE:  I think so, so I'm close to the phone.

18         THE COURT:  Yeah, you better.

19         MR. PERKOVICH:  If I may, Your Honor, I just want to

20    interject that we can hear much better counsel's speech with him

21    in his current position, so we encourage that geography in the

22    courtroom.

23         THE COURT:  We will do it.

24         MR. PERKOVICH:  Thank you.

25           **PHILIP HORWITZ,** RESPONDENT'S WITNESS, SWORN

1                          **DIRECT EXAMINATION**

2      BY MR. SPILLANE:

3      Q    Sir, could you state your full name for the Court, please?

4      A    Yes, Phil Horwitz.

5      Q    How are you employed, Mr. Horwitz?

6      A    I am self employed as an attorney in St. Louis.

7      Q    Do you have your own law firm there, sir?

8      A    Yes, I do.

9      Q    How long have you been in practice?

10     A    Oh, since 1989.

11     Q    1989.  Have you done CJA work before?

12     A    Yes.

13     Q    Could you tell me what you've done before?

14     A    In the capital area, in the habeas?

15     Q    Why don't you tell me about both if it's not too extensive

16     to remember.

17     A    Sure.  Early on in my career, I was a public defender.  And

18     after that, I did mostly criminal work.  And I was appointed to

19     cases by the Eastern District Court of Missouri on numerous

20     occasions.

21          As far as my death habeas work is concerned, I've

22     represented five death row inmates before, before

23     Mr. Christeson.  It was -- let's see.  If you would like the

24     names, I can do that.

25     Q    That would be helpful, sir.

1    A    It was Mr. Basile, Mr. Rousan, Mr. Weaver, Mr. Six, and

2    Mr. Simmons.

3    Q    Sounds like you've had four capital cases against me, and I

4    didn't remember it, sir.  So sorry.

5         THE COURT:  So those are all state of Missouri capital

6    cases?

7         THE WITNESS:  State of Missouri.  Total of five capital

8    cases.

9    BY MR. SPILLANE:

10   Q    Let me ask you about the first document in the index of

11   exhibits that I gave you.  It is called Memorandum of Proposed

12   Budget.  Have you found that?  If you do, please go to page 2.

13   A    Yes, I'm there.

14   Q    Did you and Mr. Horwitz together agree on this proposed

15   budget?

16   A    Mr. Butts.

17   Q    Mr. Butts.  I'm sorry, sir.

18   A    Yes.

19   Q    And this was filed on July 28, 2004, which I believe is a

20   couple of months after you were appointed to the case.  Is that

21   accurate?

22   A    That's correct.

23   Q    No, I take it back.  You were appointed in July and this was

24   filed in July, so it's the same month.  Is that accurate?

25   A    Yes.

1    Q    You listed 422 hours there at $125 an hour.  Is that

2    accurate?

3    A    That's correct.

4    Q    What is your normal rate that you would charge if you had a

5    client?

6    A    It would be 225, $250 an hour.

7    Q    So you were doing this at a discount below your normal rate?

8    A    Yes.

9    Q    Let me ask you about the hours that you put in.  The first

10   thing you have there is 35 hours allocated for client interviews

11   and meetings.  Did you have client interviews and meetings and

12   phone calls and so forth?

13   A    Yes, we did.

14   Q    To the best of your recollection, could you tell me what

15   interviews and phone calls and in-person meetings you had?

16   A    Well, we had a total of, I believe, four to five meetings

17   with Mr. Christeson over a period of time.  As far as telephone

18   calls, there were not that many.  I know Mr. Christeson mainly

19   called co-counsel, Eric Butts, and that was the extent.

20   Q    I'm going to ask if I can refresh your recollection.  The

21   Department of Corrections has provided me with a list of the

22   in-person meetings and phone calls.  May I show you that and ask

23   if it's consistent with your memory, sir?

24        MR. PERKOVICH:  Your Honor, we haven't seen those prior

25   to today.

1    BY MR. SPILLANE:

2    Q    Could you please read it aloud, sir?

3    A    As far as the dates are concerned?

4              THE COURT:  Sure.  Yeah.

5              THE WITNESS:  It states that this -- the following

6    contacts are recorded between Offender Christeson and Attorneys

7    Horwitz and/or Butts.  5/27/05 there was a visit with Mr. Butts

8    and myself.  8/5/05 there's a visit with Mr. Butts and myself.

9    8/18/06 there's a visit with Mr. Butts.  6/8/07 there was a

10   visit with myself and Eric.  5/2/14 there was a legal call with

11   Eric.  6/18/14 there was a legal call with myself.  7/18 there

12   was a legal call with Eric Butts.  9/19 there was a legal call

13   with Eric Butts.

14   BY MR. SPILLANE:

15   Q    Is that consistent with your recollection as best as you can

16   recall?  If you don't remember, that's fine too.

17   A    I think we had an additional visit sometime in 2014.

18             MR. PERKOVICH:  Your Honor, I'm sorry to interject, but

19   if we could ask the witness to project a little louder, if

20   possible.  That would help us make out exactly what he's saying

21   all the time.

22             THE COURT:  Okay.  Please speak up.

23             THE WITNESS:  Yes.  I believe there was an additional

24   visit in 2014 which is not on here.

25   BY MR. SPILLANE:

1    Q    Thank you.  I'm going to move down to the next section,

2    which is witness interviews and consultation, 60 hours.  And

3    then it lists subgroups, which are prior counsel, clients and

4    family, expert witnesses, resource counsel and co-counsel.  Can

5    you tell me in a little bit of detail what that was and if you

6    conducted it and when?

7    A    Sure.  Now, this is the budget that we proposed prior to

8    having seen any of the boxes.  We really didn't know what to

9    expect except for that there were 20 boxes, I was told, and it

10   lasted -- and it was a seven-day trial.

11        Depending upon the type of case and the facts in the case,

12   it really depends on what type of interviews that you're going

13   to have with prior counsel, family, witnesses and other counsel.

14        In this case, it was slightly unusual in that there was a

15   co-defendant that testified against Mr. Christeson, and

16   Mr. Christeson himself testified.  With that and when we

17   received the boxes, the 20 boxes, it was a lot of material.

18   There were numerous police reports, approximately 30 depositions

19   of witnesses, DNA evidence, lab reports.  It was, I would say,

20   the most researched and documented habeas case I've been

21   involved with.

22   Q    Let me stop you there.  Since you went into the context of

23   the boxes and the content, I would like you to move to -- I

24   believe it is Exhibit 5, document 73 at page 8, which goes into

25   some detail on that.  I'm sorry, it's page 8 of Exhibit 5,

1   document 73.  It's towards the end.

2   A   Yes.

3   Q   All right.  Let me ask you first as we're talking about the

4   boxes.  It says at that place that you got the boxes two to

5   three months after your appointment, and your appointment was in

6   July.  Is that accurate?

7   A   I believe so.

8           THE COURT:  Let me interrupt.  Is that one of the

9   exhibits you're reading from?

10          MR. SPILLANE:  Yes.

11          THE COURT:  Give me the number.  Where?

12          MR. SPILLANE:  Oh, I'm sorry.  It is Exhibit 5.

13  Exhibit 5, page 8, and it's document 73 in the record.  I'm

14  sorry, Your Honor.  I shall be louder and clearer.

15          THE COURT:  Oh, okay.  All right.

16      Now, I just remembered something else.  Counselor on the

17  phone too, my clerk just reminded me, I didn't inquire of you if

18  you waive your right to your client to be here, Mr. Christeson,

19  for this hearing.

20          MR. PERKOVICH:  Yes, we do, Your Honor.  Given the

21  limited scope of this proceeding concerns the conduct of his

22  appointed attorneys, we have waived his presence.  Thank you.

23          THE COURT:  All right.  Does the state waive his --

24          MR. SPILLANE:  Yes, Your Honor.

25          THE COURT:  Thank you.  I'm sorry I missed that.

1          THE WITNESS:  And, Judge, in fact, as far as the

2     attorney-client privilege of Mr. Christeson, has that been

3     waived?

4          THE COURT:  Do you agree with that, counselor?

5          MR. PERKOVICH:  No, but I'd appreciate it being

6     repeated.

7          THE WITNESS:  Has Mr. Christeson waived his

8     attorney-client privilege?

9          MR. PERKOVICH:  Well, we've addressed that at the top.

10    The only issues in question here are the conduct in regard to

11    the filing of the petition.  It's a limited waiver in that

12    respect.

13         THE COURT:  Well, I'm -- all right.  I'm going to rule

14    it's been waived.  And if you think it goes -- he's gone beyond

15    what is waived and he can testify, you can raise it at any time.

16    But I'm ruling when you challenge the conduct of prior counsel,

17    the privilege is waived, and I'm ruling it's been done in this

18    case.

19         MR. PERKOVICH:  We understand the ruling.  Thank you,

20    Your Honor.

21         MS. MERRIGAN:  We can --

22         THE COURT:  You what?

23         MS. MERRIGAN:  I'm sorry.  I said, Your Honor, we

24    preserve our objection to that ruling.

25         THE COURT:  Well, why are you --

1        MS. MERRIGAN:  Make a record of that.

2        THE COURT:  Why are you arguing different than

3   co-counsel?  He understands the waiver.  Why don't you?

4        MR. PERKOVICH:  Well, no, Your Honor.  I say we

5   understand your ruling.  That doesn't mean we agree with it.

6   Obviously we don't because we argued contrary to it, and so I am

7   thankful that we are exclusively preserving the objection for

8   the record's sake.

9        THE COURT:  Okay.  All right.  Thank you.

10        MR. PERKOVICH:  That's a difference in style, Your

11   Honor, on my part.  I should have been very, very clear.  We

12   understand the ruling.  It's contrary to what we have argued,

13   and surely we object to it, Your Honor.

14        THE COURT:  Thank you.

15   BY MR. SPILLANE:

16   Q   I'm going to reask a question I may have asked because I

17   think I forgot the answer.  Did you receive the bocument -- the

18   boxes approximately two to three months after your appointment

19   as counsel as is indicated at page 8?

20   A   Yes.

21   Q   Page 8 indicates that the boxes included 761 pages of

22   transcript, 30 depositions, 31 investigative interviews, mental

23   health reports of individuals, medical records of individuals,

24   public school records, pretrial motions, pretrial hearing

25   documents including transcripts, expert mitigation records, 291

1   pages of 2915 motion, 287 pages of law enforcement reports,

2   direct appeal and post-conviction relief, family history

3   record -- excuse me, briefs.  Family history records, school

4   records, laboratory reports, autopsy reports, DNA reports, crime

5   lab reports, forensic reports, curriculum vitae of experts,

6   numerous crime scene photographs and research.  Did you receive

7   all that stuff?

8   A   Yes.

9   Q   The next line says, "Counsel thoroughly reviewed these

10  documents, contacted appellate counsel regarding these issues,

11  and investigated potential claims."  Did you do that?

12  A   Yes.

13  Q   When did you do those things?

14  A   We did it after we received the boxes.  Actually maybe a

15  little bit before we even received the boxes.  I spoke to

16  Mr. Bill Swift early on in this case prior to appointment.  And

17  I spoke to Swift, Mr. Swift in regard to another case I was

18  involved with.  I believe it was the Weaver case.

19      And the subject of Mr. Christeson's case came up, and we

20  spoke about the case.  I really didn't know a lot about it.  And

21  I think sometime after that, he indicated he was going to

22  suggest that I be appointed with Mr. Butts on this case, and I

23  think Mr. Swift sent us via email the briefs, because I wanted

24  the briefs fairly quickly.  And I believe that was sent, as I

25  said, via email prior to even getting the boxes.

1   Q   All right. I'm going to try and summarize your answer and

2   see if you agree with me. If you don't, please tell me. You

3   started reviewing documents before you received the boxes. Is

4   that what you're saying?

5   A   Yes, either by receiving information from Mr. Swift or just

6   looking online for the -- for the appellate -- and looking

7   online for the appellate proceedings.

8   Q   When you -- when you received the boxes, did you begin

9   reviewing those immediately?

10   A   Yes, there were -- it was a lot to review. You know, we --

11   Eric and I met, whether it was at my office or at his office.

12   We -- it was -- as I said, there was a lot of material to

13   review, but we began to review it.

14   Q   After you were appointed to the case, at what point did you

15   calculate the statute of limitations to determine when your

16   response would be due?

17   A   That was early on in the case. That's typically what we did

18   on all our habeas cases. As soon as we were appointed to the

19   case, we would calculate the time in which we needed to file,

20   and that was done in this case.

21   Q   All right. And I'm going to try and pin you down a little

22   bit more on that. You said early on in the case, and normally

23   you do that as soon as you're appointed. In this case, do you

24   have a specific recollection of when you made a calculation of

25   when you thought the response would be due?

1    A    It was during one of these meetings with Eric.  It was

2    probably soon after we received the boxes.

3    Q    Soon after you received the boxes, and you received the

4    boxes I believe two to three months after you were appointed,

5    according to the documents.  Is that accurate?

6    A    That's right.

7    Q    All right.  I'm going to move on a little bit to, if we

8    could, Exhibit 3, document 39, the traverse.  And this would be

9    pages 8 to 11.  Let me know when you get there, sir.

10   A    Okay.

11   Q    Now, this is a document that you and Mr. Butts filed in

12   August of 2006, so this is long after you filed the petition.

13   It's your traverse.  Is that accurate?

14   A    Yes.

15   Q    And you discussed your reasoning in calculating the statute

16   of limitations at pages 8 to 11 there.  Could you look at that

17   real briefly and then tell me what your reasoning was in

18   calculating that the statute of limitations ran as it did?

19   A    Yes.  As the statute indicates, a state prisoner seeking

20   habeas relief has one year after a state conviction becomes

21   final to file his habeas, which does not include the periods of

22   time when the petitioner is pursuing collateral review or PCR.

23   And as far as we calculated it, it was -- we calculated based on

24   the time that the Missouri Supreme Court denied relief on

25   Mr. Christeson's PCR, which I believe was May 14th, 2004.

1    And what we did is that we -- cert was not taken in this

2    case to the U.S. Supreme Court, but we believed that those 90

3    days were tolled.  So what we did is that we calculated the 90

4    days plus the 365 days, and we came up to an August 8th, 2005

5    date in which to file a petition.

6    Q    Did you review case law in making this calculation?

7    A    Yes.

8    Q    Did you have case law that supported you on this 90-day

9    period?

10    A    We reviewed *Carey v. Saffold*.  There was a case called

11    *Curtis v. Mount Pleasant*.

12    Q    I'm going to stop you there.  I think that's the first

13    period.  I thought you were talking about the --

14    A    I'm sorry.  I'm talking about the entire period of time.

15    Q    Okay.  Go ahead then.  I'm sorry.

16    A    Yeah.  It was our belief that *Carey v. Saffold* held that

17    the -- it was a case out of California in 2002, I believe, where

18    the petitioner had filed -- he had filed in state court, and he

19    was working his way up through the appellate court, and there

20    was intervals between these periods of time.  And his petition

21    was dismissed because the Court did not toll those periods of

22    time, which was about 44 days.  And the U.S. Supreme Court came

23    back and said that those intervals should have been tolled.

24    And so based on our reading, we believed that this entire

25    period, whether or not something -- whether or not a petition

1  had been filed or not were tolled.

2  Q   Right.  And did you have any other cases besides -- on that

3  first period, the first period that we're talking about, did you

4  have any other cases besides *Carey* that you relied on?

5  A   It was *Curtis v. Mount Pleasant* that we also --

6  Q   Right.  That's an 8th Circuit case, is it not?

7  A   Yes.

8  Q   All right.  Let me ask you about the second period.  In

9  pages 8 to 11 there, it seems to indicate that you relied on the

10  6th Circuit en banc period in *Abela v. Martin*.  Tell me about

11  that, and tell me why you relied on that.

12  A   Well, the *Abela* case, I believe, stood for the proposition

13  that whether or not you actually sought cert from the Supreme

14  Court, you were -- that that period of time was tolled, so that

15  90 days was not accounted against the one-year period.

16  Q   And was cert denied on *Abela*?

17  A   Cert denied on *Abela*?

18  Q   If you don't remember --

19  A   I don't recall.

20  Q   -- the record will reflect.  Was *Lawrence v. Florida* decided

21  sometime after you filed the petition?

22  A   Yes, that was decided after we filed the petition.  Yes,

23  that is correct.

24  Q   And what did *Lawrence v. Florida* hold?

25  A   Well, *Lawrence v. Florida* held that that 90-day period is

1    not -- is not tolled, so you don't get the benefit of that

2    period of time when calculating out when you should file habeas.

3    Q    And you were aware of *Lawrence* and the cert granting

4    *Lawrence* during this case.  Is that accurate?  If you don't

5    remember --

6          MR. PERKOVICH:  Your Honor, I'm going to lodge an

7    objection here.  Counsel is leading the witness with regard to

8    navigating the ins and outs of this area of the law.  I think an

9    appropriate line of questioning would posit to the witness how

10   he calculated and allow the witness to explain the authorities

11   and different periods of tolling and not tolling.

12         THE COURT:  Objection overruled.

13   BY MR. SPILLANE:

14   Q    Okay.  I think I'm going to move on to Respondent's

15   Exhibit 5, document 73, and let's go to the first page there.

16   Let me know when you're there, sir.

17   A    Sorry.  That's Exhibit 5?

18   Q    Yes, sir.  I'll give you the title.

19   A    Page 73?

20   Q    No, it's document 73 in the record.  I apologize for being

21   confusing.  It's page 1 that I want to start on.

22   A    I'm not seeing it.

23   Q    It's called Response to Court Order of May 27, 2014.

24         THE COURT:  It's the front page on Exhibit 5.

25   Exhibit 5, down in the lower right-hand corner.

1          THE WITNESS:  I'm there.

2     BY MR. SPILLANE:

3     Q    All right.  The first paragraph, you deny an allegation that

4     you had abandoned Mr. Christeson.  Could you please explain to

5     the Court what your conclusion was for that denial?

6     A    Yes.  We did not abandon Mr. Christeson.  It was -- it was

7     based on our calculation.  It appears now that it was incorrect,

8     but at the time we believed it was a correct calculation; and so

9     therefore, we had time.

10         I think our first meeting with Mr. Christeson was on

11    5/27/05, which is a few, like maybe two-and-a-half months, three

12    months before the petition was due as far as our calculation was

13    concerned.

14         MR. PERKOVICH:  Your Honor, I'm going to have to object

15    to the question.  It asks for the legal conclusion.  What we

16    need to adduce here is the conduct, what Mr. Horwitz did, not

17    his legal assessment of the effect of his conduct or misconduct.

18         THE COURT:  Just limit your testimony to what you did.

19         THE WITNESS:  So I -- so this is -- so I think I'm

20    explaining.

21         THE COURT:  No, no, wait a minute.  I'm going to

22    overrule it.  He's going to be allowed to explain how he

23    approached the decision he made.  I'm going to overrule the

24    objection.  Thank you.  We want the factual background, so I

25    need to hear what this gentleman was doing and how he arrived at

1   it.  I'm sorry.  Go ahead.

2   BY MR. SPILLANE:

3   Q   If you're not finished, please continue, sir.

4   A   Yes.  As far as the issue of their allegations --

5   Q   What you did, sir.

6   A   -- of abandonment?  So as far as what we did during the

7   entire period?

8   Q   Yes, what you did prior to filing what you told me about

9   with the boxes, what you did when you filed, what pleadings you

10  filed after that, so forth.

11  A   So yes.  And so in addition to that, we did meet with

12  Mr. Christeson.  It took us a while to go through those boxes.

13  As I said, I mean, it was -- they were -- there was numerous,

14  numerous documents.

15      We planned to visit with him, and that's why I -- I do know

16  there was some legal calls made prior to that time that we -- I

17  think we even told him that we were coming to visit him.  That's

18  not indicated on this record.

19      But we did visit him, and we went through -- I appeared with

20  Mr. Butts on a visit with Mr. Christeson, and I had the

21  pleadings.  We went through the pleadings.  We went through

22  many, many different issues.

23      And so as far as abandonment, I didn't -- it's an allegation

24  that's not accurate, but it's -- and it's -- it's based on the

25  fact that our calculation was wrong.  But at the time, we did

1    not know it was wrong.   We believed we were correct.

2         And so based on our calculation, we actually visited with

3    him, as I said, two to three months prior to the petition

4    actually being due, which we felt was sufficient time to speak

5    with him, to review issues, and to finalize the petition.

6         MR. PERKOVICH:   Your Honor, given the length of that

7    winding response to the question that we a long time ago

8    objected to in terms of the legal conclusion that was being

9    solicited, the answer did opine on the ultimate legal conclusion

10   here.   We think it's inappropriate.   We just want to confirm

11   that our objection to the overruling is in the record

12   encompassing that entire response, especially the end where he's

13   articulating his view of abandonment.

14        THE COURT:   Objection noted and overruled.   Go ahead.

15        MR. PERKOVICH:   Thank you, Your Honor.

16   BY MR. SPILLANE:

17   Q   I'm going to ask you a question.   I read in the record, and

18   I won't go back to it for the purposes of time unless you don't

19   recall.   Did you at some point, in possibly August of 2005, ask

20   Mr. Christeson to take action that would set up his being a

21   participant in a systemic challenge to the Missouri death

22   penalty?

23   A   Yes.   I was not involved in that as much as Mr. Butts was.

24   He was the one that was actually communicating with

25   Mr. Christeson regarding that area.

1    Q    Do you know what action Mr. Butts had Mr. Christeson take?

2    A    I think he had filed a formal appeal within the prison

3    system.  I'm not sure of all the details of that, but Mr. Butts

4    would know more about that.

5    Q    At some point in this case, did you become concerned that

6    you might have a conflict of interest?

7    A    As far as a conflict of interest, can you be more specific?

8    Q    Let me ask the question a different way.  Obviously I didn't

9    ask a very good question.

10        At some point in this case, you contacted Ms. Merrigan and

11   asked her for advice in the case.  Why did you do that?

12   A    Well, at that time --

13        MR. PERKOVICH:  Objection, Your Honor.  That's a leading

14   question.

15        THE COURT:  Sustained.  It is, but I'm going to permit

16   it.

17        THE WITNESS:  At that time we had received news of a --

18   that -- of a show cause order, I believe, and so we knew there

19   was going to be an execution date set fairly soon.  And in the

20   best interests of Mr. Christeson, we believed new counsel should

21   be appointed.

22        As far as a conflict, I did not at the time believe there

23   was a conflict.  The -- based on the case law at the time, I

24   know that there was a case called *Kretzer*, and in that

25   particular case, the attorney -- the attorney had waited I

1  believe the period of time that he was untimely in his petition,

2  and it was -- it was based on his mistake or his understanding

3  of the law.  And he continued on with the case, and there was --

4  there was no -- there was no relief.  Even though he argued

5  equitable tolling, the Court denied that.  And as I said before,

6  he did not withdraw, and his client was eventually executed.

7       But I don't believe there was a conflict also because of --

8  it was our belief that this was a mistaken calculation, and I

9  think the case law was pretty clear in the 8th Circuit and in

10 the Supreme Court that a mistake of the calculation of the

11 filing date does not create a conflict.  It -- because there

12 is -- so -- well, I'm sorry.  It doesn't create a remedy, so

13 there was no available remedy for Mr. Christeson.

14      And because there was no available remedy, we didn't believe

15 there was a conflict because -- and so that's -- so that's why

16 we remained on the case.  But as I said before, it was our

17 belief that in the best interest, that new attorneys should be

18 appointed to investigate all avenues.

19 BY MR. SPILLANE:

20 Q   Did you at some point ask Ms. Merrigan if she was willing to

21 come in as substitute counsel?

22 A   Yes.

23 Q   Explain the circumstances.

24 A   Well, actually we were looking for counsel in the St. Louis

25 area, and we had -- between Mr. Butts and myself, we had talked

1   to four or five different habeas attorneys that we knew.  At the

2   time, they were quite busy themselves, and they didn't have time

3   to take on the -- a new case.

4       So I think Eric received the name of Ms. Merrigan, and he

5   contacted her.  And at the time, I don't believe we knew that

6   she was from out of state.  We soon learned that, in fact, she

7   was out of state; but at the time I don't believe we knew.  But

8   she was willing to proceed with helping Mr. Christeson.  And, as

9   a matter of fact, we paid for her and her co-counsel to come in

10  to St. Louis to meet with Mr. Christeson and ourselves.

11  Q   I want to follow-up on what you just told me.  Did you out

12  of your own pocket pay for their travel expenses and lodging to

13  come and meet Mr. Christeson?

14  A   Yes.

15  Q   Did you ever get reimbursed for that?

16  A   No.  We didn't ask for it.

17  Q   I'm probably going to get an objection to this question, but

18  I'm going to ask if there's anything important on this subject

19  that you need to tell the Court that I wasn't able to ask the

20  proper question about.

21          MR. PERKOVICH:  Objection.

22          THE COURT:  Overruled.  I'll permit it.

23          THE WITNESS:  In regard to?

24  BY MR. SPILLANE:

25  Q   In regard to the allegation of abandonment, sir.

1   A     Just to add that we -- it was a -- as far as abandonment is

2   concerned, we didn't abandon Mr. Christeson.  We -- it was a --

3   it was because of our understanding of the case law that we

4   selected a certain date to file the petition.

5        It's not as if we said, you know, we're just not going to

6   file anything, we're not going to speak with him, we're not

7   going to review documents or anything of that nature.  It was

8   a -- it was a -- it was a mistake.  At the time we did not

9   believe it was a mistake in the calculation.  But as I said

10  before, because of that calculation, it pushed us -- it pushed

11  us out further, and we thought we had more time than we actually

12  did.

13       And that was -- and this was based on the case law as we

14  understood it with our experience of dealing with five habeas

15  cases previously.  We felt confident that we had selected the

16  correct date, and we believed the case law provided for that

17  date, but the Court has felt differently.

18       MR. SPILLANE:  I want to thank you for coming in from

19  St. Louis for your testimony today, and I want to thank you for

20  your service under the Criminal Justice Act, sir.  Thank you.

21       I have no more questions.  I think they'll probably have

22  some cross.

23       THE COURT:  You may cross-examine.

24       MR. PERKOVICH:  Yes, Your Honor.  Thank you.

25                         **CROSS-EXAMINATION**

1    BY MR. PERKOVICH:

2    Q   Mr. Horwitz?

3    A   Yes.

4    Q   When did you learn of the ruling that has led to this

5    hearing today?

6    A   Oh, I learned of that yesterday.

7    Q   Yesterday?

8    A   Uh-huh.

9         MR. SPILLANE:  I'm going to object to the question.  I'm

10   not sure he understands what's being asked.

11        MR. PERKOVICH:  I'll try to --

12        THE WITNESS:  As far as the 8th Circuit --

13        MR. PERKOVICH:  -- rephrase it.

14        THE COURT:  Now, wait.  Yeah.  Well --

15        THE WITNESS:  Yeah, can you be more specific?

16        THE COURT:  Are you talking about the 8th Circuit

17   opinion or my order?

18        MR. PERKOVICH:  I'm talking about the hearing that's

19   called today.

20        THE COURT:  Oh, when the --

21   BY MR. PERKOVICH:

22   Q   So with regard to this Court setting the evidentiary hearing

23   that we are now in the midst of, Mr. Horwitz, how did you learn

24   of this hearing?

25   A   I learned of the hearing through a email I received from

1    Mr. Spillane.

2    Q    And what did that email say?

3    A    It said that he was planning to -- that -- I'm sorry, that I

4    think attached was the 8th Circuit ruling and that he was

5    planning to set a date as soon as possible for an evidentiary

6    hearing.

7         And then I think soon after he filed his motion, this Court

8    set the hearing for today, and that's how I found out about it

9    was through Mr. Spillane.

10   Q    All right.  After first learning of the 8th Circuit's

11   ruling, what was the next thing that was communicated to you

12   about this hearing?

13   A    Besides the date and time?

14   Q    Did you call Mr. Spillane to get that information?

15   A    He called me.

16   Q    Mr. Spillane called you?

17   A    Uh-huh.

18   Q    Counsel, the appointed counsel for Mr. Christeson,

19   Mr. Spillane, called you?

20        MR. SPILLANE:  I'm going to object.  I don't represent

21   Mr. Christeson.  I represent the Department of Corrections.

22        THE COURT:  Counsel --

23        MR. PERKOVICH:  No, I'm referring to the witness as the

24   former appointed counsel.

25        MR. SPILLANE:  Oh, I'm sorry.  I apologize.  Withdrawn.

1          THE WITNESS:  I think he had sent me the email.  I think

2     he was following up with a phone call to make sure I received

3     it.

4     BY MR. PERKOVICH:

5     Q    Do you know what time he placed that call?

6     A    I don't know.  It was probably in the afternoon sometime.

7     Q    Do you recall seeing an email from my co-counsel,

8     Ms. Merrigan, reflecting our objection to Mr. Spillane

9     communicating with you?

10    A    Yes, I do.

11    Q    Was his call to you before or after that?

12    A    It was before that.

13    Q    Okay.  Did you speak with him subsequent to the email from

14    Ms. Merrigan?

15    A    About a subpoena.  He was concerned whether or not he

16    actually had to serve me.

17    Q    I'm sorry.  Could you repeat that?  I had difficulty

18    hearing.

19    A    He was dealing with a subpoena only.

20    Q    Uh-huh.  Okay.  So if we could return to the first phone

21    call, what was discussed?

22    A    Just the -- just the time to appear.

23    Q    So Mr. Spillane, at the point of his first call, that

24    followed Judge Whipple's entry of the schedule for this hearing?

25    A    I believe so, yes.

1   Q   So Mr. Spillane communicated the time of the hearing?

2   A   Trying to remember.  Yes.  I believe so, yes.

3   Q   What else did Mr. Spillane speak about?

4   A   Nothing else.

5   Q   Nothing?

6   A   Nothing.

7   Q   When was the next time you spoke or corresponded with

8   Mr. Spillane or someone from his office?

9   A   The next time I think was in regard to a subpoena that he

10  was going to attempt to serve.

11  Q   And what was discussed?

12  A   Whether or not I would accept it.  And I told him, I said,

13  "Well, you know, you have to do what you have to do."  And that

14  was it.  He said, "Well, I'll go ahead and serve you."  I said,

15  "That's fine."

16  Q   I'm sorry.  Serve how?

17  A   Serve me.

18  Q   Uh-huh.  And did that occur?

19  A   Yes.

20  Q   When did that occur?

21  A   Yesterday, actually on my way here, someone from his office

22  stopped by my office, and she accepted service.  She called me

23  on my cell phone and asked if I should accept service.

24  Q   So you made arrangements for travel for this hearing before

25  you actually had been served in any way; is that correct?  And

1    you actually traveled to the location of the hearing before

2    being served with any process; is that correct?

3    A    No, I actually had an email.  I had an email prior to

4    leaving St. Louis with the subpoena on the email.

5    Q    Right.

6    A    And then -- and then I was served.

7    Q    You knew the subpoena was going to be served.

8         COURT REPORTER:  Wait a second.  Wait, wait, wait, wait.

9         THE COURT:  Hold up.  One at a time.  Go ahead and ask

10   your question.

11        THE WITNESS:  I was -- he sent me a -- he sent me the

12   summons to appear via email, and then I was -- and then service

13   came afterwards.  The actual physical service came later in the

14   day, probably 3:30, 4:00, something like that.

15   BY MR. PERKOVICH:

16   Q    So that we're clear about the timeline here, because we're

17   all very painfully aware this is a short timeline with very

18   serious matters at stake.  You departed St. Louis before the

19   service on you or your office or any representative who could

20   accept service for you to appear for this hearing to ensure that

21   the hearing could stay on schedule; is that correct?

22   A    No.  I was served prior to leaving my office.  As I said, he

23   sent it via email.

24   Q    By email?

25   A    Yes.

1    Q    Is that your understanding of the federal rules, that

2    service can be done by email?

3    A    Well, I wanted to make sure I was going to be here, so we

4    had to -- we had to leave.

5    Q    Right.

6    A    And I did speak to outside counsel regarding this, and this

7    is what he recommended.

8    Q    And who was your outside counsel?

9    A    Mike Downey.

10   Q    I'm sorry.  Could you please spell his name for the record?

11   A    D-O-W-N-E-Y.

12   Q    Thank you.  Okay.  Apart from the communication you've just

13   spoken about, please tell us the additional communications

14   you've had with Mr. Spillane before appearing in court -- before

15   being sworn in, I should say, today, this morning.

16   A    That was it.  This morning I happened to see Mr. Spillane.

17   He happened to be staying at the same hotel.  He was sitting

18   down in the breakfast room.  I came in, said hello.  I ate

19   breakfast.  He got up and left.

20   Q    And is that the full extent of the substance of your

21   conversation?

22   A    Yes.

23   Q    So what was the name of the hotel, just so we're clear?

24   A    Oh, just down the street from here.

25            MR. SPILLANE:  Your Honor, I can help if you want.  It's

1    the Comfort Inn on 770 Admiral Boulevard.

2            THE WITNESS:  That's correct.

3    BY MR. PERKOVICH:

4    Q   And who made arrangements for that hotel for you?

5    A   I did my own.

6    Q   You did?

7    A   Uh-huh.

8    Q   Yourself?

9    A   Yes.

10   Q   Okay.  Thank you.  And so when you bumped into Mr. Spillane,

11   was that pure happenstance, or was there any kind of

12   communication as to coordinates before the hearing this morning?

13   A   Just a coincidence.  We were both hungry and wanted

14   breakfast, and we went to the breakfast room.

15   Q   And so what was discussed in terms of the proceedings today?

16   A   Nothing.

17   Q   Nothing?

18   A   No, there was no conversation.  As I said, he left the

19   breakfast room.

20   Q   All right.  Thank you.  Prior to the order entered by the

21   8th Circuit earlier this week calling for this limited remand,

22   I'd like to talk about your communication with Mr. Spillane and

23   his office such as Mr. Hawke and others who have acted for the

24   state in connection with this habeas litigation since the time

25   of May 23, 2014 when the notice by friends of the court relating

1  to the conflict of interest and the substitution issues that

2  were ultimately adjudicated through the Supreme Court occurred

3  in this case.

4      You've spoken about conflict issues.  I just want to ask a

5  couple quick questions in terms of a conference with the state

6  in relation to the litigation that transpired beginning in

7  May 2014.  When did you speak with Mr. Spillane or anyone else

8  on this case or any involvement about the substitution

9  litigation in this case?

10  A   I have never talked to Mr. Spillane before except for this

11  past day or so.  And in regard to anyone else in his office, I'm

12  forgetting the attorney's name.  Stephen Hawke actually called

13  me at one time early on in the case, and I told him that I

14  couldn't speak to him.  That if he wanted to speak to me, he

15  would have to subpoena me.

16  Q   Uh-huh.

17  A   And that was the extent.

18  Q   I'm sorry.  That's the extent of it?

19  A   Correct.

20  Q   Okay.  Do you recall -- do you recall when -- well, let me

21  back up.  You stated that you recall the show cause order that

22  was entered by the Missouri Supreme Court for Mr. Christeson in

23  2014; is that correct?

24  A   Yes.

25  Q   Do you recall when the Missouri Supreme Court ordered his

1    execution in 2014?

2    A    Yes.

3    Q    Do you recall the date?

4    A    Not offhand.

5    Q    Okay.  Would September 19th, 2014 sound correct?

6    A    Okay.

7    Q    Okay.  Do you recall the execution date that was set by

8    Missouri?

9    A    Yes.  On that date?

10   Q    I'm sorry?

11   A    On that date, you're saying?  I'm not sure what date you're

12   talking about.

13   Q    It's very difficult with the phone.  I apologize, Mr.

14   Horwitz.  Could you repeat your answer?

15   A    I'm not sure what date you're speaking about.

16   Q    Yeah, October -- did you say October?

17   A    I can't -- I'm not sure what date you're speaking about.

18   Q    Would it help if I provided you a copy of the Supreme Court

19   opinion in this case to refresh your recollection of the

20   timeline?

21   A    Sure.

22   Q    Okay.

23        MR. PERKOVICH:  Ms. Potts, if you could, please hand the

24   state and the Court and Mr. Horwitz, upon permission of the

25   Court, a copy of *Christeson versus Roper*.

```
1          MS. POTTS:  Your Honor, may I approach?

2          THE COURT:  Sure.  Do you have one?

3          MR. SPILLANE:  I don't have one, but I know the case.

4          THE COURT:  Okay.  Thank you.

5          THE WITNESS:  Okay.

6   BY MR. PERKOVICH:

7   Q   I'm sorry.  Do you have a copy?

8   A   Yes, I do.

9   Q   Okay.  So I think it's on the second page of the printout

10  you have.  The left column near the bottom speaks a little bit

11  about the timeline, the last full paragraph.  If you could just

12  review that.

13  A   Oh, I see, uh-huh.

14  Q   Okay.  And then if we go to the conclusion of the section

15  before section 2, the last paragraph, if you could review that.

16  And it reads, "We stayed Christeson's execution and now

17  reverse."  Do you recall when Mr. Christeson's execution had

18  been stayed by the Supreme Court?  Do you recall when that would

19  have been in relation to October 29, the date for his execution?

20  A   It was stayed, I think, that day or the day before.

21  Q   Okay.  Now, after that, did you have any communication with

22  the state?  And by "the state," I mean Mr. Spillane, Mr. Hawke,

23  any counsel for the Attorney General's office.

24  A   No.

25  Q   I'm sorry.  Was that yes?
```

1   A   No, no.

2   Q   No?  Okay.  Thank you.  And then that includes after the

3   ruling in this case on January 20, 2015.

4   A   That's correct.

5   Q   Thank you.

6   A   Except for when I spoke to Mr. Hawke just briefly on the

7   phone.

8   Q   I'm sorry.  When was that?

9   A   I had mentioned previously that Mr. Hawke had contacted me.

10  Q   Right.

11  A   And that was the only time.

12  Q   I appreciate that.

13  A   Yeah.

14  Q   I'd like you to revisit the record in these proceedings just

15  to kind of move things forward chronologically in terms of your

16  activity in the case.  So with Ms. Potts' help, I'd like to

17  provide --

18          MR. PERKOVICH:  Codi, it's document C in what you have.

19  It is a fax message, a copy of that.  And I'd like to -- for you

20  to provide a copy to Mr. Spillane, the Court, and Mr. Horwitz

21  upon permission of the Court.

22          MR. SPILLANE:  Could I say something, Your Honor?

23          THE COURT:  Yes.

24          MR. SPILLANE:  Counsel, I don't think they have enough

25  copies for me, but that's fine with me.

1          MR. PERKOVICH:  Thank you.  I apologize.

2          MR. SPILLANE:  No problem.

3          MR. PERKOVICH:  If there's any question as to what we're

4    viewing, please do speak up, Mr. Spillane.

5          THE WITNESS:  Yes.

6    BY MR. PERKOVICH:

7    Q   Do you have a copy?

8    A   Yes.

9    Q   Very good.  Could you review the transmittal page briefly?

10   A   Yes.

11   Q   And the fax number, the number on the receipt, do you

12   recognize that fax number?

13   A   I believe that was my fax number.

14   Q   Is that still your fax number, by chance?

15   A   No, no.

16   Q   Okay.  You've changed location since this date?

17   A   This is back in -- yeah, this is back in 2004.  Yes.  Yes,

18   I've moved since that location.

19   Q   And so what do you understand you have in your hands there,

20   sir?

21   A   It's from Bill Swift.  It's an affidavit.

22   Q   Who is Bill Swift?

23   A   It's from Bill Swift.  It's an affidavit.

24   Q   Who is Bill Swift?

25   A   Oh, Bill Swift.  He is with the Missouri State Public

1    Defender's office.

2    Q    And who is he in relation to this case of ours?

3    A    He represented him during the state proceedings during the

4    post-conviction relief.

5    Q    Uh-huh.  And what is he transmitting to you here?

6    A    It appears the affidavit and the motion to proceed as a poor

7    person.

8    Q    Uh-huh.  And what in addition to those things?

9    A    And motion to appoint counsel.

10   Q    Do you recall receiving this transmission?

11   A    I don't remember.  I'm sure if it came through, I'm sure I

12   did.

13   Q    And what would your practice have been at that time upon

14   receiving a transmission from another lawyer in connection with

15   a possible appointment in a case?  What would you have done with

16   the transmission?

17   A    I would have -- I'm not sure if I understand your question.

18   Q    Would you have read it?

19   A    Oh, yes.

20   Q    Okay.  Would you have given it a considered review as an

21   attorney?

22   A    Yes.

23   Q    Can we afford you a couple minutes to take a look at the

24   motion to appoint?

25        THE COURT:  All right.  Yes, look at it.  And while you

1   look at it, my clerk has just alerted me, these exhibits have

2   not been marked.  They have no numbers on them.

3            MR. PERKOVICH:  I apologize, Your Honor.  I would like

4   to mark this.

5            THE COURT:  Well, I think you should.  Why weren't you

6   prepared?

7            MR. PERKOVICH:  I apologize.  We didn't understand

8   whether we needed to premark or whether we could mark as we go.

9            THE COURT:  Why didn't you ask?  Your conduct as you're

10  doing everything you can to delay and elongate is --

11           MR. PERKOVICH:  Your Honor, I respectfully submit we are

12  trying to elucidate information under challenging circumstances.

13           THE COURT:  But you've been appointed since -- you saw

14  my order yesterday.  You've been in this case for almost two

15  years, and now you're just stumbling to get exhibits?  This

16  looks pretty careless to me.

17           MR. PERKOVICH:  Your Honor, respectfully -- respectfully

18  we sought an evidentiary hearing for several years.  We were

19  preparing a reply brief in the appellate court when we were

20  alerted to having to shift gears completely to prepare this.  It

21  will not be trouble for our assistant to mark these.  This would

22  be marked as Exhibit A, if that's the preference of the Court.

23           THE COURT:  No, it's marked Exhibit 2.  She marked it

24  Plaintiff's 2.

25           MR. PERKOVICH:  Okay.  Exhibit 2 it is for petitioner.

1        THE COURT:  Yes, please.

2        MR. PERKOVICH:  My apologies, Your Honor.

3        THE COURT:  Okay.

4        MR. PERKOVICH:  That was neglectful of me.

5        THE COURT:  Okay.  Now, we've given him some time to

6  review it.  Go ahead with your questioning.

7        THE WITNESS:  Yes.

8        THE COURT:  He's looking at it, what is now marked

9  Plaintiff's Exhibit 2 and has been answering questions.  Now

10  let's proceed.

11        MR. PERKOVICH:  Thank you.

12  BY MR. PERKOVICH:

13  Q  Mr. Horwitz, could I ask you to turn to the second page of

14  that motion I just referred to?  The numbered paragraphs are 5

15  and 6.

16  A  Okay.

17  Q  Can you read the first sentence in paragraph 5?

18  A  "My present state-appointed attorney has communicated with

19  Attorneys Phil Horwitz and Eric Butts about accepting an

20  appointment to represent me in an application for writ of habeas

21  corpus."

22  Q  Okay.  So what do you recall about those communications?

23  A  The -- we just -- prior to this?  Document is -- I spoke to

24  Bill Swift, and I think I mentioned previously we were just --

25  we were talking about a different habeas case, and he happened

1  to mention Mr. Christeson's case.  And he was interested if I

2  would be -- if Eric and I would be willing to represent him.

3  Q  Mr. Horwitz, I'll have a follow-up question, but I would

4  like to raise a question for the Court.

5       MR. PERKOVICH:  There may have been a note apart from

6  the exhibit that has been circulated, and that's before

7  Mr. Horwitz right now passing within the Court.  We would like

8  awareness of what that would be.

9       THE COURT:  What is it?

10       MS. POTTS:  It's the case.

11       THE COURT:  This one?

12       MS. POTTS:  Yes.  I'm sorry.

13       THE COURT:  All right.  We've just marked this copy of

14  *Christeson versus Roper* that was referred to earlier.  She's

15  marked that as Plaintiff's Exhibit 1 since that's the first one

16  you were -- you questioned --

17       MR. PERKOVICH:  Okay.

18       THE COURT:  -- this witness about.

19       MR. PERKOVICH:  Thank you, Your Honor.

20       THE COURT:  All right.  Now we're okay.

21       MR. PERKOVICH:  So if I may return to questioning?

22       THE COURT:  Yes.

23  BY MR. PERKOVICH:

24  Q  Mr. Horwitz, who do you understand prepared this motion?

25  A  Mr. Swift.

1  Q   Okay.  And do you have any reason to believe that anybody

2  other than Mr. Swift or people in his office prepared this

3  motion?

4  A   No.

5  Q   Okay.  Thank you.

6      The next paragraph is paragraph 6.  Could you read that into

7  the record?

8  A   It says, "Although all post-opinion filings on my behalf may

9  not have been ruled on, this court should now appoint

10  Mr. Horwitz and Mr. Butts."

11  Q   And just to be clear, this is written in the voice of the

12  petitioner himself; is that correct?

13      Okay.  And the next sentence?

14  A   "My case file, like most death penalty cases, is large and

15  will require substantial expenditure of time to review."

16  Q   Okay.  And the next sentence?

17  A   "In *Snow v. Ault*, the 8th Circuit ruled that under the

18  AEDPA, the time for filing my habeas corpus petition will

19  commence running when rehearing is ruled on.  Mr. Swift expects

20  that the rehearing motion will be ruled on shortly after it's

21  filed.  For these reasons, this Court should now appoint counsel

22  to represent me in order to allow timely and thorough

23  presentation to this Court."

24  Q   Okay.  Thank you.  And I would just like to point to the

25  record.

1          MR. PERKOVICH:  Your Honor, how do you want to proceed

2     in terms of documents that are in the record?  Do you want them

3     marked as exhibits as well, or can we reference the record

4     simply?

5          THE COURT:  They can be entered and mark them as

6     exhibits.  Do you have copies of them?

7          MR. PERKOVICH:  Yes, we do.

8          THE COURT:  I think you ought to mark them as we go.

9          MR. PERKOVICH:  Very well.

10         THE COURT:  I think for any -- for myself or any other

11    attorneys in this case or any reviewing courts, let's mark the

12    exhibits that are used in this hearing so any -- myself

13    included, don't have to keep bouncing back and forth in trial

14    proceedings.

15         MR. PERKOVICH:  Very well.  You're clearly understood.

16    I want to mark what was in the record or is in the record as

17    document 3 as our Exhibit 3, I believe it is.  And, Ms. Potts,

18    if you could distribute.

19         THE COURT:  Plaintiff's Exhibit 3, which is captioned

20    Motion to Appoint Counsel in Habeas Case, Petition Action in a

21    Death Penalty Case.  Any objection to entry?

22         MR. SPILLANE:  No objection, Your Honor.

23         THE COURT:  Plaintiff's Exhibit 3 for this hearing is

24    admitted.

25         MR. PERKOVICH:  Thank you.

1    BY MR. PERKOVICH:

2    Q    Mr. Horwitz, can you consider this document and compare it

3    to the one you have just been reviewing?

4    A    Compare it?

5    Q    Yes.  Does it appear to be the same document --

6    A    Yes.

7    Q    -- that you received?  Thank you.  And the date on this, the

8    filing date in the corner of that document reads in our record

9    is which date?

10   A    5/14/04.

11   Q    Okay.  And paragraph 6, the second page, cites to *Snow*

12   *versus Ault*; is that correct?

13   A    Correct.

14   Q    Thank you.  Okay.  No further questions regarding this

15   exhibit.

16         Do you recall entering your appearance in this case?  Or

17   actually let me move on to an order of this Court.

18              MR. PERKOVICH:  Ms. Potts, it's document 5 from the

19   record.  If you can mark that as our -- I believe it will be

20   Exhibit 4 and circulate.

21              THE WITNESS:  Yes.

22   BY MR. PERKOVICH:

23   Q    Okay.  If you could quickly consider it and move to the

24   second page, you'll see your name, I believe, to the bottom?

25   A    That's correct.

1   Q   And that first sentence, can you read it to the Court?

2   A   "Attorneys Phil Horwitz," that sentence?  Is that the

3   sentence you're talking about?

4       "Attorneys Phil Horwitz and Eric Butts have indicated that

5   they will accept appointment in this action."

6   Q   Okay.  Thank you.  And then moving on to the following page,

7   if you could read what that -- those first three lines, please.

8   The first sentence, first full sentence, I should say.

9   A   "In their entry of appearance, both attorneys shall confirm

10  they meet the applicable mandates and are otherwise qualified to

11  handle this matter."

12  Q   All right.  Thank you.

13      MR. PERKOVICH:  Okay.  No further questions about this.

14  I'd like to move to -- if you can confirm this document 7 in the

15  record, Ms. Potts.  It's the entry of appearance and statement

16  of qualifications.  And so this would be Exhibit 5, I believe.

17      I'm sorry, is there a need for clarification?

18      MS. POTTS:  No, I have it.  Thank you.

19      MR. PERKOVICH:  Very good.  Thank you.

20  BY MR. PERKOVICH:

21  Q   Mr. Horwitz, can you briefly review that and just confirm

22  that you recognize filing this and that the information is true

23  and correct?

24  A   Well, actually this appears to be a -- there's one mistake

25  on here.  It says 1988.  It should be 1989.

1    Q    Uh-huh.

2    A    The license to practice law.

3    Q    Okay.  And since that time -- or at what point did you

4    become a sole practitioner?  You may have stated this earlier.

5    A    Oh, I would say maybe three or four years since 1989.  After

6    1989.

7    Q    Approximately a decade before this filing?

8    A    Yes.

9    Q    Okay.  Thank you.  And I just want to talk about your

10   practices in doing your work in terms of how you go about

11   preparing a case, a new case.  When you receive a file, what are

12   the first things that you do?

13   A    Well, in what type of case are we speaking of?

14   Q    I'm sorry, can you repeat that?

15   A    Yeah.  In what type of case are we speaking of?

16   Q    Well, let's say in a criminal case or a post-conviction case

17   such as this one.

18   A    I'm sorry, your question again?

19   Q    What is -- upon receiving a file, what is it that -- your

20   practice in terms of the work that you do?

21   A    Receiving a file?

22   Q    Right.  A file that you've inherited in a post-conviction

23   case such as this one and you receive the file from prior

24   counsel, which would include the prior proceedings presumably,

25   what are the steps that you undertake as a rule?

1    A    Start reviewing the file typically if I've been appointed.

2    Q    (Counsel speaking over witness.)

3    A    I'm sorry?  I didn't hear that.

4    Q    Review.  What literally does that mean for those of us --

5    let's say we came from Mars and we have no idea what lawyers do.

6    For you, what does "review" mean?

7    A    Review means going through the files.  In a post-conviction

8    type of case, I'm typically looking for issues that I believe

9    are the best to present for review.  As a -- as an appellate

10   attorney, if that's the type of case that you're talking about,

11   by the time I receive the file, the trial attorney has tried the

12   case.  It's been through direct appeal.  It's been through PCR.

13   There's probably at least two or three attorneys that have

14   handled the files already.  It's pretty well documented, as this

15   case was.  Some aren't; some are.

16        In this case, there was a large amount of material, and you

17   begin to review.  Typically you review the briefs.  You try to

18   find the stronger issues.  If you could find one or two or three

19   issues, you're doing great, and you kind of focus on that, but

20   it just really depends on the case.  Depends upon, you know, the

21   trial court rulings.  Depends upon the legal issues.  Every case

22   is different.

23   Q    And in the review, how do you keep track of that information

24   that you're absorbing for the voluminous material and the string

25   of proceedings that predate your involvement?  How do you

1    process that review?

2    A    Well, typically because it's just so much material, I will

3    go through the files and just read if -- if there's something

4    that I feel that needs to be further reviewed.  And typically

5    it's research.  Most often it's research, although I've had a

6    couple cases that I've reviewed that there -- that needed

7    additional, I would say, oh, additional fact finding where we've

8    hired private investigators and so forth.  But every case is

9    different.

10        In this particular case, it was -- it's just a question of

11   just review.  If something was really significant, I would

12   probably do the research on that issue to try to see if there's

13   any remaining issues to present.

14   Q    So with those activities, would work product be made by you?

15   A    Work product?  I would -- sometimes.

16   Q    And just to be clear to define work product, like a writing,

17   notes, digests.

18   A    Typically if I took notes or something like that, it was

19   usually a -- it was a note of a case, or I would research that

20   case.  At the time I believe I was going to the library or maybe

21   SLU or Wash U's Library, St. Louis County Library and doing the

22   research the old-fashioned way.  But it was usually just an

23   accumulation of case law.  I mean, that was -- that's what we

24   really hoped that we could find, was some case law that would

25   support our theories.

1    Q    And so would you also use computer databases to do legal

2    research at that time?

3    A    Not really.  I don't think -- I think Eric had the old

4    Westlaw or the West CDs that we would -- that we would use.  I

5    didn't have access to that.  So as I said, my office was in

6    Clayton, so I would usually spend --

7    Q    Okay.  So it sounds like that you would keep this in your

8    head mostly, the research and the content that you were

9    reviewing?

10   A    No.  I would -- no.  I mean, there's -- I mean, there's

11   cases that we collected that we would review, but -- you know,

12   as far as just going through the files, did I take, you know,

13   many, many notes?  No.  That's not -- I just never did it that

14   way.  It was always --

15   Q    I just want to be clear.  You don't take notes in reviewing

16   a complicated file like this?

17   A    I don't say I don't take any notes.  As I said before, I

18   would take notes regarding cases that I thought that stood out

19   that would help us.  And in this case, there was -- there was

20   just so many notes in the files, so many interviews, it was --

21   it really wasn't necessary for me.

22        MR. PERKOVICH:  Your Honor, here I'm just going to

23   caution the witness that he has an enduring obligation to his

24   client with regard to the substance of the underlying habeas

25   claims available to him, and so I'm just going to ask him not to

1    opine on the subject matter involved here.  We really want to

2    focus on his process because that relates to his conduct.

3          THE COURT:  All right.

4          MR. PERKOVICH:  Thank you.

5    BY MR. PERKOVICH:

6    Q   So memos to file, that's not -- that's not a habit?

7    A   No.

8    Q   Outlines, working outlines in terms of articulating claims

9    that would go into a habeas petition?

10    A   No.

11    Q   Okay.  Drafts of, you know, the beginnings of claims that

12    you're distilling from your review, would that -- is that a part

13    of the work process perhaps?

14    A   Drafts, certainly.  How it would typically work is after

15    doing the research --

16    Q   Uh-huh.

17    A   -- I would typically -- I didn't have a full-time secretary,

18    so I would go to Mr. Butts' office and I would dictate, and his

19    secretary would draft it and fax it back, the redrafts or the

20    drafts, and that's typically how it worked.

21    Q   And so the environment of the secretary in drafting

22    mechanically, how would that proceed?  Would there be dictation?

23    Would there be handwritten drafting?  How would that play out?

24    A   I would dictate into a Dictaphone, and she would --

25    Q   Okay.

1  A    -- produce the copies for me to review, and then I would

2  correct those.

3  Q    Do you know if Mr. Butts used that same method or something

4  like that?

5  A    I believe so.

6  Q    And the secretary, this was Mr. Butts' employee?

7  A    Correct.

8  Q    And what is her name?

9  A    Laurie.

10  Q    I'm sorry.  Could you repeat that?

11  A    Laurie.

12  Q    Laurie?

13  A    Yeah.  I don't know her last name.

14  Q    You don't know her last name?

15  A    No.

16  Q    Laurie was her first name?

17  A    Yes.

18  Q    About how old was she around this time, 2004, 2005?

19  A    I'm sorry?

20  Q    About how old was Laurie around 2004, 2005?

21  A    It appears --

22  Q    I know that's a fraught question.

23  A    Yeah, I don't know.  She was -- I know she's been a

24  secretary for him for years and years ever since I've known --

25  Q    I think that fits the bill.  Thank you.

1    All right.  So when you're working on a case like this and

2    you're devoting time like this, you're reviewing in the method

3    that you've just outlined, how do you -- what system of

4    timekeeping were you using in this period of 2004, 2005?

5    A   Well, I didn't really keep time on this case, and nor did I

6    keep time on truly any of the other death penalty cases except

7    for when I worked for someone else that required me to keep my

8    time.  And the reason why is I never -- I wasn't doing this for

9    the money.  And I made a good salary outside of this, outside my

10    habeas practice, and this was -- I believe was my pro bono work,

11    even though I did get paid on a couple of occasions for maybe a

12    couple of the cases.  But for the vast majority of cases, I've

13    never -- I've never billed the government for my work.

14    Q   Well, that begs the question.  Why would you seek

15    appointment and submit a rate and billing that reflects time and

16    a rate and a figure and -- although you had no intention -- I'm

17    hearing you say you had no intention to -- you didn't keep track

18    of your time for this?

19    A   Well, I was required to do so.  This was the first case that

20    I was actually required to do this.  The Court asked me to

21    provide a budget.  This was my 6th habeas case.  In the previous

22    five cases, I've never submitted a budget whatsoever.

23    Q   And in all of those cases, you did not submit billing as

24    well?

25    A   I submitted billing on the Andy Six case because I was

1    employed for a period of time when the case was active.  And I

2    submitted billing on the Weaver case because I was also employed

3    at the time, and my employer required me to do so.

4         But beyond that on the other cases, I never submitted any

5    types of fees, including -- including Mr. Weaver's fees, which

6    was taken up to the U.S. Supreme Court, which I was at the U.S

7    Supreme Court when this was argued, and I didn't request any

8    fees from the Supreme Court or from -- or from any court at the

9    time.

10   Q    All right.  So --

11   A    Including my travel.

12   Q    -- what is your reason for not billing this court in

13   relation to Mr. Christeson and knowing that you were not going

14   to do that, despite submitting averment to the Court as to the

15   time and the rate involved for budget purpose was because you

16   had another source of income?  Is that what you said?

17   A    Well, it wasn't that.  I just didn't -- you know, I didn't

18   want to get -- it wasn't that important to me to keep track of

19   my time in order to bill the government.  I didn't want to feel

20   constrained by that.  I just wanted to do my job, and that's --

21   Q    Would there be opportunity costs from a business standpoint

22   in dedicating time that you were not going to be compensated at

23   all for as opposed to what you could be compensated for?

24   A    I didn't --

25   Q    There are 24 hours in the day.  Can you explain that

1    thinking?

2         THE COURT:  Now, wait a minute.  Wait a minute.  I don't

3    know why you're expending this period of time on this because

4    that's not the issue, whether he kept track of his time, how

5    much time he spent.  Why are you going into this?  That's not

6    the issue in this case.

7         MR. PERKOVICH:  Your Honor -- Your Honor, respectfully,

8    I think the matter of that there's no time being kept is

9    extremely vital --

10        THE COURT:  No, it is not.

11        MR. PERKOVICH:  -- of his performance and what he was

12   doing.

13        THE COURT:  That's your opinion on what an attorney has

14   to do.  The question here is when he went to work on this case

15   and whether he abandoned his client, not how he billed, not how

16   much he billed, and not why he billed.

17        MR. PERKOVICH:  Okay.  Well, we're just -- we are

18   currently -- the matter of time spent.

19        THE COURT:  Where?  It's not in your petition.  Why are

20   you -- that's not in this issue.

21        MR. PERKOVICH:  Your Honor -- Your Honor, if I could

22   just ask a follow-up question in regards to --

23        THE COURT:  Sure.

24        MR. PERKOVICH:  -- his use of his time.

25        THE COURT:  Sure.

1        MR. PERKOVICH:  Because this -- because this does boil

2   down to his performance on the case.

3   BY MR. PERKOVICH:

4   Q    And so you -- you did not keep track of time in this case.

5   Can you describe your practice generally in terms of timekeeping

6   and billing in this time?

7   A    During this time period, I would say there were some cases

8   that were billed hourly, I believe, but the vast majority of

9   cases were probably flat-fee types of criminal cases.  During

10  this proceeding, I believe I was also representing through the

11  CGA also, which I kept track of my time.  But for these types of

12  cases, just because of the amount of material to review, and I

13  just didn't -- I just didn't go for my time when it came to

14  habeas cases.

15  Q    So that I'm clear, so for matters that were less time

16  consuming, you kept track of time.  But for the ones that were

17  extremely time consuming, you did not keep track of how you were

18  using your -- allocating your time?

19  A    I don't think that's -- that's correct.  I just didn't -- I

20  just felt, generally speaking, that I just was not going to keep

21  track of my time on these death habeas cases.  I mean, they did

22  require a lot of time, and I could have billed for that time,

23  but I decided not to.

24  Q    Okay.  Okay.  So if we could quickly, because it seems that

25  some case has been treated differently from others in terms of

1    your capital cases and your history here, and I'm just trying to

2    understand the distinction between Mr. Christeson's case and

3    your election to present a budget and contemplate the hours that

4    you would spend on it, but then a determination at the outset,

5    you're saying, to not track any of that time versus some of

6    these other cases.  So can you speak to the cases you were just

7    listing for us?  Let's start with the first case you recall in

8    terms of your capital case and the billing that you did on

9    those.

10         MR. SPILLANE:  I'm going to object to this as beyond the

11    scope.

12         THE COURT:  Sustained.  This is far beyond the scope of

13    what's necessary for this hearing.

14         MR. PERKOVICH:  Thank you, Your Honor.  If I can just

15    ask one question about the method of timekeeping, whether he had

16    a system of timekeeping, a software or whether he has it by

17    notes when he does keep time.

18         MR. SPILLANE:  I'm going to object again.

19         THE COURT:  Sustained.  Not relevant.  You're off on the

20    wrong tangent here, counselor.

21         MR. PERKOVICH:  Thank you, Your Honor.

22         If we can -- if we can, Ms. Potts, move to some

23    correspondence.  And I would like to start with what's document

24    E.  It's a May 26th, 2004 letter.  If she can distribute that,

25    and I think we're on Exhibit 6?

1          THE COURT:  Did you say -- I heard you say D.  Does that

2     sound right?

3          MR. PERKOVICH:  That's internally, just so I can

4     coordinate with --

5          THE COURT:  Yeah, I know that.  I'm just helping your

6     paralegal here.

7          MR. PERKOVICH:  That's right.

8          THE COURT:  Thank you.

9     BY MR. PERKOVICH:

10    Q    So, Mr. Horwitz, please review this.  And when you're able

11    to speak, please let me know.

12    A    Yes.

13    Q    Okay.  Can you identify what you have in your hand there?

14    A    It's a letter from Bill Swift to Mr. Christeson.

15    Q    And the date is?

16    A    May 26th, 2004.

17    Q    Can you read the last paragraph?

18    A    "The documents to start your federal habeas case were filed

19    with the court in Kansas City on May 14th.  I expect that

20    shortly both Mr. Horwitz and Mr. Butts will be appointed to

21    represent you.  When I know more, I will let you know."

22    Q    Is that statement consummate with your recollection of that

23    conference?

24    A    I don't recall.

25    Q    I'm sorry?

1    A    I don't recall this time period.

2    Q    I'm sorry, it is accurate or --

3         COURT REPORTER:  Counsel.

4         THE COURT:  One at a time.

5         THE WITNESS:  I don't have a specific recollection of

6    this time period.

7    BY MR. PERKOVICH:

8    Q    Okay.  You do not have a specific recollection of this time

9    period; is that right?

10   A    Yes.

11   Q    Thank you.

12        MR. PERKOVICH:  If we could provide the witness with,

13   Codi, the July 16 letter that's marked -- that you have.  This

14   will be our Exhibit 7.

15        THE COURT:  Thank you.

16   BY MR. PERKOVICH:

17   Q    And, Mr. Horwitz, again, you know the drill.  Please take

18   your time to review this, and we'll speak about it.

19   A    Yes.

20   Q    Okay.  Can you identify this document?

21   A    It's a letter from Mr. Swift to Mr. Christeson.

22   Q    And can you read the CC line on this letter?

23   A    Attorneys Phil Horwitz and Eric Butts.

24   Q    Okay.  Do you -- so that's your name there; is that right?

25   A    Yes.

1    Q    Do you recall receiving this?

2    A    Yes.

3    Q    Okay.  Would you read the middle paragraph that begins, "The

4    district court"?

5    A    "The district court in Kansas City, Judge Whipple, has

6    conditionally appointed them to -- appointed them subject to

7    them submitting a proposed estimated budget for your case.  They

8    are in the process of putting together the requested budget.

9    They expect that once the submitted budget is submitted, they

10    will have their appointment made final to represent you.  Once

11    the appointment is finalized, they will be able to begin working

12    on your case."

13    Q    And so what do you recall about this time period of

14    Mr. Swift communicating with you your entry of appearance which

15    predates this, we've established, and the steps that were

16    unfolding in this court?

17    A    I'm not sure if I understand your question.

18    Q    Is this an accurate reflection of your understanding of the

19    position of your role in the case?

20    A    Yes.

21    Q    So you were conditionally appointed, and you were expecting

22    to submit a budget, and you were expecting a determination on

23    that budget; is that correct?

24    A    Yes.

25    Q    Okay.  I want to return to the State's Exhibit 1, I believe

1    it was, Respondent's Exhibit 1, which is the budget we

2    considered earlier.  And if you have that or when you have that,

3    Mr. Horwitz, please let me know.

4    A   Yes, sir.

5    Q   Okay.  Can you read the date, the filing date on the footer?

6    Not the recent one as this exhibit, but the initial document

7    date.

8    A   July 22nd, 2004.

9    Q   July 28th?

10    A   July 22nd, 2004.

11    Q   Maybe we're talking about different documents.  I'm

12    referring to one marked today as document -- it's document

13    163-1.  I believe that's Exhibit 1.  And I'm reading the ledger

14    above -- the blue ledger in my copy of it, which is the document

15    8 in our record, and it has a file date, and it appears to be

16    7/28/4?

17           MR. SPILLANE:  May I approach and show him?

18           THE COURT:  Sure.

19           THE WITNESS:  I don't see a date on here.

20           MR. SPILLANE:  Right there at the bottom, sir.

21           THE WITNESS:  Oh, 7/28.

22           MR. SPILLANE:  On your copy it's right here.

23           THE WITNESS:  I'm sorry.  I see what you're talking

24    about now.

25    BY MR. SPILLANE:

1    Q    Okay.  Thanks.  It's hard to do this this way.  We

2    apologize, and I appreciate your patience.

3         Okay.  So is that accurate, that filing date?  Does that

4    seem to be when you would have or did file this budget as was

5    required?

6    A    Yes.

7    Q    Okay.  And we've already discussed some of the estimates

8    here.  We've already discussed that while these estimates in

9    terms of the amount of time, which is the metric involved or set

10   forth here, that from the outset, you did not track your time

11   working on this.  That's correct, right?

12   A    That's correct.

13   Q    Okay.  It seems that the third page contemplates a cost

14   associated with an expert.  Can you read the line on the third

15   page there, No. 7?

16   A    Yes.  It says costs of neuropsychological exam and testing.

17   Q    Okay.  And the amount was?

18   A    $4,000.

19   Q    4,000.  And do you recall contacting a neuropsychologist?

20   A    No.

21   Q    Okay.  And --

22   A    Can I give you the reason why?

23        THE COURT:  Yes, you can.

24        MR. PERKOVICH:  Okay.  Thank you.

25        THE COURT:  Wait a minute.  He asked to tell you why he

1   didn't, so I'm going to let him to speed this hearing along.

2       MR. PERKOVICH:  Well, that's what I'm trying to do, but

3   if you'd like a follow-up question, Your Honor.

4   BY MR. PERKOVICH:

5   Q   Why did you not do that?  And I caution again that you have

6   enduring duties to your client with respect to underlying merits

7   here.

8       THE COURT:  Well, now wait.  You don't need to counsel

9   this man on what his duties are.  You ask the questions for your

10  client, and I'll take care of any cautions that need to be given

11  to this attorney.

12      MR. PERKOVICH:  Yes, Your Honor.  And I just want to

13  renew my objection with regard to the waiver and that it's being

14  treated as a blanket waiver.

15      THE WITNESS:  Well, it's my understanding that it's been

16  waived by your client.

17      THE COURT:  I agree.

18      MR. PERKOVICH:  I understand that's your legal view,

19  witness, and I understand the judge's position.  I'm just

20  repeating my objection with regard to the idea that this is a

21  blanket waiver.

22      THE WITNESS:  Do you not want me to answer the question?

23      MR. PERKOVICH:  But if he wants you to answer, please

24  answer.

25      THE WITNESS:  Do you not want me to answer the question?

1    BY MR. PERKOVICH:

2    Q   Why did you not -- when you budgeted for a

3    neuropsychological evaluation, why did you not contact or

4    consult any expert in relation to that?

5    A   Okay.  And you understand that this may get into

6    attorney-client privilege information?

7    Q   I don't want you to answer this, so I would be happy if we

8    moved on, frankly.  I don't see the --

9         THE COURT:  Do you want to answer it?

10        THE WITNESS:  I'd like to answer.

11        THE COURT:  Then you may answer it.

12        THE WITNESS:  When I spoke to Bill Swift, we had talked

13   about -- about Mr. Christeson's mental state.  Mr. Swift told me

14   that he refused to undergo any type of psychological evaluation.

15   When -- but I had put in there that amount of money just in case

16   we would need it in the future.  But it was my understanding

17   that -- that that was not going to be needed.

18        When we actually met with Mr. Christeson, he did not want to

19   undergo any type of neuropsychological exam either.

20   BY MR. PERKOVICH:

21   Q   I'm sorry.  Can you repeat that response?  I'm sorry, just

22   the last part.

23   A   When we met with him, he also did not want to undergo any

24   type of mental evaluation.

25   Q   Okay.  And can you tell me specifically when that question

1   was posed to him?  Was that your first meeting?

2   A   Yes, that was our first meeting.

3   Q   Okay.  We'll get to that.  I'd like to --

4       MR. PERKOVICH:  Ms. Potts, document F, if we can mark

5   that as our exhibit, I believe it's 7, and supply that to the

6   witness and the Court.

7       THE WITNESS:  Yes.

8   BY MR. PERKOVICH:

9   Q   Thank you.  Can you identify this?

10  A   It's a letter from Bill Swift to Mr. Christeson.

11  Q   Okay.  And who is copied on the letter?

12  A   Myself and Eric Butts.

13  Q   Do you recall this letter?

14  A   If I was CCed, I'm sure I received it; but independently, I

15  do not recall.

16  Q   And you wouldn't have notes to be able to consult in

17  relation to, you know, the case file as it's transpiring?

18  A   No.

19  Q   Because you don't -- you wouldn't have kept notes.  You

20  wouldn't have made a note of this, I guess is what I'm --

21  A   No.

22  Q   If I could have you read the full paragraph there, that

23  would be very helpful.

24  A   "I just wanted to update to you on what I know about Mr.

25  Horwitz and Mr. Butts being able to represent you.  I spoke to

1    Mr. Horwitz today, and he indicated that they had submitted

2    their proposed budget to the district court and were awaiting

3    approval of that budget.  Mr. Horwitz mentioned that Mr. Butts

4    has spoken to the Western District Court Clerk's office on

5    multiple occasions, but there has not been any action indicating

6    approval of the proposed case budget.  It is my understanding

7    that once the case budget is approved, Mr. Horwitz and Mr. Butts

8    can then begin to work on your case.  If you have any questions,

9    please write" --

10        THE COURT:  Now, slow down.  The court reporter is

11    having to take this down.

12        THE WITNESS:  Oh, I'm sorry.  "Please write to me, and I

13    will try to answer them."

14    BY MR. PERKOVICH:

15    Q   Okay.  Do you recall calling the district court clerk's

16    office?  This letter refers to Mr. Butts, but did you recall

17    around this time frame making calls yourself --

18    A   No.

19    Q   -- to the clerk's office?

20    A   No.

21    Q   Now, was that not -- that was Mr. Butts' bailiwick?

22    A   That's correct.

23    Q   Okay.  Well, fortunately we'll be able to ask him about

24    that.  This last sentence, could you read that last sentence one

25    more time?

1   A   "If you have any questions, please write to me, and I will

2   try to answer them."

3   Q   "It is my understanding," the one that begins with that.

4   A   I'm sorry?  Oh, "It's my understanding that once a case

5   budget is approved, Mr. Horwitz and Mr. Butts can then begin to

6   work on your case."

7   Q   Now, that's Mr. Swift writing.  Is that an accurate

8   depiction of the state of affairs?

9   A   I believe so.

10  Q   Okay.  Thank you.

11          MR. PERKOVICH:  Codi, what we've got G, can you mark

12  that as Exhibit 8, please?

13          THE COURT:  8 is just what you referred to.

14          MS. POTTS:  And, Mr. Perkovich, we're actually on 9.

15          THE COURT:  The 23rd letter.

16          MR. PERKOVICH:  My numeracy has led me to the law, so I

17  apologize.

18          THE WITNESS:  Yes.

19  BY MR. PERKOVICH:

20  Q   Okay.  Can you identify this?

21  A   "I justed want to let you know that during the last week,

22  your case file materials we sent to Mr. Horwitz and Mr. Butts in

23  St. Louis.  I spoke to Mr. Horwitz, and he told me that even

24  though he still had not received approval from the district

25  court for the proposed case budget, he felt they needed to

1    obtain the file so they could begin to review it."

2    Q    Okay.  And what's the date of this letter?

3    A    September 27th, 2004.

4    Q    And it's a letter from whom to whom?

5    A    From Mr. Swift to Mr. Christeson.

6    Q    Okay.  And who's copied on it?

7    A    Myself and Mr. Butts.

8    Q    Okay.  And do you recall receiving this letter?

9    A    As I said before, I don't have an independent recollection,

10   but I'm sure I did if it was CCed to me.

11   Q    Okay.  And does this seem to be a reflection of the

12   circumstances that have been spoken to earlier in your direct

13   examination in terms of the file being provided?

14   A    Yes.

15   Q    So how many months is this after the submission of your

16   budget?

17   A    I don't know.  I haven't calculated it.

18   Q    Well, we just looked at the budget.  It was dated July 28th,

19   so I can help you with that.  So that's two months; is that

20   correct?

21         Okay.  And then you entered your appearance on which date

22   was that?  That was according to document 7, which dated -- was

23   filed July 22nd.  So a couple months plus afterwards, Mr. Swift

24   is indicating to Mr. Christeson the file has been shipped.

25         So your earlier discussion about the review of the file, you

1    know, you can tell us, what does this writing in September 27th

2    reflect in terms of your work on the case?

3    A    I'm sorry, I don't understand.  I didn't review the file

4    until I received it.

5    Q    Right.  Okay.  So I guess that's -- that's --

6         Now, you earlier testified that the first order of business

7    between you and Mr. Butts would have been to calculate the

8    deadline for the petition?

9    A    One of them, correct.

10   Q    Uh-huh.  Now, if we could return to your motion for

11   appointment.

12        MR. PERKOVICH:  And, Codi -- or I'm sorry.  In terms of

13   keeping track, this would be document 3 that we marked as --

14   perhaps it was Exhibit 2 or Exhibit 3.  I hope I'm right.

15        MS. POTTS:  Yes.

16        MR. PERKOVICH:  It's a file in the record, doc 3, motion

17   to appoint counsel.

18        THE WITNESS:  Okay.

19   BY MR. PERKOVICH:

20   Q    Right.  And that 6th paragraph, it refers to *Snow versus*

21   *Ault*.  Can you read that sentence?

22   A    "In *Snow v. Ault*, the 8th Circuit ruled that under the

23   AEDPA, the time for filing my habeas petition will commence

24   running when rehearing is ruled on."

25   Q    Does that seem to be an accurate statement of the law at the

1    time?

2    A    I haven't looked at this case in a long time.

3    Q    Would you -- it's a short case.  Would you like to be able

4    to consult it?  Very short.

5         MR. PERKOVICH:  Okay.  Codi, this is, I think, N.  It's

6    *Snow versus Ault*.  And if you could -- the three pages, if you

7    could supply that short three-page opinion.

8         MR. SPILLANE:  I'm going to object to what this has --

9         MR. PERKOVICH:  Mark it as, I guess, Exhibit 10.

10         MR. SPILLANE:  I'm going to object to this because I

11    think it has nothing to do with abandonment.  I think he's going

12    to be asked to read a case and then give his legal opinion on

13    what it means.

14         THE COURT:  Sustained.  You're going beyond the purpose

15    of this hearing.

16         MR. PERKOVICH:  The question is their calculation.

17         THE COURT:  You're going beyond -- I don't care what you

18    think it is.  You don't render the opinions.

19         MR. PERKOVICH:  Respectfully, Your Honor, the Supreme

20    Court has already spoken to the reliability of their averments

21    with regard to post hoc reasoning of how they calculated, so I

22    think it's important for us to look at the authority that's in

23    the first moving document in this record that points clearly to

24    the prevailing 8th Circuit law that unambiguously answers this

25    question.

```
 1          THE COURT:  Objection sustained.
 2          MR. PERKOVICH:  Okay.  Codi, if I could ask you to
 3    supply Mr. Horwitz with document H, and that would be
 4    Exhibit 11.
 5          MS. POTTS:  10.
 6          MR. PERKOVICH:  I'm sorry.  I just want to clarify that
 7    the copy of *Snow versus Ault* was not admitted as an exhibit.  Is
 8    that what transpired in the courtroom?
 9          THE COURT:  Yes.
10          MR. PERKOVICH:  All right.  Thank you, Your Honor.  I
11    need all the help I can get.
12          THE COURT:  That was 9.  No?  What was *Snow v. Ault* that
13    I sustained the objection?
14          MR. SPILLANE:  That was the 8th Circuit case on when
15    tolling starts.
16          THE COURT:  Right, but it hadn't had an exhibit number
17    put on it, right?
18          MR. PERKOVICH:  So if we may mark it for the record just
19    simply.  We understand that, you know, it wasn't presented to
20    the witness.  You did not consider it.
21          THE COURT:  No, I'm not going to cloud the record
22    further.  No.
23          MR. PERKOVICH:  Okay.  So this is *Snow versus Ault*.  The
24    reporter cite is 238 F.3d 1033, 8th Circuit 2001.  Thank you,
25    Your Honor.
```

1    BY MR. PERKOVICH:

2    Q    Mr. Horwitz, do you have a copy of this document --

3    A    Yes.

4    Q    -- dated May 23, '05?

5    A    Yes.

6    Q    Can you describe it or identify it, I should say?

7    A    It's a letter from Eric to me.  It's --

8    Q    Okay.  And this was sent in what method, it appears?

9    A    Fax.

10   Q    Facsimile.  And can you read the content of the body of the

11   letter?

12   A    "Please have your secretary contact Potosi Correctional

13   Center and schedule a time for us to meet with Mark Christeson

14   and William Rousan on Friday, May 27th, 2005.  I believe

15   visiting hours on Friday are from 3:00 p.m. to 8:00 p.m.  I

16   prefer 3:00 p.m."

17   Q    And do you recall receiving this faxed letter from

18   Mr. Butts?

19   A    Yes.

20   Q    Okay.  And did you, in fact, schedule a visit based on this

21   request?

22   A    Yes.

23   Q    And did you visit with Mr. Christeson and Mr. Rousan?

24   A    I'm sure we did.  I know we visited with Mr. Christeson.

25   I'm sure we visited with Mr. Rousan too.

1   Q   Okay.  If I could point you to Respondent's Exhibit 3 today,

2   I believe there's -- make sure I got the right number here.  No,

3   I misspoke.  I misspoke.  I think it's maybe Exhibit 5.  Yes, it

4   is.  And Mr. Spillane directed you to page 8 on that document

5   earlier.  I'd like to also go there.

6   A   Could you point that out to me?

7           MR. SPILLANE:  Yes, sir.

8           THE COURT:  I believe Exhibit 5 is the entry of

9   appearance.

10          MR. PERKOVICH:  That's right.  Respondent's Exhibit 5,

11  page 8 in the record is, once again, document 73.

12          THE WITNESS:  Page 8.  Okay.  I'm there.

13  BY MR. PERKOVICH:

14  Q   Okay.  If you look at the end of the last full paragraph,

15  about four lines up from the bottom of the page, can you read

16  that sentence?

17  A   "Counsel met with Mr. Christeson on May 27th, 2005"?

18  Q   Okay.  Now, I just want to take you -- I want you to take a

19  brief moment to consider the context of this writing, the

20  paragraph, and I'm going to ask you a question as to whether

21  that was the first meeting.  It seems to be represented as such.

22  A   Yes.

23  Q   Okay.  So you believe that that was your first meeting with

24  Mr. Christeson?

25  A   Correct.

1    Q    And at that time, you earlier said that you -- you met --

2    you met him, and what's the -- how long had you -- when was --

3    did you enter your appearance?  That was July 22nd, I believe

4    you said, 2004.  And this is May 27th, 2005.  That's your first

5    meeting with your client; is that correct?

6    A    That's correct.

7    Q    Normally would you wait this long to meet a client in a case

8    that had a one-year statute of limitations?

9    A    Well, as I previously discussed, we thought we had more time

10   to file.

11   Q    I understand that.  I understand that.  That's not my

12   question, respectfully.  Normally would you let so much time

13   pass?  It seems like a lot of time in terms of an attorney

14   getting a new case, being appointed for an indigent prisoner to

15   consult the prisoner about a case, especially a post-conviction

16   case that concerns investigation.  But is that -- would it be

17   fair to say that that would be typical or atypical?

18   A    I think it would be a little -- I think it was more unusual

19   in this case just because of the volume of material that we went

20   through, and we wanted to be prepared when we -- when we went

21   down there to visit him.

22   Q    Uh-huh.  And so when you met him, you know, how did you

23   broach a neuropsychological examination on this introduction to

24   a client that you had entered an appearance in this court to

25   represent ten months or so earlier?  How did that come about, do

1    you recall?

2    A    I'm not sure I understand the question.

3    Q    So you earlier said that you asked him if he would submit to

4    testing --

5    A    That's correct.

6    Q    -- of a neuropsychologist --

7    A    That's correct.

8    Q    -- pursuant to the averments made in the budget about your

9    intention in working this case up.

10   A    That's correct.

11   Q    I'm wanting to know how you raised that question that you

12   state he rejected.

13   A    Well, many times that can be fruitful grounds on an appeal,

14   the petitioner's mental status.  I know in my previous case or

15   in one of my previous cases, the Willie Simmons case, we

16   actually had conducted neuropsychological testing, and we gained

17   relief for him because of that.  So I'm aware, I'm fully aware

18   that that's always a potential issue out there.

19        And from looking at the files, there had not -- at that time

20   I don't believe there was a full mental evaluation contained

21   within the file.  It appears that there was some discussions

22   about his mental competency.  I believe he may have met with one

23   or two physicians or psychologists or, I'm sorry, psychiatrists,

24   but it doesn't appear that there was any firm -- firm ground as

25   far as his mental abilities at the trial level.

1      And because of that, I just -- it was -- because of my

2    conversation with Bill Swift, I -- and there was little mental

3    competency issues contained within the files that I received, I

4    believed that was a good issue to speak to him about.

5    Q   And so what did you say to him about it?

6    A   I asked -- well, I'm not sure if I asked or if Mr. Butts

7    asked, but I know the issue of mental competency and whether or

8    not he would undergo testing was talked about.

9    Q   And it is your practice upon meeting a new client in prison

10    to ask them if they would submit to psychological testing of

11    various kinds on the first meeting?

12    A   Sure.

13    Q   Sure?  Okay.  Do you recall speaking to my co-counsel,

14    Ms. Merrigan, about Mr. Christeson's level of cooperation?

15    A   No.

16    Q   You do not recall, okay.  So you don't recall telling her

17    that Mr. Christeson was very cooperative with you?

18    A   Oh, in that -- yeah, I believe he was cooperative.

19    Q   Okay.  So is it your understanding when, you know, making a

20    request for funding that you have to have some basis, you know,

21    in the file or in the communication from prior counsel to, you

22    know, submit that and that -- what's your understanding as to

23    the implications in terms of your followthrough on such a thing?

24    A   I'm not sure if I understand your question.

25    Q   I'll strike it, and we'll move on.

```
 1          MR. PERKOVICH:  Okay.  So I'd like to take a brief
 2     recess if we could, just five minutes, before I release the
 3     witness.
 4          MR. SPILLANE:  No objection.
 5          MR. PERKOVICH:  We've been going for over two hours now.
 6          THE COURT:  Yes, we have.  What I'm trying to decide, if
 7     we take a five minute recess.  I guess so, and then we're going
 8     to need to take a recess for lunch and let everybody regroup.
 9          MR. PERKOVICH:  I appreciate that, Your Honor.
10          THE COURT:  Let's take a short five minutes.
11          MR. PERKOVICH:  It will be under five minutes.
12          THE COURT:  Well, you may have some redirect.  Do you?
13          MR. SPILLANE:  No, Your Honor.
14          THE COURT:  All right.  Let's take a short five minutes.
15     Do you need to talk to your paralegal?
16          MR. PERKOVICH:  I would like to do that, Your Honor.
17          THE COURT:  Do you want us to leave the courtroom?
18          MR. PERKOVICH:  Your Honor, we can do it on a side
19     channel.
20          THE COURT:  Okay.  Let's take a five minute recess.  As
21     soon as we're done with this witness, we're going to take a noon
22     recess.
23          MR. PERKOVICH:  If it's -- the phone stays connected on
24     your end, we can dial back into it.
25          THE COURT:  We're not going to leave an open line.
```

1   We'll have you dial back in when it's time to be back.  Let's

2   take five minutes before we take a noon recess.

3        MR. PERKOVICH:  Thank you.

4   *(Recess taken from 12:10 to 12:18.)*

5        THE COURT:  Okay.  Reconvene from recess.  We have five

6   minutes of questions.  Then we'll take our noon recess.  Ready?

7        THE WITNESS:  Yes.

8        THE COURT:  Go ahead.  Oh, wait.  We don't have counsel.

9   Wait, he's on the phone.  What's the matter with me?

10  Mr. Perkovich, you may continue.  You said you had five more

11  minutes.

12       MR. PERKOVICH:  Thank you, Your Honor.  That should be

13  all I need.

14  BY MR. PERKOVICH:

15  Q   Mr. Horwitz, I just want you to return to the May 23rd, 2005

16  fax letter that we had marked as -- I think it was -- I want to

17  say Exhibit 11?  Is that 12?

18       MS. POTTS:  10.

19       THE WITNESS:  10?

20  BY MR. PERKOVICH:

21  Q   Okay.  And the prior document we looked at was dated

22  September 27th, 2004.

23  A   Correct.

24  Q   Now, I'm going to ask you a question in the negative, which

25  is do you recall any communication or correspondence with

1 Mr. Swift or between you and Mr. Butts concerning activity on

2 this case between those periods?

3 A  Between myself and Mr. Swift and Mr. Butts?

4 Q  Well, yes.  And to be clear, you know, not the three of you

5 necessarily all together, but just communications involving you

6 and/or either of those men.

7 A  Well, I know as far as Mr. Butts is concerned, we had

8 numerous communications regarding this case.

9 Q  And what would be the mode of that communication?

10 A  Whether through a telephone call or me coming down to his

11 office.

12 Q  Uh-huh.  So this is circa 2005.  Would you exchange emails?

13 A  No, that was -- it was interesting that I don't think

14 Mr. Butts was quite used to the email at the time.  I think he's

15 just kind of getting used to it now.

16 Q  Well, we look forward to his perspective on technology a

17 little bit later today.  So the rule was maybe a fax here and

18 there, or it was mostly phone?

19 A  Yeah, very -- it was -- Mr. Butts did most of the

20 communications with Mr. Christeson.  And in regard between

21 myself and Mr. Butts, it was strictly on the phone or in person.

22 Q  So do you recall sending correspondence to Mr. Christeson

23 yourself?  Just yourself.

24 A  No.

25 Q  That's a no?

1    A    No.

2    Q    All right.  Okay.

3         MR. PERKOVICH:  I have no further questions.  But before

4    I release the witness, I want to move to admit the exhibits we

5    have marked.  I believe that at least one has been admitted,

6    maybe Exhibit 3.  It's not clear to me, but I do want to move to

7    admit every exhibit that we have marked today in connection with

8    his testimony.

9         MR. SPILLANE:  I have no objection.

10        THE COURT:  Well, that is Exhibits 1 through 10.

11   Paralegal, do you agree with that?

12        MS. POTTS:  Yes.

13        THE COURT:  All right.  Exhibits 1 through 10 that have

14   been marked by your paralegal and admitted or are admitted a

15   second time.  All right.

16        MR. PERKOVICH:  We call this belts and suspenders.

17   Thank you for indulging us.

18        THE COURT:  That's all right.

19        MR. PERKOVICH:  And --

20        THE COURT:  Let's discuss when we're coming back.

21        MR. PERKOVICH:  And I would also like to lodge a motion

22   here that we will follow-up in writing to request Mr. Horwitz's

23   CJA billing in other capital appointments.  He has referred to

24   these.  He has juxtaposed them in relation to his choices with

25   regard to how he would proceed with his representation in

1    conducting his work on it, and I think they're vital to

2    surmising the credibility of his averments today.

3         MR. SPILLANE:  And just for the record, I'm going to

4    object to that.

5         THE COURT:  And I'm going to sustain the objection.  You

6    don't need that for purposes of this hearing.  You're trying to

7    expand this hearing, Mr. Perkovich, way beyond the directive

8    I've received from the 8th Circuit.  I'm sorry.  You're trying

9    to engage in -- or determine whether or not this counsel did it

10   the way you would do it or bill it or didn't bill it, et cetera,

11   et cetera.  That's not the issue, absolutely not.  How can you

12   make that the issue?  I'll give you an opportunity to tell me.

13   How can you make that the issue?

14        The question is abandonment.  And here you just developed he

15   got 20 pages -- 20 boxes of documents and went over it.  Now,

16   how is that abandonment?  Tell me that right now.

17        MR. PERKOVICH:  Well, Your Honor, I respectfully will

18   say a couple things in response.  One is those are inherited

19   boxes that he has stated he reviewed.  He's spoken about his

20   pattern and practice with respect to the extensive experience in

21   capital cases.

22        THE COURT:  That's fine, and you can't criticize that.

23        MR. PERKOVICH:  That practice seems to vary widely, Your

24   Honor, and I think it's extremely relevant for us to be able to

25   review his pattern and practice of conduct so that we can judge

1    what he's testifying to now.

2        THE COURT:  Absolutely not.  You are wrong.  You know

3    you're wrong, Mr. Perkovich.  You're just raising this argument

4    to try to extend this hearing in your cause of action.  That's

5    wrong, Mr. Perkovich.  I don't know how you can get that.

6        MR. PERKOVICH:  Well, Your Honor, respectfully, we're

7    trying to get to the truth of the matter with regard to what

8    actually occurred because there are no records of this, which is

9    highly irregular for an attorney to keep no records or notes of

10   his activity.

11       THE COURT:  That's your opinion.  Mr. Perkovich, that's

12   your opinion, and that's not the issue.  The issue is not how he

13   conducted his practice in this case.  Nowhere is that mentioned

14   by the 8th Circuit, by the Supreme Court and saying they just

15   want to know if this man abandoned him.  Now, I know you're

16   wanting to expand this, but you're wrong.

17      All right.  Let's -- how much do we need for a noon break?

18   It's 12:25 by the wall -- the clock on the wall in the

19   courtroom.  Can you be ready at 1:30 my time?  What's your time

20   there, Mr. Perkovich?

21       MR. PERKOVICH:  It's just an hour ahead of yours, Your

22   Honor.  We'll go all night, and I will take a five minute break

23   if that's what the Court wants to --

24       THE COURT:  We're going to break for lunch.

25       MR. PERKOVICH:  We are very urgently concerned about

1   wrapping this up just as much as the Court is.  I apologize if

2   you disagree with our method in terms of our advancement of this

3   inquiry about their conduct.  With all due respect, I really

4   mean it, we want to get to the truth of the matter.  Thank you,

5   Your Honor.

6        THE COURT:  All right.  Listen to me.  We're going to

7   recess for one hour.  Yes, we're going to continue until we get

8   done today, I can assure you this.  It's 12:00 -- well, it's

9   12:20.  I'm going to call it 12:30.  We're going to reconvene at

10  1:30 our time.  And you say you're an hour ahead, so that's

11  2:30.

12       MR. PERKOVICH:  Very well.

13       THE COURT:  Are we finished with this witness?

14       THE WITNESS:  Judge, yeah, I just -- sorry, Judge.  I

15  was just looking at this document that Mr. Spillane had handed

16  me.  And as far as the contacts are concerned between myself and

17  Mr. Christeson and Mr. Butts, which it's not marked as an

18  exhibit, but I would just like to say that I don't believe this

19  is completely accurate as far as the legal calls are concerned

20  because I know there were -- there were many, many legal calls

21  that were not -- that are not documented on here.  He contacted

22  me by cell phone.

23       MR. PERKOVICH:  Your Honor, we're going to object to the

24  witness volunteering his opinion on records that the state

25  submitted to him that we haven't seen, that purportedly are from

1    the Department of Corrections.  I mean, this is something that

2    we can address with disclosures from the state and our ability

3    to consult with the Department of Corrections.  But I think it's

4    fair to say that their recordkeeping should be taken with much

5    more seriousness than the opinion of the witness who has stated

6    he keeps no records.

7            THE COURT:  All right.  Point that out to counsel.  I'm

8    going to let you testify.

9            MR. SPILLANE:  Thank you.  These are just --

10           MR. PERKOVICH:  I would move for all of that to be

11   stricken.

12           THE COURT:  No, I'm not -- now, Mr. Perkovich, lets you

13   and I understand each other.  You're having this hearing.

14   You're wanting to review all kinds of documents.  You were

15   appointed in this case.  You've been in this case for 22 months.

16   Why don't you have all this?

17           MR. PERKOVICH:  Because they don't exist in large part.

18           THE COURT:  You haven't done any discovery to find out,

19   have you?

20           MR. PERKOVICH:  Your Honor, we do have records from the

21   Department of Corrections.  We believe they are accurate and

22   reliable representations of the communications between these

23   lawyers and Mr. Christeson.  Mr. Horwitz is opining that there

24   are calls outside of the records kept in the Department of

25   Correction, which I find remarkable.  And I'm simply noting

    1    that.  We are actually -- without having seen these documents,

    2    we are aware of the production from the Department of

    3    Corrections to us that based on requests that we made years ago

    4    that we think are accurate.  And it seems that we're referring

    5    to the same thing.  I do not know that as I sit here and speak

    6    to the Court, but the idea that Mr. Horwitz has a recollection

    7    as to more calls or something that diverges from the state's

    8    records simply baffles me.  And I'm simply lodging my

    9    incredulity with regard to just volunteering that.

   10        THE COURT:  But it took you 22 months to lodge it.

   11    That's the point I'm making.  You should have done all this

   12    research before a week before the 31st of January.

   13        MR. PERKOVICH:  Your Honor, actually we pled details

   14    with regard to their communication in the record in our motion,

   15    with all due respect.  We have pled this, and we have

   16    investigated this fully.  And we've pled this, and it's in the

   17    record; and frankly, you know, we hope to get more information

   18    from these witnesses today, but we feel that we have pled all

   19    the information that reflects the absence of activity and the

   20    evidence of this level of misconduct in question.

   21        So, you know, I don't want to be advocating an oral argument

   22    here, but to speak to these records that the state has

   23    volunteered here today with regard to the Department of

   24    Correction, I think that, you know, they say what they say.  And

   25    Mr. Horwitz's opinion as to whether they're comprehensive or not

1    is really outside the scope of what he should testify to.

2            THE COURT:  I understand your position.  I'll see you or

3    I'll talk to you at 1:30 our time.  It will be 2:30 your time,

4    and we'll begin with the next witness, Mr. Butts, I assume,

5    isn't it?

6            MR. SPILLANE:  Yes, Your Honor.

7            THE COURT:  We'll begin with Mr. Butts at 1:30 Western

8    District of Missouri time and whatever your time is

9    correspondingly, Mr. Perkovich.  Thank you.

10           MR. PERKOVICH:  Thank you very much.

11           THE COURT:  Be in noon recess.

12      *(Recess taken from 12:30 to 1:32.)*

13           THE COURT:  Thank you.  Please be seated.

14      Court will reconvene from noon recess.  Mr. Perkovich, are

15   you on the line again?

16           MR. PERKOVICH:  Yes, Your Honor.

17           THE COURT:  And, Ms. Merrigan, are you on the line?

18           MS. MERRIGAN:  Yes, Your Honor, I am.

19           THE COURT:  All right.  I'm going to have the government

20   call their next witness.

21           MR. SPILLANE:  Your Honor, I call Mr. Eric Butts.

22           THE COURT:  Mr. Butts, be sworn in.

23      *(Witness sworn.)*

24           THE COURT:  This is our witness stand, Mr. Butts.  If

25   you'll have a seat.

1        MR. SPILLANE:  If I may approach the witness, Your

2   Honor, I'll give him a copy of my exhibit list and my exhibits.

3        THE COURT:  All right.

4        MR. SPILLANE:  Thank you, Your Honor.

5             **ERIC BUTTS,** RESPONDENT'S WITNESS, SWORN

6                  **DIRECT EXAMINATION**

7   BY MR. SPILLANE:

8   Q   Mr. Butts, I'm kind of standing on top of you here so they

9   can hear me through the cell phone.

10  A   Sure.

11  Q   Could you tell me your full name, please?

12  A   Eric Butts, B-U-T-T-S.

13  Q   How are you employed, sir?

14  A   I'm a lawyer.

15  Q   How long have you been a lawyer, sir?

16  A   About 28 years.

17  Q   28 years.  What firm do you work for in St. Louis, sir?

18  A   I'm a sole practitioner.  I rent space from a law firm in

19  St. Louis, Leritz Plunkert.

20  Q   What type of practice do you have, sir?

21  A   I do a lot of criminal work, but I also do other general

22  practice, wills, you know, some landlord/tenant, some things

23  like that.

24  Q   Have you done capital habeas work before this case, sir?

25  A   Yes.

1   Q   Could you tell me what other capital cases, if you can

2   recall, sir, that you have represented clients in?

3   A   In -- the individual's name is Eugene Petary, Daniel Basile,

4   Willie Simmons, William Rousan, William Weaver, and

5   Mr. Christeson.

6   Q   So that would be six?

7   A   Yes.

8   Q   And my recollection is that Willie Simmons killed two

9   people, and there were two separate cases in that, or am I

10   misremembering?

11   A   He was tried for killing two people.  There were --

12        MR. PERKOVICH:  If I may, Your Honor, I'm having

13   difficulty hearing the witness.  I hear Mr. Spillane very well.

14   If we could ask Mr. Butts to project a little bit.

15        THE COURT:  Be sure and speak up.

16        MR. PERKOVICH:  We apologize for the difficulty with the

17   phone.  And also I would just like to object to the leading

18   nature of that question.

19        THE COURT:  Objection overruled.

20        THE WITNESS:  Yeah.  Mr. Simmons was tried twice in

21   state court for killing two people and sentenced to death.

22   BY MR. SPILLANE:

23   Q   And my -- did you win any of those cases in the sense of

24   having the death penalty overturned?

25   A   With Mr. Horwitz as co-counsel, Willie Simmons, the 8th

1    Circuit reversed his two sentences of death.  He was sentenced

2    to life.  William Weaver, the U.S. Supreme Court set aside his

3    sentence of death.

4    Q    And that went up to the U.S. Supreme Court for argument,

5    Weaver?

6    A    Yes, yes.  I did not argue it.  Somebody else argued it, but

7    it was in the Supreme Court.

8    Q    Did you work on the brief?

9    A    Yes.

10   Q    Let me ask you to turn to what I have marked as Exhibit 1,

11   page 2, which is the proposed budget.

12   A    Yes.

13   Q    According to this, you filed the proposed budget on

14   July 28th, 2004.  Is that accurate?

15   A    Yes.

16   Q    About how long was that after you were appointed into the

17   case, sir?

18   A    I believe the Court entered an order in early July saying

19   that Mr. Horwitz and I were provisionally appointed subject to

20   other criteria, I believe one of the further requests.  I

21   believe one of the requests was that we file a proposed budget.

22   Q    Now, when you filed a proposed budget, it lists hours for

23   various things.

24   A    Uh-huh.

25   Q    Was that your estimate at the time of how long those -- how

1    long you would spend on each of those things?

2    A    Having not seen the discovery for the case, knowing a little

3    bit about the case -- you know, Mr. Horwitz had talked to Bill

4    Smith -- Bill Swift, who is with the Missouri Public Defenders,

5    the guy who represented Mr. Christeson in his 2915, we had an

6    overall sense of some of the issues and some of the arguments

7    that would be made.

8        This is the first time that I ever filed a budget in a

9    capital case or any other case, and I think it could best be

10   characterized by we were looking back at other work we had done

11   and making a reasonable guesstimate.  We consulted with other

12   attorneys who had done capital work to try to get some idea of,

13   you know, the number of hours that they believed the Court would

14   approve, the total amount the Court would approve, and fashioned

15   our budget accordingly.

16   Q    Did you expect to be paid the amount in the budget, or was

17   this more of a pro bono case?

18   A    Other than Eugene Petary, I've never billed for any capital

19   case.  This was a request by Judge Whipple, which we followed

20   through with, but we -- neither -- I certainly didn't have any

21   intent of billing for the case.

22   Q    Let me ask you this.  When Ms. Merrigan and Mr. Perkovich

23   came into the case, did Mr. Horwitz pay for their travel fees

24   and expenses out of his own pocket?

25   A    Yes.

1    Q   Did he ever ask for reimbursement for that to your

2    knowledge?

3    A   From me or --

4    Q   From anyone?

5    A   No, he didn't.  He didn't.

6    Q   Let me ask you to go to a different document, which would be

7    Exhibit 5, page 8.  That is document 73.  And I can come up

8    there if my marking system causes you any problems finding it.

9    A   Okay.

10    Q   At the top of the page, which is a pleading that you and

11    Mr. Horwitz filed, it says that approximately two or three

12    months after your provisional appointment, you received 16

13    bocuments -- boxes of documents from appellate counsel.  Is that

14    consistent with your recollection?

15    A   Yes.

16    Q   Did you do work on the case before you actually received the

17    boxes from appellate counsel?

18    A   We had -- Phil had received some of the briefs from Bill

19    Smith -- Mr. Horwitz had received some of the briefs from Bill

20    Swift.  I was generally aware of the case through reading the

21    reported opinion in the Missouri Supreme Court, Missouri Court

22    of Appeals.  I didn't sit down and research beyond that; beyond,

23    you know, having a general awareness of what I thought the

24    issues might be or what we thought the case would present.

25    Q   Let me ask you if I can clarify that a little bit.  Is what

1   you're saying is that Mr. Horwitz or Mr. Horwitz and yourself

2   reviewed the briefs before the boxes arrived?

3   A   He had gotten some of the briefs.  I don't know if he got

4   all of the briefs, but he got a couple of them.  It may have

5   been from Janet Thompson who represented Mr. Christeson on the

6   direct appeal, or it may be from Bill Swift, just to give us an

7   idea of what issues had been raised and what the Court had

8   looked at.

9   Q   When the boxes arrived, it indicates here that there were 16

10   boxes of documents, including 1761 pages of trial transcripts.

11   A   Yes.

12   Q   When did you and Mr. Horwitz begin reviewing the boxes, the

13   documents in the boxes?

14   A   I think the boxes were shipped September 29th.  He received

15   a letter.  I know he showed me a letter he got from Bill Swift

16   saying they had been sent probably the first part of October,

17   and then we started over the next, you know, several weeks and

18   months going through the case in general.  I read the

19   transcripts and then start looking at everything else.

20   Q   I'm going to ask you to look at all the documents that are

21   listed as being in the boxes on page 8.

22   A   Yes.

23   Q   I won't spend time going through them one by one, but I want

24   to ask you if that is consistent with your recollection of

25   what's in the boxes, and if there's anything that was in the

1    boxes that's not listed there.

2    A    No.  It was an incredible case file.  In the past in capital

3    cases, we've received maybe five to six, seven, at most eight

4    boxes.  This was a lot of material.

5    Q    How long did it take to review that material in total, sir?

6    A    We finished prior to seeing Mr. Christeson in May.  We

7    probably finished -- you know, even up until the time you go see

8    him, you're still rethinking issues and still rethinking things.

9    I would guess probably May, you know.

10   Q    So during the period from when you received the boxes, which

11   is two to three months after your appointment, until May of

12   2005, you all were reviewing and studying the material in the

13   boxes.  Is that a fair characterization of your answer, sir?

14   A    Yes.

15   Q    When did you and Mr. Horwitz sit down and think about when

16   the response to the habeas petition was due?

17   A    When we first started, when we got the information from

18   Bill -- or, I'm sorry, from Mr. Swift, we would have had a

19   general idea as to the procedural posture of the case itself,

20   that being the direct appeal that was handled by Ms. Thompson,

21   the PCR, the dates the things had been filed.  I don't know if I

22   saw a particular document or not as to those specific dates, but

23   we had an idea of when the end date was, which was May 11th,

24   2004, when the PCR was denied by the Missouri Supreme Court, I

25   believe.

1    Q    When you filed on August 5, 2005, was that a deliberate

2    decision to file on that date that you and Mr. Horwitz had

3    reached based on your examination of the case law?

4    A    We believed the petition was due August 8th.  And, yes, we

5    filed -- our belief was that it was filed timely.  We filed on

6    that date because we believed that was a timely date.

7    Q    Did you examine case law in reaching that decision?

8    A    Yes.  As we initially got into the case, looked at the

9    May 11th date, looked at the other pleadings that were filed as

10    we got the materials in the case, and looked at the cases for

11    timeliness, I know that both he and I had been and were involved

12    in other capital cases at that time.  We were generally familiar

13    with time periods.

14        You're always looking at the habeas list serves in the

15    habeas cases, looking at cases to see if something new and

16    unusual has happened.  And my belief was it was filed correctly

17    based upon cases I had looked at.

18    Q    Now I'm going to ask you, and if you don't remember, that's

19    fine.  But do you remember looking at *Carey v. Saffold*?

20    A    Yes.

21    Q    What did you get out of *Carey v. Saffold*?

22    A    *Carey v. Saffold* I believe was out of California, and it had

23    to do with an individual who filed a pleading, and then there

24    was a gap before he filed it again in the California Supreme

25    Court.  And my reading of *Carey* was that -- the Supreme Court in

1    *Carey* was that a petition remains pending as long as they're

2    pursuing post-conviction relief.  In other words, as long as

3    there are avenues remaining, that time period, the gap between

4    when one period ended and the next one -- and the next filing

5    occurred was tolled.

6        We also looked at *Curtis* and *Mount Pleasant* and *Painter*.

7    *Painter* held contrary to that but was before *Carey*.  *Curtis* in

8    dicta allowed for the fact that they believed that *Carey* was

9    good law.  Had Mr. Curtis filed his state petition within the

10   one-year federal time period, my recollection is the Court said

11   that it would have been allowable.  So I believe *Carey* said --

12   and I assume you're asking about the 31 days between?

13   Q    I am.  I'll ask you about the 90 days later.

14       MR. PERKOVICH:  Your Honor, I'm going to object to the

15   leading nature of the initial question here and the response

16   under Rule 611(c).  You know, this is direct examination.  He

17   can ask him what he did in calculating it.  But to pose the

18   question in terms of, "Did you read this case," is very leading.

19       THE COURT:  It may be leading, but it expedites this

20   hearing, and it's not prejudicial.  I'm going to overrule the

21   objection.

22       THE WITNESS:  I'm sorry.

23       THE COURT:  I'm going to allow him to answer it because

24   it expedites the hearing of the case.

25       MR. SPILLANE:  I think you already answered.  I think he

1    was objecting to your answer afterwards.

2    BY MR. SPILLANE:

3    Q    But let me ask you about the second period, and I'll try and

4    phrase it in a way that's less offensive.

5         What did you look at in deciding that the time was tolled

6    during the second period, that is the 90-day period after denial

7    of rehearing by the Missouri Supreme Court?

8    A    There are a number of cases, and specific things escape me

9    at the moment, that talk about exhaustion in federal habeas and

10   cases --

11        MR. PERKOVICH:  Your Honor, I'm sorry, I have to object

12   to that too because that assumes that he looked at anything in

13   relation to a second period, which also assumes that there's a

14   recognition of a second period.

15        THE COURT:  Overruled.

16        THE WITNESS:  I -- generally speaking, habeas cases look

17   at exhaustion when they talk about whether or not -- pursuit of

18   remedies.  And my belief was generally that the 90-day period,

19   the petition for cert period after the PCR denial should be

20   allowed because that was a remedy that would necessarily be

21   pursued by most litigants.

22        Specifically I looked at the *Clay* case, in which Justice

23   Ginsburg addressed the issue of tolling in a 2255.  But she also

24   addressed the issue of 2244 -- 44, 54, I don't recall.  And then

25   I also looked at *Abela, A-B-E-L-A, v. Martin*, which is a

1    6th Circuit case which compiles a number of cases and does

2    recognize the circuit split as to whether or not that 90-day

3    period applies.

4        The results of dicta in the *Curtis* case, it said that the

5    90-day period should apply.  It was my belief that it would

6    apply because it was a proceeding necessarily pursued by

7    individuals, and then our habeas remedies would not be -- what

8    do I want to say -- completed until the conclusion of that

9    90-day period.

10        And although *Lawrence* held contrary to that, Justice

11   Ginsburg, who wrote the dissent in *Lawrence*, begins with the

12   fact that the Supreme Court has never recognized the rule they

13   put forth in *Lawrence*.  And I do recognize that Ginsburg in the

14   opinion said that she is not reaching the issue of whether or

15   not an individual who has the opportunity to file but does not

16   do so.  But based upon what I knew at the time, and *Lawrence* was

17   2007, I believed that the 90 days should apply.

18   BY MR. SPILLANE:

19   Q   What, if any, pleadings did you file in the Rule 2254 case,

20   sir?

21   A   We filed -- you mean Mr. Christeson's?

22   Q   Yes, his 2254 case.

23   A   We filed a petition.  We filed a motion or a request for a

24   hearing.  We filed a traverse.  I believe we filed a reply to a

25   pleading filed by the state.  We filed a document further

1    briefing on AEDPA that the Court requested.

2    Q   Let me stop you.  When you say AEDPA, you mean the statute

3    of limitations?

4    A   I believe -- let me look at that.  Yes.

5    Q   Continue, please.

6    A   Yes.  And then after -- there were -- I think there were

7    two.  I don't have the docket in front of me, but I think we

8    filed two pleadings.  After the AEDPA, the Court wanted further

9    briefing.  I could be wrong about that.  You then filed a

10   response to that, the state did.  After Judge Whipple entered

11   his order, we filed a Rule 59(e) asking him to reconsider his

12   order.

13   Q   Did you take any actions or did Mr. Horwitz take any actions

14   in order to put Mr. Christeson in a position to make systemic

15   challenges to Missouri's death penalty?

16   A   I don't know that I understand the question.

17   Q   I'll ask it a different way.  I don't want to be leading,

18   but I will be.  Did you and Mr. Horwitz encourage Mr. Christeson

19   to file a grievance with the Missouri Department of Corrections

20   challenging Missouri's death penalty in order to set up a later

21   civil suit?

22           MR. PERKOVICH:  Objection.

23           THE COURT:  Basis?  Are you objecting because it's

24   leading?

25           MR. PERKOVICH:  Yes, Your Honor, as counsel recognized.

1          THE COURT:  Again, I'm going to overrule the objection

2     to expedite the hearing of this case.

3          THE WITNESS:  Yes, we did.  Beginning in 2005, there was

4     some movement among the capital habeas bar in the state of

5     Missouri regarding lethal injection protocol.  And we asked

6     Mr. Christeson August of 2005 to file a grievance with the

7     state, Department of Corrections, in order to get the matter

8     going because he had to exhaust his administrative remedies so

9     that we could then pursue it in court.

10    BY MR. SPILLANE:

11    Q   Did you at some point after he did that take any other

12    action in relation to challenging -- systemically challenging

13    Missouri's death penalty on behalf of Mr. Christeson?

14    A   Yes.  We asked him -- I believe he filed another -- no, we

15    had another form where he had to request the records from the

16    Department of Corrections.  During the time -- this was

17    occurring from 2005 to 2013, I believe, when the *Zink* case was

18    dismissed by the Court of Appeals.  The case began with

19    *Middleton*, I believe.  May have been *Clemons* first and then

20    *Middleton v. Lombardi* or whoever the Director of Revenue is and

21    then transitioned into *Zink v. the Director of Revenue*.  The

22    names changed as the named plaintiffs were executed.

23          In order to get into the cases, we would file -- I would

24    file petition for leave to intervene.  The state resisted the

25    first application that I made for -- and I believe it was

1    Clemons in 2008.  District court overruled it.  We were allowed

2    to intervene.

3        And then as the case moved forward, additional pleadings

4    were filed over the course of years in which I participated in

5    phone conferences as the petitions were prepared or as the

6    pleadings were prepared.  John Simon and Elizabeth Carlisle were

7    primarily involved.

8        I would receive copies of what they proposed, and then all

9    of us who were involved would review it and submit corrections

10   or notes or ideas.  So Mr. Christeson was a named plaintiff in

11   all of those cases as they went forward.

12   Q   I have no more questions for you, sir.  But before I forget,

13   I want to thank you for coming here today.  I want to thank you

14   for taking the CJA appointment, and I want to thank you for your

15   pro bono work, sir.

16   A   Thank you.

17       THE COURT:  Thank you.  You may cross-examine.

18                        **CROSS-EXAMINATION**

19   BY MR. PERKOVICH:

20   Q   Mr. Butts, can we pick up with when you learned of the

21   hearing that is occurring right now?

22   A   I normally keep track of the *Christeson and Roper* case.  By

23   that I mean I will periodically review the district court file

24   as well as the Court of Appeal file.  The reason I do that is

25   because of pleadings that have been filed by his current counsel

1    and to keep abreast of it.

2        I saw on Wednesday that the Court of Appeals had entered an

3    order directing the district court to hold a hearing as to the

4    issue of abandonment.  I think I learned that late in the

5    afternoon.  On Thursday -- was it Thursday?  Wednesday, I'm

6    sorry.  So that would have been Tuesday.  I'm sorry.  I have my

7    dates kind of confused.

8        Wednesday, in and out of the office, I received a call from

9    Mr. Horwitz asking me if I knew what was going on, and I said

10   no.  And then he talked to me about the fact that he had

11   received an email from the Attorney General's office regarding

12   the hearing in the case and asked -- told me to check my emails,

13   which I did, and I checked my phone.  And I don't know if it was

14   Mr. Hawke or Mr. Spillane had called and asked me to call him

15   back.  So that's how I heard.  And I think it was Wednesday from

16   Mr. Horwitz and the Attorney General.

17   Q   Okay.  So you -- so that we're clear, you continued to track

18   this case, the docket activity?  Could you explain exactly what

19   you mean?

20   A   I looked at it because of the nature of the pleadings that

21   had been filed by you and Ms. Merrigan.

22   Q   Wait.  Because of the nature of the pleadings, you knew --

23   I'm sorry, I couldn't quite hear you.  What did you know?

24   A   I saw that the Court of Appeals had on Tuesday, I believe it

25   was Tuesday, entered an order that the -- directing the district

1    court to hold a hearing as to abandonment.

2    Q    Right.  I'm just trying to understand how you saw that.

3    A    It's on CM/ECF.  It's also on the Court of Appeals website.

4    If you go to 8th Circuit Court of Appeals and click opinions, it

5    will come up.

6    Q    So by happenstance or by habit, you check to see orders or

7    opinions coming in from that court, and you happened to see that

8    your former case had this arise?

9    A    Yes.  I normally try once a week to look at the 8th Circuit

10   Court of Appeals cases.

11   Q    So essentially it was by happenstance that you looked at

12   that at the time that the opinion was published?

13   A    Yeah, on Tuesday.  Monday was a holiday.  And just as I

14   said, I mean, I check, I would say, once a week to see what the

15   opinions are, the 8th Circuit, in order so I can keep track of

16   issues and what's going on.

17   Q    Okay.  And your interest in it is -- I'm sorry, I think you

18   stated that, but could you just recapitulate your interest in

19   monitoring this case?

20   A    Because I and Mr. Horwitz at one time were involved in it.

21   We represented Mark Christeson, got to know Mark Christeson, and

22   I think it would be natural to assume that anyone who's involved

23   in a case, a lengthy case and knows that it remains pending, you

24   know, something comes up and you see it, you read it.

25        When Mr. Christeson received his execution date, August --

1    or October 29th, 2014, I received several calls from attorneys

2    who had represented him in the past who wanted to know if it was

3    all right to call Mark because they had represented him, and

4    they wanted to see how he was doing.  So I don't -- I don't find

5    that to be unusual or bizarre.

6    Q   I wasn't saying that, just to be clear.  I was just curious

7    as to how, you know, you were becoming aware of this.  It's

8    apparent that Mr. Spillane emailed or used an email address

9    that, you know, had been associated with you and also for

10   Mr. Horwitz, sent an email to alert you to or to attempt to, to

11   these developments.

12       I just want to say for the record, it seems that you're

13   pronouncing Mr. Christeson's name Mr. Christianson.

14   A   I apologize for mispronouncing his name.

15   Q   Okay.  But so it's your regard for Mr. Christeson that is

16   kind of propelling this enduring interest in this case, even in

17   the Court of Appeals where you're not entered in this case and

18   not getting notifications on it, unlike the docket here at the

19   district court; is that correct?

20   A   I don't know -- I don't understand your characterization of

21   enduring interest as rising to some sort of nefarious --

22   Q   I'm talking about your enduring interest.  I'm just trying

23   to understand where it's coming from exactly, but we can move

24   on.

25       So when you received the call from the attorney from the

1  state, who called you, and did you return that call?  I believe

2  you said that you didn't answer it the first time?

3  A   I don't know -- you know, to be honest with you, I don't

4  know if I talked to Mr. Spillane or Mr. Hawke.  For some reason

5  I'm thinking that I talked to both of them.  I know I did talk

6  to Mr. Spillane.  I called him.  They notified us the hearing

7  was at 9:00, because in the original email that I know you and

8  Ms. Merrigan were copied into since it appeared on the header,

9  had to do with the time in which it was scheduled.  And I

10  believe it read, you know, an opportunity to state whatever you

11  may.  And then, of course, that was followed up with an email by

12  Ms. Merrigan who said that she objected to ex parte

13  communication and reminding us we owed a duty of confidentiality

14  to our clients.

15      I spoke to Mr. Spillane after that and asked him several

16  questions.  I wanted to know where the courthouse was because I

17  was incorrect on where it was.  I wanted to know if there are

18  any hotels around here because I'm unfamiliar with this area of

19  Kansas City.  And then I wanted to know --

20  Q   So that I'm clear, you -- so you saw the email Ms. Merrigan

21  sent objecting to the communication.

22  A   Ex parte, yes.

23  Q   I'm sorry?

24  A   Yes, ex parte communication because we owed an enduring duty

25  of confidentiality to our client.

1    Q    Right.  Correct.  And so -- and then next you elected to

2    call counsel for the state?

3    A    You know, I may have -- I may have called him beforehand,

4    but I don't -- didn't -- in my mind, I didn't think calling

5    counsel for the state advising us of a hearing would involve me

6    saying anything about Mr. Christeson other than where's the

7    courthouse and, you know, where's parking.

8          Excuse me?

9    Q    And so you were calling because you anticipated the need to

10   participate in this hearing?

11   A    I did because I was advised by Mr. Spillane that they were

12   going to issue a subpoena.

13   Q    Uh-huh.  And so let's just quickly go through the sequence

14   of events.  It's a short timeline because it seems like it was

15   only minutes ago that all this occurred.  So you made

16   arrangements upon speaking to Mr. Spillane and obtaining

17   recommendations for accommodations.  Is that what happened?

18   A    No, not at all.  He did not recommend accommodations.  As I

19   said previously, I asked him where the courthouse was.  I have a

20   daughter who lives in Kansas City, teaches at UMKC, and I had on

21   occasion visited her.  And what happens was I would drive down

22   next to the World War I Memorial.  Last time I was here, I said,

23   well, that's the federal courthouse.  Well, obviously it's not

24   because I looked on the map, and it wasn't there.

25   Q    So you consulted him to identify where the public

1   courthouse --

2   A   I asked him where is the federal courthouse, and I said

3   because I thought it was up by Crown Center, and he said no,

4   it's not.

5   Q   I see.  So just from there, you opted not to consult public

6   sources as to where the federal courthouse in Kansas City was.

7   You called the attorney for the state to get that information?

8   A   No, sir, that's incorrect.  I said that I called the

9   attorney for the state because he called me and notified and

10  sent me an email as to the hearing date.  And I called him and

11  inquired whether or not they were going to issue a subpoena.

12  Q   Right.

13  A   During the course of that conversation, I asked him where

14  the courthouse was because I was incorrect as to where it was.

15  I assumed that he would be gracious enough to tell me where the

16  courthouse was.

17  Q   And then what did you do after you got that information from

18  him that -- you know, where the courthouse was and when the

19  hearing would occur?

20  A   I went online and made a reservation, and here we are.

21  Q   When did you receive service of the subpoena for this

22  hearing?

23  A   I believe it was about 4:00 yesterday.

24  Q   And where were you?

25  A   I was in a car traveling on Interstate 70 to Kansas City.

1   Q   So you -- so I don't want to be glib, but did the process

2   server drive up next to you?

3   A   That would have been -- that would have been great.  No, he

4   did not, sir.

5   Q   Okay.

6   A   Mr. Spillane had indicated to both myself and Mr. Horwitz

7   that they would issue a subpoena.  Had you or Ms. Merrigan told

8   me that, I would have believed you, believed in your

9   representations as an attorney, and I would have acted

10  accordingly.  Because Mr. Spillane told me that he would do

11  that, I drove here believing that he would followthrough with

12  what he said.  If I had never been served, I guess that would

13  have been a different issue for the Court to address.  But an

14  attorney told me that he would do this, and I believed that I

15  could believe him.

16  Q   Okay.  You mentioned that you spoke with Mr. Horwitz upon

17  this development.

18  A   What development?

19  Q   The remand.  Can you tell me about that phone call?

20          MR. SPILLANE:  I'm going to object to the form of the

21  question.  I don't think the witness understands.

22          THE COURT:  Rephrase the question.  He's questioning

23  that it's a remand.

24  BY MR. PERKOVICH:

25  Q   The 8th Circuit remanded the case to the Court for this

1   evidentiary hearing.  Mr. Spillane notified the two former

2   attorneys.  Mr. Butts has testified that he spoke with

3   Mr. Horwitz upon that development.  I'm asking about that

4   conversation.

5   A   Sure.

6   Q   What was said?

7   A   Initially Mr. Horwitz had called me and said -- and again,

8   about Mr. Spillane's call about the email and everything else.

9   "Did you see that?"  I said yes.  And he said, "Did you see the

10  8th Circuit order?"  I said yes.  That was it.  We made

11  arrangements to come here.

12  Q   Did you speak again before today?

13  A   Oh, sure, sure.  We rode in the car together.

14  Q   Oh, I see.  Okay.  So you had a fair amount of time to

15  discuss, you know, the case and many other things?

16  A   Yes, we did.  We talked about the case.  We talked about,

17  you know, what we thought might be potential issues.  And

18  certainly the 8th Circuit's order was very clear about

19  abandonment.  So, sure.

20  Q   And so you both have reviewed the 8th Circuit's opinion that

21  has led to this hearing?

22  A   I looked at it.  I, you know, realize that they had remanded

23  or transferred the case back to the district court for further

24  proceedings.  I could not -- beyond that, I could not tell you

25  as to all the specific language or holdings in the order.

1    Q    Did you speak with Mr. Horwitz over lunch before your

2    testimony?

3    A    Yes.

4    Q    You did, okay.

5    A    Yes.

6    Q    What did you talk about just now?

7    A    Over lunch we talked about whether or not he needed to call

8    his office, could he get email on his phone.  I talked to him

9    about some of the things that I was doing with work.  I asked

10   him how it went.  He said fine.  What else?  That was generally

11   it.

12   Q    Other than fine, did you discuss his testimony this morning?

13   A    No.

14   Q    Or earlier today?

15   A    No.

16   Q    I'm sorry.  That's a negative?

17   A    Yeah, it's a negative.  Well, he did ask me about -- he

18   said, "How many times do you think we talked to Mark?"  And --

19   but beyond that, no, I don't -- we didn't talk about his

20   specific testimony or answers that he gave or things like that.

21   Q    Okay.  So the one thing he brought up, just so -- and again,

22   I apologize because we're doing this by phone, so my hearing is

23   not perfect, but he inquired how many times did you collectively

24   talk with Mark?  Is that what he said?

25   A    He said, "How many times did we talk to Mark?"  He said, "I

1   think we talked" -- and he said, "They" -- I don't know who

2   "they" is -- "said that we never talked to him before 2014."

3   And I said, "No, we did talk to him before 2014." So that's --

4   Q   This is how misunderstandings are made.

5   A   That was it.

6   Q   In any event, why don't we return to the record here. I'd

7   like to put before you what was marked as our Exhibit 3 earlier.

8   It's document 3 also in the record. It's a -- it's a May 14,

9   2004 motion.

10          MR. PERKOVICH:  Codi, if you have that available or

11  wherever that may be in the court, if we could again consult

12  that and provide Mr. Butts a copy.

13          THE WITNESS:  She's handing it to me now.

14  BY MR. PERKOVICH:

15  Q   I'm sorry?

16  A   She just handed it to me.

17  Q   I'm sorry. I didn't make that out.

18  A   She just handed it to me.

19  Q   I see. Very good. Very good. Okay. So can you identify

20  that document?

21  A   The caption reads Motion to Appoint Counsel in a Habeas

22  Corpus Petition, Action in a death Penalty Case.

23  Q   Okay. And you identified that as, one, concerning this

24  case. Can we turn to the second page?

25  A   Okay.

1    Q    And the top paragraph, can we go through -- read that first

2    sentence, please.

3    A    First sentence of what?

4    Q    No. 5, paragraph No. 5.

5    A    "My present state-appointed attorney has communicated with

6    attorneys Phil Horwitz and Eric Butts about accepting an

7    appointment to represent me in an application for a writ of

8    habeas corpus."

9    Q    And do you recall those communications?

10   A    I recall that Mr. Horwitz spoke to Mr. Swift, and

11   Mr. Swift -- or not Mr. Swift, Mr. Horwitz talked to me.

12   Q    Thank you.  So Mr. Horwitz was the point of contact with the

13   public defenders who were, you know, finding counsel for

14   Mr. Christeson and his federal habeas.  Is that fair to say?

15   A    Mr. Horwitz knew Bill Swift, having worked with him at the

16   public defender's office.  He was friends with him, so I assume

17   that's why Mr. Swift called Mr. Horwitz.

18   Q    Yes.  And Mr. Horwitz recommended you to join him in the

19   case?

20   A    I don't know that he would recommend it.  I do recall that

21   he called me and asked me if I would be interested in

22   representing Mr. Christeson with him in a case.

23   Q    You testified earlier that you had collaborated with

24   Mr. Horwitz on other capital post-conviction cases; is that

25   correct?

1    A    Yes.

2    Q    And what case or cases were those?

3    A    I believe it would have been Daniel Basile's case, William

4    Weaver's, Willie Simmons, and William Rousan.

5    Q    What was the name after Simmons?

6    A    I don't remember even what I just said.

7         THE COURT:  Rousan.

8         THE WITNESS:  Rousan.

9    BY MR. PERKOVICH:

10   Q    Okay.  And the name -- I'm sorry.  I really apologize.  The

11   name before William Weaver was, first one?

12   A    Daniel Basile, B-A-S-I-L-L-E.

13   Q    And when were those cases?  Were any of those cases ongoing

14   when this conversation about representing Mr. Christeson arose

15   in 2004?

16   A    I'm sure they were.  I don't recall the date of Simmons'

17   finality.  I think Weaver's and Rousan's were ongoing.

18   Mr. Rousan was executed last year, so his would have been.

19   Q    Do you -- and do you recall -- the first of those cases, do

20   you recall what year that was when the federal habeas began and

21   your involvement began in it?

22   A    No, I don't.  Whenever Mr. Petary's case first hit the

23   district court.  I don't remember when it was.

24   Q    And with these cases, can you tell us the manner by which

25   you calculated any statute of limitations questions presented?

1    A    The same way that I did it in Mr. Christianson's --

2    Christeson's case.  I'm so worried about mispronouncing his name

3    now.  You know, looked at dates by which the state proceedings

4    had terminated or when pleadings had been filed.  Looked at the

5    status of petitions for certiorari.  Looked at it the same way

6    we did in this case.

7    Q    Do you recall the effective date of Antiterrorism and

8    Effective Death Penalty Act you referred to?

9    A    I believe it was filed in 1996, wasn't it?

10   Q    And were these cases all arising in federal court before or

11   after that?

12   A    Interestingly enough, William Weaver was actually before

13   that.  And in Mr. Weaver's case, what happened was he was so

14   worried about missing the federal date, that he went ahead and

15   filed his petition.  It was not exhausted, as the district court

16   found.  I think it was Judge Shaw found that out.

17       We then were appointed to represent Mr. Weaver, proceeded

18   through lots of litigation, raising the issue of improper

19   prosecutorial comments and other things.  And that was always a

20   side issue as to the date the case was filed, whether it was

21   AEDPA or pre-AEDPA.

22       In the Supreme Court, the argument surfaced.  The justices

23   raised the issue that maybe it wasn't an AEDPA case.  So

24   Mr. Weaver, as I said, fascinating case, because it was not

25   AEDPA, it was pre-AEDPA, his petition was successful.  The

1   others were post-AEDPA.  Petary was pre-AEDPA.

2   Q   And this was during argument in the Supreme Court in the

3   Weaver case?

4   A   Yes, yeah.  And we were all stunned.  I don't know if

5   stunned was the right word, but we were all just very surprised

6   because that was an issue that was just kind of a side issue

7   going before the Supreme Court.  We felt that we had a very,

8   very strong issue as to prosecutorial misconduct in argument.

9   The guy who was the prosecuting attorney in St. Louis County,

10  passed away five, six years ago, in each death penalty case that

11  he argued, he just went crazy in closing argument, and each one

12  of them was reversed, death sentence, as a result of that.  Ours

13  was because AEDPA did not apply.

14  Q   The Weaver case, who argued that for Mr. Weaver?

15  A   Excuse me?

16  Q   Who argued the case in the Supreme Court for Mr. Weaver?

17  A   John Bloom.

18  Q   John Bloom, okay.  Your representation of Mr. Rousan, do you

19  recall when you got involved in that case?

20  A   I don't recall the specific dates as to these other cases.

21  I didn't review their files prior to coming here today, so I

22  don't know when it was.

23  Q   And did that involve -- did that case involve calculation of

24  federal limitations period?

25  A   Yes, just as we did in Mr. -- in Mark's case.  We looked at

1    the dates the state proceedings had taken place, the end dates,

2    the filings of various motions and pleadings, and also looked at

3    the status of the case and calculated as to when the one-year

4    period would be -- would be hit.

5    Q    Okay.  To refer to the document in front of you --

6    A    Sure.

7    Q    -- look at paragraph 6.

8    A    Yes.

9    Q    And if you could read -- if you could just begin to read

10   that paragraph, please.

11   A    Out loud or to myself?

12   Q    Yes, into the record, please.

13   A    "Although all post-opinion filings on my behalf may not yet

14   be ruled on, this Court should appoint -- should now appoint

15   Mr. Horwitz and Mr. Butts.  My case file, like most death

16   penalty cases, is large and will require substantial expenditure

17   of time to review.  In *Snow, S-N-O-W, v. Ault, A-U-L-T*, 238 Fed.

18   3d 1033, 1033-36 (8th Circuit, 2001), the 8th Circuit ruled that

19   under the AEDPA, the time for filing will commence -- my habeas

20   corpus petition will commence running when rehearing is ruled

21   on.  Mr. Swift expects that the rehearing motion will be ruled

22   on shortly after it is filed.  For these reasons, this Court

23   should now appoint counsel to represent me in order to allow

24   timely and thorough presentation of my claims to the court."

25   Q    So you recall this motion being filed for your appointment

1   in May of 2004?

2   A   I didn't see it until just now.  Well, I saw it when I got

3   the case file, but I didn't see it when it was filed.

4   Q   So okay.  When you were appointed -- when you entered your

5   appearance in the case, did you consult the record in the case?

6   A   I'm sure we did.  I'm sure I did.

7   Q   So did you consult *Snow versus Ault* with regard to this idea

8   about the commencement of the statute of limitations upon

9   rehearing denial?

10  A   Sure.  I looked at *Snow*.  I looked at *Clay*.  I looked at

11  *Curtis*.  I looked at lots of cases.  And my belief, based upon

12  my review of the case law, was that the 90-day period following

13  the May 11th, 2004 date was -- did not -- was tolled, did not

14  apply towards the federal time period.  Excuse me?

15  Q   When did you do that?

16  A   As I said previously, we did that during the beginning of

17  our representation of Mr. Christeson after we received the file,

18  after we looked at the issues in the case, and as we were

19  looking at when to file the habeas petition.

20  Q   Okay.  I'd like to ask you to look at what we marked as

21  Exhibit 6, and that's a May 26, '04 dated document.

22  A   Thank you.

23  Q   Please take a chance to review it.  Let me know when you've

24  been able to familiarize yourself.

25  A   Okay.

1   Q   Okay.  And the last paragraph, can you read that sentence,

2   the first sentence in the last -- or the first two sentences,

3   please?

4   A   "The documents to start your federal habeas corpus -- your

5   federal habeas case were filed with the court in Kansas City on

6   May 14th, 2004."

7   Q   And the next one.

8   A   "I expect that shortly both Mr. Horwitz and Mr. Butts will

9   be appointed to represent you."

10   Q   So that seems to coincide with the timing here and the

11   motion for appointment; is that right?

12   A   Sure.

13   Q   Okay.  I'd like you to look at what was marked as Exhibit 7,

14   the July 16 letter.  Or, I'm sorry.  Before that if we could

15   look at what is Exhibit 4, and that's in the record, document 5.

16   A   Thanks.

17   Q   When you have the document, could you let me know?

18   A   Yeah, I have it.

19   Q   Okay.  And can you identify the document?

20   A   At the top it says "Order."

21   Q   What does it pertain to?

22   A   It says, "Before the Court is petitioner's motion to proceed

23   in forma pauperis in this habeas corpus action.  The Court has

24   reviewed this motion, (doc 1), and petitioner's affidavit of

25   financial status (doc 2.)  For the reasons discussed below, the

1    Court grants the motion to proceed in forma pauperis and

2    provisionally grants petitioner's companion motion to appoint

3    counsel, (doc 3.)

4    Q    Okay.  So does this, you know, refresh your recollection in

5    terms of when this order came down and its implications for your

6    role on the case?

7    A    I don't understand the question.

8    Q    Do you remember when this happened and that it provisionally

9    granted your role in the case?

10   A    I believe I previously testified that I thought the Court

11   provisionally appointed us to the case on July -- early July,

12   and this document says July 2nd, '04 is when it was filed.

13   Q    Okay.  And moving to the third page.  You see the first full

14   sentence there.  Says, "Both attorneys shall confirm that they

15   meet the applicable mandates and are otherwise qualified to

16   handle this matter"?

17   A    Let's see.  That's in the last paragraph, provisionally

18   granted.

19   Q    It's on page 3, the first full sentence at the top is what

20   I'm referring to.

21   A    Oh, okay.  Okay, yeah.

22   Q    Okay.  Now, you recall entering your appearance in the case?

23   A    Yes.

24   Q    Okay.  If I could ask you to take a quick look at what is in

25   the record as document 9.  It's the July 15th, 2004 entry in the

1   record.  Again, that's document 9 in our current record.

2   A    Thank you.

3   Q    And I believe we need to mark that one, so is that

4   Exhibit 12 or Exhibit 11 for us?  I believe it's 12.

5        THE COURT:  What is it, 12?

6        MS. POTTS:  Yes.

7        THE COURT:  What's 11?

8        THE WITNESS:  This isn't the same thing.  Okay.  That's

9   not what you showed me before.

10       THE COURT:  What's 11?

11       COURTROOM DEPUTY:  I don't have 11.

12       MR. PERKOVICH:  So we're calling this what number?

13       MS. POTTS:  12.

14       THE COURT:  This one is 12.

15       MR. PERKOVICH:  Okay, very good.

16  BY MR. PERKOVICH:

17  Q    So, Mr. Butts, if you can review that, just refresh your

18  recollection and confirm for me that, indeed, you filed this.

19  A    It appears to be an entry of appearance that I filed on

20  July 15th, 2004.

21  Q    Okay.  And it states your admission dates and --

22  A    Yes.

23  Q    -- in that second paragraph, so those appear to be correct?

24  A    Yeah, and it has the date for Mr. Petary.  You inquired

25  earlier as to what date I became involved.  That was '93.

1    Mr. Basile was '97. Weaver was '96.

2    Q   Let's see. You were speaking about Mr. Rousan's case, I

3    believe it was earlier, talking about the calculation of

4    timelines and things like that, and you consulted other

5    attorneys. Who did you consult?

6    A   I didn't say I consulted other attorneys. I said that I

7    looked at the case law, looked at the timelines, looked at the

8    status of the state court proceedings in the case. And then in

9    each case that Mr. Horwitz and I would talk about it, we would

10    try to carefully review that, make certain that it was filed in

11    a timely fashion.

12    Q   Okay. Thank you for clarifying that. I've got the phone

13    pressed to my ear, and it's turning my ear into a cauliflower.

14    I'm doing my best to hear every word.

15    So the dates in terms of your admission are accurate. You

16    had been practicing for a significant amount of time before

17    this -- before taking this case or entering your appearance; is

18    that correct?

19    A   Sure, yes.

20    Q   And if we could, when you entered your appearance, what were

21    your first steps in relation to the case?

22    A   We hadn't yet received the case file. I know that

23    Mr. Horwitz and I were still generally talking about the case.

24    In terms of research into actual issues or reviewing documents,

25    we didn't have the case file to do that. Like I said, it is a

1  reported case.  We were generally aware of the issues and talked

2  about them.  But not having the case file, I don't know that --

3  you know, we didn't sit down and carefully research each issue

4  as we did after we got the case file.

5  Q   Were you concerned about time elapsing on the statute of

6  limitations, given that you didn't have the case file at that

7  point?

8  A   No, because I had looked at the previous proceedings, and so

9  had Mr. Horwitz.  We had a general idea as to when we believed

10  the petition was due in looking at the May 11, 2004 date and 90

11  days from there.

12  Q   I'm not asking about the determination of when the petition

13  was due, but just the notion that the one-year statute of

14  limitations would be working against you while you're waiting to

15  actually get the file.  Was that a concern?

16  A   No.  I mean, I assumed that we would get the file very, very

17  soon.  Mr. Swift had said he would send it.  Quite frankly, it

18  was some somewhat delayed.  I thought we would have gotten it in

19  July.  We didn't, so...

20  Q   Right.

21  A   I'm certain that Mr. Horwitz talked to Mr. Swift.  I did

22  not.  But, yeah, we were concerned about not having the case

23  file.

24  Q   Uh-huh.  If I could bring to your attention what I started

25  to do earlier, this July 16 letter which is denoted as

1    Exhibit 7.  If you would consider that.

2    A    I don't have that.  Thank you.

3    Q    When you have a look at it, please let me know.

4    A    Sure.

5    Q    Okay.  Can you identify this document?

6    A    It appears to be a communication from William Swift to Mark

7    Christeson dated July 16th, 2004.  Mark's in Potosi Correctional

8    Center.

9    Q    And are you copied on this letter?

10   A    It says CC, Attys. Phil Horwitz and Eric Butts.  I don't

11   know if I got it or not, to be honest with you.

12   Q    I'm sorry?

13   A    I don't know if I received it or not.  I -- you know.

14   Q    Do you have any reason to think you didn't?

15   A    What?  You know, I don't have any reason one way or another.

16   I don't know if I received it or didn't receive it.

17   Q    Can you read the second paragraph?

18   A    "The district court in Kansas City, comma, Judge Whipple,

19   comma, has" --

20   Q    You don't have to read the punctuation.  We are, you know,

21   obviously trying to move this along.

22   A    I was doing it for the benefit of the court reporter.  "The

23   district court in Kansas City, Judge Whipple, has conditionally

24   appointed them, subject to them submitting a proposed estimated

25   budget for your case.  They are in the process of putting

1    together the requested budget.  They expect that once the

2    estimated budget is submitted, they will have their appointment

3    made final to represent you.  Once the appointment is finalized,

4    they will be able to begin working on your case."

5    Q   Sir, does that seem to be an accurate depiction of the

6    position in mid July?

7    A   All I can answer that by saying it's in his letter.  The

8    appointment was pending before the Court.  Beyond that, I don't

9    know how to answer your question.

10   Q   Okay.  I'll ask another one.  Do you recall putting together

11   the information for the budget?  You were questioned about that

12   earlier by Mr. Spillane, and I want to return to your

13   recollections about the method by which you came up with that

14   filing.

15   A   Yes.  Yes, and -- yes, I was questioned by Mr. Spillane.

16   Q   And so did you or did Mr. Horwitz have responsibility for

17   that, or did you work on this together?  Were you -- did you

18   sort of have a meeting and you hash it out?  Do you recall how

19   you came up with that?  You noted that it was apparently

20   singular in experience.  You hadn't had to do that in prior

21   cases of this kind.

22   A   No, I hadn't.  I hadn't.

23   Q   I'm sorry.  You don't recall?

24   A   No, I had not presented -- assembled a budget for a prior

25   capital case.

1    Q    And so how did you go about doing this one?

2    A    In conversation between the two of us, general belief as to

3    in a typical case what we would typically do or what issues

4    might be presented in terms of, I don't know, what do you think

5    we're going to have to do with this guy, for lack of a better

6    word.

7         I know when -- No. 4 has got psychological experts.  We

8    had -- had Mr. Simmons psyched.  It was considerably more than

9    12 hours, but, you know, we included that.  Legal research.

10   That was just based upon our general reading of the reported

11   opinions.  I'm sure with input from Mr. Horwitz, having talked

12   to Mr. Swift about the nature of the case, the proceedings, the

13   length of the case, I knew that it was a lengthy tried case.

14   For lack of a better characterization, we were trying to come up

15   with something that, in general terms, show what we thought the

16   case would take.

17   Q    And so in coming up with the estimates at the time for these

18   different aspects, I think I understand you to say that these

19   different aspects comprise the universe of the activity that you

20   could foresee based on your experience and in consultation with

21   Mr. Christeson's prior counsel.  What other forces did you draw

22   upon in terms of coming up with these estimates for the Court?

23   A    Our prior experience in other cases.  I mean, I see in

24   paragraph 3 it says 20 boxes.  Well, it was 16 boxes.

25        Generally my experience has been since then that a

1    provisional budget is entered with the court.  And then as the

2    case develops, the parties would go back and they would modify

3    their budget.  They may find that a particular aspect of the

4    budget is no longer relevant.  It may be that something they

5    thought would present itself isn't, so it's very difficult to

6    predict without even having a case file what you're going to

7    spend on a case.

8    Q    And the amount of time that you could determine as an

9    initial estimate based on the volume of materials, how were you

10   able to calculate the amount of hours in relation to the amount

11   of documents?

12   A    I don't understand your question.

13   Q    Are you relying on your prior experience to come up with the

14   figures in terms of the number of hours to spend on these

15   different elements of the work?

16   A    Sure.  That's all we had.  We didn't have the case file.

17   Q    And so you were able to consult your experience in prior

18   cases in coming up with these estimates?

19   A    Well, like for paragraph No. 3 where it says there's 20

20   boxes.  I'm sure that we looked at it in terms of, okay, 20

21   banker's boxes; you know, how long do you think it will take to

22   go through that?  Seven day trial.  Well, there's going to be

23   probably 2,000 pages of trial transcripts.  If you read one

24   page every, you know, six minutes, which I think is what the

25   Court allows now, how long will that take?

1    I mean, it's just a general feeling.  If it's a seven-day

2    trial and there's 20 boxes, you know, quite frankly, I think

3    that I probably would have thought it was 100 hours instead of

4    95 hours.  But we were trying to satisfy the Court's concern as

5    to billing for the case and also present something that was --

6    what we thought we would expend in terms of the case were we to

7    bill.

8    Q   And so were you able to consult prior time records, prior

9    notes from other cases so that you could make a sound estimate

10   for the Court and for your interest?

11   A   No.  It's just based upon experience.  As I said, you know,

12   we would look at it, okay, 20 boxes, seven-day trial, 2,000

13   pages.  How long do you think it would take to read 2,000 pages?

14   Okay, it's going to take me 20 hours to read that.  I mean, it's

15   just having not had the file, you know, the specific time

16   periods, many of them would change, and many of them wouldn't

17   even be applicable.

18   Q   But you do know from just being a lawyer, working in this

19   area, doing this review that, you know, you know how much time

20   it takes to go through a transcript.  You know how much time it

21   takes to get through your average box that you're going to get

22   from prior counsel.  Is that fair to say?

23   A   I think all attorneys have a general idea of how long it

24   would take them to read 2,000 pages.

25   Q   Right.

1   A   Or how long it would take them to go through a banker's box

2   of information.  And again, it was not having the case file.

3   Q   Right.

4   A   Just an estimate.

5   Q   And so, you know, work on a case like this, you would

6   maintain your time through note taking?  Would you have a system

7   like a timekeeping system to track your activity in this regard?

8   A   I didn't hear the first part of your question.

9   Q   In keeping track of your time, how would you do that?  Well,

10  let's -- you know, in 2004, 2005.

11  A   I didn't keep track of my time.

12  Q   You did not keep track of your time?

13  A   No.

14  Q   And I'm sorry.  Why not?

15  A   I had no intention of billing the Court.

16  Q   Can you explain your intentions then?

17  A   I intended to represent Mr. Christeson.  Other than

18  Mr. Petary, I've never billed for a capital case.

19  Q   Can you help me understand this budget that presents a

20  figure of $56,000 750 -- $56,750 that you submitted to the

21  Court?

22  A   Uh-huh.

23  Q   And your understanding as to what you would be doing in the

24  way of billing and timekeeping in relation to the work on this

25  matter at the time you filed this with the Court?

1    A    My understanding was that I would not be billing the Court.

2    Again, I have never billed the Court for a capital

3    representation other than Mr. Petary.

4    Q    You have never billed?

5    A    Never other than Mr. Petary's.  No, I have not billed.

6    Q    I'm sorry.  The last part I did not hear.

7    A    No, no.  We had no intention of billing for Mr. -- for

8    Mark's case.

9    Q    I'm still trying to understand why you would submit a dollar

10   figure to a court when you were --

11            MR. SPILLANE:  I'm going to object.

12            THE COURT:  That's argumentative.  You've got your

13   answer, now go on.

14            MR. PERKOVICH:  I'm sorry, Judge?

15            THE COURT:  He started to raise an objection.  The

16   attorney -- I interrupted him.  It's -- it's argumentative.  Why

17   or whether he did it, he told you what he did.  Now please go to

18   the next question.

19            MR. PERKOVICH:  Your Honor, I'm trying to understand

20   that he submitted something to the Court that he did not believe

21   would reflect what he would be doing at that instant time and in

22   the future, and so I think this is a fair area to explore his

23   conduct.

24            THE COURT:  It is not.  It is not.  Listen to me.  Go to

25   your next question.  Quit challenging me.

1    MR. PERKOVICH:  I understand, Your Honor.  I'll move on.

2  BY MR. PERKOVICH:

3  Q    So moving on, if I could ask you to look at a letter dated

4  August 23rd, and I believe that is already marked our Exhibit 8.

5  When you have a chance to hand it to him, let me know.

6  A    Thank you.  Yes.  Yeah, I have it.

7  Q    Okay.  Very good.  Now, can you identify this letter?

8  A    It's a letter from William J. Swift to Mark Christeson at

9  the Potosi Correctional Center dated August 23rd, 2004.

10  Q    Okay.  And who's copied on it?

11  A    It says Phil Horwitz and Eric Butts.

12  Q    And do you have any reason to believe you did not receive

13  this around the time of its date?

14  A    Again, I know we went through this in the last one.  I don't

15  have an independent recollection of this letter.  I have no

16  reason to believe that I didn't receive it or I did receive it,

17  so...

18  Q    Sure.  That's fine.  You understand that I have to ask you.

19  If I could get you to look at -- focus on -- well, you know,

20  let's take it from the top.  There's some material to discuss

21  here.  And if I could ask you to, you know, as swiftly and

22  articulately as possible read this, the first couple sentences.

23  A    I will try.  "I just wanted to update you on what I know

24  about Mr. Horwitz and Mr. Butts being able to represent you.  I

25  spoke to Mr. Horwitz today, and he indicated that they had

1    submitted their proposed budget to the district court and were

2    awaiting approval of that budget.  Mr. Horwitz mentioned that

3    Mr. Butts has spoken to the Western District Clerk's office on

4    multiple occasions, but there has not been any action indicating

5    approval of their proposed case budget.  It is my understanding

6    that once a case budget is approved, Mr. Horwitz and Mr. Butts

7    can then begin work on your case.

8         "If you have any questions, please write to me, and I will

9    try to answer them."

10   Q    The reference to you speaking to or reaching out to the

11   clerk, do you recall reaching out to the clerks around this

12   time?

13   A    I don't have any independent recollection of reaching out to

14   the clerk or not reaching out to the clerk.  I have no reason to

15   disbelieve what Mr. Swift has said.

16   Q    Okay.  Thank you.

17   A    Sure.

18   Q    And from your understanding of the status of the case was --

19   as of the order you had read earlier, your work on the case or

20   your appointment had been provisionally granted, contingent upon

21   your qualifications, as we read.  Is that fair to say?

22   A    My understanding as to what date?  As to this August 23rd?

23   Or July or -- excuse me?

24   Q    I believe that's the date.  I'm referring to what occurred

25   the month before that we just covered in terms of the order

1    instructing you to supply a budget, the order also contemplating

2    providing your credentials and qualifications that we spoke

3    about.

4    A    Okay.

5    Q    Is this sentence referring to there has not been any action

6    indicating approval of their proposed case budget comport with

7    your understanding of the sequence of events where the order

8    came down, you submitted a budget that we've discussed, and it's

9    August now of 2004?

10   A    I understand that eventually the Court said you're

11   appointed.  I don't know what date that was.  I have no reason

12   to disbelieve what Mr. Swift has in his letter.  I assume that's

13   correct.  I don't have any independent recollection of receiving

14   a letter or of talking to the clerk's office.

15        I do recall we submitted the budget, and it was a period of

16   time before we heard anything.  By "heard anything," I mean

17   before anyone contacted us from the court.  So that's the best I

18   can do on that.

19   Q    Okay.  And you said you recall at some point it was

20   confirmed that you were appointed?

21   A    I'm sure it was, yes.

22   Q    Okay.  Do you have any recollection in the record about that

23   moment, that indication?

24   A    What moment?  What moment?  I didn't understand your

25   question.

1    Q    Would you repeat that?

2    A    Yeah, I didn't understand your question.

3    Q    Right.  Do you recall anything in the record, an indication

4    in the record that speaks to the confirmation of your

5    provisional appointment, making it, you know, a full

6    appointment?

7    A    I don't -- you know, I'm sure it's there somewhere.  I mean,

8    as I sit here today, I don't have the docket sheet in front of

9    me.  I can't imagine that the Court never followed through.

10   Q    Right, okay.  Let's, if we can, move to what is already

11   listed as Exhibit 10.  No, I'm sorry, 9, I believe, which is the

12   September 27th dated letter.  Please let me know when you have

13   that.

14        MS. POTTS:  It's actually Exhibit 9.

15        THE WITNESS:  Thank you.

16        MR. PERKOVICH:  And I hope that's the

17   September 27th dated document.

18        THE COURT:  It is.

19        THE WITNESS:  Okay.

20        THE COURT:  It's the September 27th dated letter to

21   Mr. Christeson from William J. Swift.

22        MR. PERKOVICH:  Excellent.  That's the one I'm looking

23   for.

24   BY MR. PERKOVICH:

25   Q    If you could just identify this document.  Again, as you can

1   see, it's got the same form that we've looked at.  Can you tell

2   me who is CCed on it?

3   A   It's a letter from William Swift to Mr. Christeson at

4   Potosi.  It says CC, Phil Horwitz and Eric Butts.

5   Q   And can you read the middle paragraph?  You don't have to

6   read the close.

7   A   The middle sentence?

8   Q   No, I'm sorry.  Just the main paragraph, the first

9   paragraph.

10  A   "I just wanted to let you know that during the last week,

11  your case file materials were sent to Mr. Horwitz and Mr. Butts

12  in St. Louis.  I spoke to Mr. Horwitz, and he told me that even

13  though they still had not received approval from the district

14  court for their proposed case budget, he felt that they needed

15  to obtain your file so that they could begin to review it."

16  Q   Okay.  And does this seem to comport with your recollection

17  of this time?

18  A   I have no independent recollection of receiving or not

19  receiving that letter.  I do remember receiving the case file.

20  I thought that the case file was mailed on September 29th.  I

21  think that's what I testified to previously.  Apparently from

22  this letter, it was sent on September 27th.  I don't recall when

23  the case budget in the case was approved.  I assume it was at

24  some point.  That's --

25  Q   And when you received the files, were the files shipped to

1   your office?

2   A   No, they went to Mr. Horwitz's office.

3   Q   Okay.  Did Mr. Horwitz maintain the files that Mr. Swift had

4   routed to you?

5   A   By "maintained," do you mean kept them in his office?

6   Q   And how did you go about working --

7       THE COURT:  Wait.  Answer the question --

8   BY MR. PERKOVICH:

9   Q   -- in terms of reviewing those files between the two of you?

10      THE COURT:  Wait a minute.  Let me -- maybe this will

11   help.  That mic is no good.  You can only speak to that phone.

12      THE WITNESS:  To the phone?

13      THE COURT:  That may help.  So speak up.

14      THE WITNESS:  No, I had asked what you meant by

15   "maintained."  I'm sorry.  Did you hear that?

16   BY MR. PERKOVICH:

17   Q   I think so.  If you could just explain how the file was

18   consulted in terms of physical location being with your

19   colleague's office, how the two of you set out to review and

20   access the file upon its receipt a couple months after you

21   entered your appearance.

22   A   We -- I would go and look at it.

23   Q   I'm sorry.  Can you repeat that?

24   A   I would go and look at the file.

25   Q   You would?  And how frequently would you do that?

1    A   It would depend on my other cases that I had, depend on

2    other things that was happening.  I suppose there were times --

3    not suppose.  I mean, there were times when I would go pick

4    something up and take it back to my office.  There were times

5    when I would go out and spend an afternoon in his office.

6        You know, over the course of many, many months, we reviewed

7    all of the pleadings.  Sometimes I would spend all day in his

8    office.  Other times I would pick the stuff up and take it to my

9    office.  Just depended on what I was doing.

10   Q   In reviewing the materials that you received from prior

11   counsel, how would you go about reviewing the file?  It's a

12   big -- I mean, we've seen that it's many boxes.  Budget referred

13   to 20, something in that neighborhood, of materials.  How would

14   you go about conducting your activity?

15   A   I would read the file.

16   Q   You would read the file?

17   A   Yeah.

18   Q   Would there be, let's say, an inventory of the boxes to

19   understand where to begin?  Was there a beginning box and an end

20   box?  How did you commence to review all of that material or

21   identify what you would review from that material?

22   A   We went through the file.  I don't understand your question.

23   I mean, I think any attorney would get --

24   Q   I asked how you would -- did you just -- it didn't matter

25   where you started?  I mean, you opened a box and just dove in?

1   A   Generally go through the transcript and then proceed from

2   there.  But I don't -- you know, the boxes were -- the materials

3   within them were labeled.  Again, I don't understand your

4   question.

5   Q   I'm just asking how you would approach understanding the

6   case, understanding the issues so that you could deliver a

7   habeas corpus petition at the end of it.

8   A   You read all the prior pleadings in the case.  You read the

9   documents contained in the case file.  You look to make sure

10   that issues are not procedurally defaulted.  You discuss with

11   your co-counsel case law, cases, your ideas as to the case, what

12   you believe will be good issues.  I mean, those are things that

13   an attorney would do when they review any file.

14   Q   And so after you moved through the material and divided the

15   work between the two of you, would you annotate the file?  Would

16   you make notes about what you were reading?

17   A   Well, generally I don't know that we divided the case file

18   between the two of us.  I mean, I think we both had a good

19   reading of the file in reading the depos and reading the reports

20   and reading the investigations and reading the trial

21   transcripts.  You know, I'm sure that I on occasion would write

22   something down if I thought it was an issue that was important.

23        But at the time, we generally discussed the case, discussed

24   the issues and discussed the pleadings on a somewhat regular

25   basis.  On a regular basis.

1    Q    So as you say, you're not sure if you noted anything, but

2    you do recall discussing --

3    A    Oh, I'm sure I --

4    Q    -- with your colleague?

5    A    I'm sure at one point I wrote something down, "Look at this

6    case."  At that time the Internet wasn't that prevalent, and you

7    would take an issue or take a case that you had seen in the file

8    and go to the law library and look that case up and see whether

9    or not that applied.

10        But I would never annotate a file.  I mean, I'm not -- the

11   file is labeled.  Again, I just don't understand what you're

12   asking.

13   Q    Well, I'm just asking if there -- if you, in handling these

14   20 boxes, if that led to work product in the way of notes or

15   digests or memos, outlines, an index.  Do you recall making

16   attorney work product --

17   A    No.

18   Q    -- as you reviewed this volume of material?

19   A    No.  It was already pretty well organized.  It was 16 boxes,

20   and they had -- the various sections of the file were divided as

21   to the individual issues and the arguments that were made and

22   the notes.  Bill Swift did an extraordinary job, which I'm sure

23   you know because you've seen the file.

24   Q    Okay.  So that's a no to the question about creating work

25   product?

1  A   You have everything in the file that we put into the file or

2  had in the file.  As I said earlier, many times I would read a

3  case and say, "I don't know if that's right."  And I would write

4  down the citation and go to the library and do additional

5  research.

6      When we compiled the petition or other pleadings that were

7  filed in the case, we often had cases that we had copied, and we

8  talked about the cases and referred back to the notes in the

9  file.

10 Q   So you don't independently recall notes created -- if it's

11 in the file, it's in the file.  Would that be fair to say?

12 A   What my co-counsel and I would do is we would look through

13 the file.  We would read the file materials, read the

14 transcripts.  We would read the notes, the cases in the file,

15 the prior pleadings in the case.  If there was an issue that

16 arose, generally either myself or Mr. Horwitz would do

17 additional research on that by going to the law library and

18 looking in the law library and researching those issues.

19     As we would prepare the pleadings, we certainly had copies

20 of the cases that we felt were important.  We talked about it on

21 a regular basis.  If ideas came to one of us, we would do

22 research at the law library.

23     Given the nature of procedural default in habeas petitions,

24 we typically looked at the issues that had been presented,

25 looked at the research, carefully checked the research in order

1    to make sure it was accurate, and then discussed between

2    ourselves, "Is this a good issue?  Is it a bad issue?"  Those

3    discussions then led to the preparation of the pleadings.

4    Q   So it won't surprise you if the file contained no notes from

5    this?

6    A   During the time -- I don't know how else to answer your

7    question.  I've answered it three times.

8    Q   No, I'm just asking you, it would not surprise you if there

9    were no notes by hand or typed concerning the review of the

10   file?

11   A   You have the file.  As I said, Mr. Horwitz and I would read

12   the file, would review the file.  We would discuss the file.

13   That's --

14   Q   In terms of your research, you stated a couple times your

15   practice, and I believe you've averred that Mr. Horwitz had the

16   same practice, going to the law library to do the legal research

17   in 2004, 2005.

18   A   Right.

19   Q   Could you describe the steps involved at that time?

20   A   To have what?  I couldn't hear you.

21   Q   Your legal research was conducted at a law library, a

22   physical library.  Could you just explain kind of what that

23   would look like when a legal issue would come up?  Would you

24   remember the case and then go to the library and pull a book?

25   How would this work?

1   A    Yeah.  At that time I -- you know, I think it was very

2   common for attorneys to go to law libraries and research legal

3   issues.  You would look at the reported cases, you'd look at the

4   advance sheets, you would look at -- I don't know.

5   Q    Did you use online sources like Westlaw or Lexus to do legal

6   research in 2004, 2005?

7   A    No.

8   Q    I'm sorry.  Was there an answer?

9   A    Yeah, there was.  It was no.

10  Q    Okay.  So if we could consult I believe it's Exhibit -- it's

11  the Respondent's Exhibit 3.  Bear with me.  There's a lot of

12  files here.  It's document 73 in the record, and that is

13  Exhibit 5 today that respondent has marked earlier.

14  A    Is that Respondent's Exhibit 5?

15  Q    Yes, Respondent's Exhibit 5.  And I actually would like to

16  go to page 8 as you did earlier in your testimony.

17  A    Okay.

18  Q    Okay.  About eight lines up from the bottom, there's a

19  sentence that starts, "Counsel thoroughly," and then it goes to

20  the next line.  Do you see that?

21  A    Yes.

22  Q    If you could read from that point to the end of the

23  paragraph.

24  A    "Counsel thoroughly reviewed these documents, contacted

25  appellate counsel regarding issues raised at the trial level and

1    investigated potential claims.  Counsel will file their entry of

2    appearance and motion and order to appear pro hac vice with the

3    Court.  Counsel met with Mr. Christeson on May 27th, 2005.

4    Thereafter, Mr. Christeson's petition for writ of habeas corpus

5    was filed on August 5, 2005."

6    Q   Okay.  We've spoken a fair amount about the review.  You

7    refer to the contact with appellate counsel.  Can you explain

8    what that entailed?

9    A   I believe appellate counsel would have been Janet Thompson

10   and William Swift, and Mr. Horwitz had several conversations

11   with Mr. Swift.

12   Q   Okay.  Do you recall the substance of those discussions?

13   A   I wasn't part of those conversations.

14   Q   Okay.  Not one?

15   A   Excuse me?

16   Q   You don't recall being a part of any of those conversations?

17   A   No.  That's why I said I wasn't a part of them.

18   Q   Okay, that's fine.  And the investigation of potential

19   claims --

20   A   Uh-huh.

21   Q   -- what did that entail?

22   A   Review of the case file, review of the prior pleadings,

23   review of the notes that have been made by prior counsel, review

24   of case law both at the time the case was tried and subsequently

25   to that, review of the trial transcript, review of all the

 1   investigator's notes, review of everything in the file.  I mean,

 2   you look at the claims that were raised, look at whether or not

 3   there's any additional claims that may present themselves, look

 4   at whether or not any claims can overcome procedural default if

 5   they were not raised, look at the status of the case law to see

 6   whether or not those claims have merit before the Court,

 7   possible merit before the Court.

 8   Q   All right.  So did investigation entail speaking to a

 9   witness?

10   A   No, sir.  I just said reviewing the case file, reviewing the

11   issues.

12   Q   Sir, I understood what you said.  I'm just asking did it

13   also entail any contact with witnesses?

14          MR. SPILLANE:  I'm going to object as asked and

15   answered.

16          THE COURT:  Sustained.

17   BY MR. PERKOVICH:

18   Q   Okay.  Did you speak to an investigator of any kind upon

19   your entry of appearance in the case who might, you know, in

20   your behalf address witnesses or look to collect records

21   relating to this case outside of the records you inherited?

22   A   We didn't hire an investigator, no.

23   Q   Okay.  Okay.  If I could ask you to consult what we marked

24   as -- I think it's Exhibit 6, a May 23 dated document.

25   A   What's the caption of the document?

1   Q   It's your letterhead, I believe.  I'm hoping you can

2  identify it.

3   A   I don't have it.

4   Q   You don't?  Okay.  I'm hoping that it's on its way to you.

5   A   That's not my letterhead.

6       Missouri State Public Defender System, is that what you're

7  talking about?

8   Q   Oh, you know what?  Actually I've got -- should be a

9  May 23rd letter.  I apologize.  That's No. 10.  I apologize.

10  That's our Exhibit 10 on May 23rd.  Can you identify those?

11   A   It's a letter from me to Mr. Horwitz saying schedule a visit

12  with Mark on Friday, May 27, 2005.

13   Q   Uh-huh.  And can you read the initials at the very bottom of

14  the page?

15   A   EWB, LJP.

16   Q   And does the EWB stand for you?

17   A   Yes.

18   Q   And LJP stands for what?

19   A   Secretary at the time.

20   Q   And her name is?

21   A   Laurie Pyatt.

22   Q   I'm sorry, the last name is?

23   A   Pyatt, P-Y-A-T-T.

24   Q   P-Y-A-T-T, okay.  And would you have dictated this letter to

25  her?

1  A   I'm sure I did.  Or maybe I just told her send it.  I don't

2  remember.

3  Q   And were you in the practice of dictating letters or using

4  dictation like recorders in that time frame?

5  A   It depended on what it was.  Sometimes I would write the

6  stuff out.  Sometimes I dictated.

7  Q   When you were reviewing materials like case materials and in

8  a space where you were -- I mean, you established that you

9  didn't create work product in the process of reviewing the

10  materials.  But ultimately things were filed, so you're drafting

11  pleadings at different junctures.  Would you rely on dictation

12  to do the drafting?

13  A   Generally not.  Generally we would write it out, talk about

14  it.

15  Q   And then would it be writing by hand or just typing it, you

16  know, to a computer file?

17  A   Writing.  You know, just with like a pencil or pen.

18  Q   I'm sorry.  Actually writing, is that what you said?

19  A   Yeah, just actually writing.

20  Q   And so would your secretary then type the documents?

21  A   Generally, yes.

22  Q   I'm sorry, you cannot what?

23  A   No.  I said generally, yes.

24  Q   Generally, yes, okay.  So the basic work flow is you would

25  in longhand hand write out, you know, the substance.  You would

1    hand those to the -- your assistant who would then type them

2    into a document?

3    A   Generally, yes.

4    Q   And would your assistant maintain those documents or the

5    electronic files?

6    A   They're all on CM/ECF, everything we filed.

7    Q   I hate to ask you to repeat that.  I didn't quite make out

8    what you said.

9    A   Everything that was filed is on CM/ECF.  Everything we

10    produced in this case is in the Court's file.

11    Q   Okay.  So if we could -- well, actually before I move to

12    another document, do you recall any written communication about

13    the case before this by you, before this May 23 note?

14    A   No.

15    Q   Okay.  Do you recall any communication to Mark Christeson --

16    A   I do recall --

17    Q   -- at that time?

18    A   -- speaking to him prior to that time in discussions with

19    Mr. Horwitz.  He also recalls talking to him.  I would guess

20    probably two, three times.  Very brief calls.  Beyond that, no,

21    there were no letters sent to him.

22    Q   Uh-huh.  And so the impetus for -- well, what do you recall

23    was the impetus for scheduling this May 27th visit?

24    A   We had completed our review of the file.  We had discussed

25    issues we felt were going to be important to raise in the

1   petition.  We felt that we were in a position to meet with

2   Mr. Christeson, address his questions as to the case, issues

3   that were going to be raised, and that's why we went to see him.

4   Q   So, you know, as we discussed, this event is happening about

5   a little over ten months after your appearance in his case.  Is

6   that typical in terms of the interval between taking on a case,

7   entering an appearance in a proceeding, and meeting or

8   communicating with the client for the first time?

9   A   Mr. Christeson's case was an enormous amount of file

10  materials.  As I've said previously, normally in capital cases,

11  we got maybe as many as eight boxes; usually six, eight boxes.

12  There's over nearly 2,000 pages of trial transcripts in Mark's

13  case.

14      The case was thoroughly investigated and pursued by state

15  trial counsel, state post-conviction counsel.  They had dozens

16  of depos, investigative notes.  Mark had, you know,

17  psychologist's examinations.  I mean, there was just anything

18  you could ever think of.  Things that normally trial counsel had

19  not done or post-conviction counsel had not done had been done

20  in Mark's case.

21      So it was -- it is an incredible lengthy file.

22  Q   It was a lengthy file that again, there's absolutely no work

23  product generated from.  That's fair to say?

24  A   As I said previously --

25  Q   This letter --

1  A   When I would review the case file --

2      COURT REPORTER:  Counsel, we need to do this one at a

3  time or nobody gets on the record.

4      MR. PERKOVICH:  I'm sorry, I couldn't hear.  I

5  apologize.  This must be very hard.

6      COURT REPORTER:  Yeah, it is.

7      THE WITNESS:  What I was saying was that I went over

8  before how Phil and I, who had worked together on numerous

9  cases, how we worked on this case.  We would get together.  We

10 would review the file.  We'd talk about it.  If an issue arose,

11 we'd go to a law library.  We'd look it up.  I think Phil had --

12 used to get Westlaw disks at that time, so perhaps he would do

13 some of the research in his office.  I don't know.  But I would

14 generally go to the law library.  We'd discuss ideas.  We'd look

15 at the research in the case file, and we'd come to a conclusion.

16 Q   Which library?  What library?

17 A   Generally I would go to the one at the state courthouse in

18 St. Louis, the municipal court's building, civil courts building

19 now, or go to the one at the county courthouse.  They have a

20 real nice library up on the third floor.  So I've used both of

21 those libraries.

22 Q   And so would it be in the evenings that you would -- you

23 know, upon reviewing some materials and consult the library?

24 A   No, I would go whenever I could.

25 Q   Uh-huh.  And I've never been to these libraries.  Is there a

1    sign-in process?  Do you have an identification card?  How does

2    one get into the library?

3         MR. SPILLANE:  I'm going to object to relevance.

4         THE COURT:  Sustained.  Not relevant.

5         MR. PERKOVICH:  Okay.  I'm just trying to understand his

6    actual conduct in performance of what he is testifying he

7    carried out.

8    BY MR. PERKOVICH:

9    Q    Okay.  If we can move on, I would like you to look at what

10   is document 10 in the record, and it's the habeas petition.  We

11   have not marked it, so we can do that now.  I believe that will

12   be No. 13.

13   A    Thank you.

14   Q    Let me know when you've got a copy.

15   A    I've got it.

16   Q    Okay.  Very good.  If you would just take a quick look to be

17   able to tell me that this is the habeas petition in this case.

18   A    I have no reason to believe that it's not.

19   Q    Okay.  What was the date this was filed?  There's a file

20   date at the bottom on this, of course.

21   A    August 5th.

22   Q    Does that comport with your recollection?

23   A    It says August 5th.

24   Q    Okay.  And --

25        THE COURT:  Wait a minute.  August the 5th of 2005.

1    Let's get the date, year.

2            THE WITNESS:  I'm sorry.

3            MR. PERKOVICH:  Thank you, Your Honor.  Yes.

4    BY MR. PERKOVICH:

5    Q   And so in putting together this document, please explain how

6    you and Mr. Horwitz collaborated to draft this document.

7    A   Mr. Horwitz and I reviewed the case file that was

8    transferred to us by the -- by Mr. Swift.  We read the materials

9    in the file, we read the transcripts, we read the prior

10   pleadings in the file.  We conducted legal research.  We

11   discussed amongst ourselves what we thought would be good issues

12   to present in the habeas petition.  We reviewed case law,

13   reviewed the cases cited in many of the documents in the case

14   file, did our own research, met with Mark, discussed the issues

15   that were going to be raised, prepared the petition and filed

16   it.

17   Q   Do you recall when you started the drafting of these claims?

18   A   I'm sure we would have discussed these claims as early as

19   November or December of 2004, as we were reviewing the case

20   file, as we were looking at prior pleadings that had been filed

21   in the case, as we were, for lack of a better word,

22   brainstorming as to issues that we felt would possibly be of

23   some merit to Mr. Christeson.

24   Q   And you say you would have done that around November,

25   December.  Is that an extrapolation from the dates we

1  considered, or do you recall that?

2  A   I recall that what we would do is after we received the file

3  in this case is that we would have discussions among ourselves

4  as to issues that had been raised in prior pleadings that were

5  filed on Mark's case, information that we obtained from the

6  file, discussions that that's a good issue, that isn't a good

7  issue; this is one that we don't believe applies, that sort of

8  conversation.

9      So as we went forward, we would have in our minds an idea of

10  the type of issues that we would present to the Court, issues

11  that we hoped and believed would receive consideration by the

12  Court.

13  Q   Okay.  If I could ask you to look at the document dated

14  August 11th of 2005.

15      MR. PERKOVICH:  Codi, I believe it's marked I, letter I,

16  and if we could mark it now as I believe 14, Exhibit 14 and

17  circulate, that would be appreciated.

18      THE WITNESS:  Thanks.  Okay.  I have it.

19  BY MR. PERKOVICH:

20  Q   Okay.  Can you identify this letter?

21  A   It's a letter from me to Mark dated August 11th, 2005.

22  Mr. Spillane asked a question regarding this, to which I

23  responded in his direct examination.

24  Q   And so this concerns lethal injection litigation?

25  A   That's what the letter says, yes, sir.

1    Q    That was the question.  I'm sorry.  I appreciate your

2    patience.  This is an involved process, as you know.

3          Do you recall corresponding, sending correspondence to

4    Mr. Christeson before this date?

5    A    Well, we just went over a -- didn't we just go over a letter

6    that I had sent prior to that?  No, it was a letter to Phil.  I

7    don't know.  I don't have any recollection one way or another.

8    Q    Understood.  Okay.  And you've already testified to the role

9    on behalf of Mr. Christeson concerning the lethal injection

10   litigation.  Who was the attorney or attorneys who were

11   primarily responsible for that litigation?

12   A    John Simon, Elizabeth Carlisle.  One of the guys in my

13   office, Mike Gorla, worked on it a lot.  Two other attorneys in

14   Kansas City.  I know that Joe Luby of Death Penalty Litigation

15   Clinic was involved in it as well.  A number of attorneys.  I

16   think John Simon was probably the moving force behind all of it.

17   Q    And did you take part in the drafting of the pleadings or

18   any of the filings in this litigation?

19   A    Initially the pleadings were filed by a number of attorneys,

20   and I don't -- other than John and Elizabeth Carlisle.  They

21   filed the initial *Clemons* or *Middleton*, and I think it was

22   *Middleton* and then *Clemons* or *Clemons* and then *Middleton*.

23          In 2008 I asked for leave to intervene with Mr. Christeson.

24   All of the attorneys who had capital habeas clients were

25   responsible for having their clients participate in it.  In this

1    case I had asked for leave to intervene because we were not an

2    initial named plaintiff.

3        Following that, as pleadings would be prepared in the case,

4    Elizabeth, John, and I can't think of the other lady's name, we

5    were all in an email group, and they would all propose certain

6    arguments, pleadings, whatever.  They would circulate them among

7    ourselves.  There would be comments made, corrections, whatever.

8    I would say to John Simon, who is a prolific writer, and

9    Elizabeth Carlisle probably wrote 90 percent of everything that

10   was filed.  However, everyone had input.

11       To answer your question specifically, yes, I received all of

12   them.  If I had a comment, I would comment on that.  If I had a

13   correction, I would make a correction, and we would all discuss

14   what was going to be filed.

15   Q   And that communication with that large group would be done

16   by email chiefly?

17   A   Yeah.

18   Q   Okay.  If I could ask you to look at Respondent's Exhibit 2,

19   if I can do that next.  When you have it, please let me know.

20   A   Okay.

21   Q   Can you read the order?

22   A   This is an order as to the budget.  It said, "The Court

23   received the proposed budget approximating 56,750 in total costs

24   needed to adequately represent Christeson in this habeas action.

25   Having reviewed the petition and the proposed budget, the Court

1    hereby approves a budget of 50,000 for this case.  So ordered.

2    Signed Dean Whipple, United States District Judge, dated

3    September 20th, 2005."

4    Q    Do you recall any other order or indication in the record or

5    in your experience in this case relating to your budget

6    submission from July of 2004?

7    A    No, but I don't have the docket in front of me.  I mean,

8    sitting here 12 years later, whatever it is, no, I don't recall

9    any additional order.

10   Q    Yeah.  That's understandable.  So that reference to document

11   8 in the paragraph, that refers to the budget that we discussed

12   earlier from July 2004, correct?

13   A    I have no idea.  I don't know what document 8 is.  I don't

14   have the --

15   Q    Right.

16   A    Wait a minute.  Respondent's Exhibit No. 1 is referenced

17   document No. 8.  I misspoke.  So yes, I assume it is the

18   document the Court is referring to.

19   Q    Okay, good.  So we discussed earlier and you testified and

20   we reviewed correspondence.  The order concerning your motion

21   for appointment provisionally appointed you; is that correct?

22   A    I believe that's what it said, yes.  Yes.

23   Q    And so you entered an appearance, as we discussed.  We

24   looked at that entry of appearance document in July of 2004.

25   And you submitted a budget with Mr. Horwitz, as we discussed,

1    for a figure of $56,750 in July of 2004.  The petition was filed

2    in August, as we've just looked at, of 2005; is that right?

3    A   Yes.

4    Q   Okay.  And so this order on September 20, 2005 is a belated

5    order concerning the budget from July.  Would that be your

6    understanding?

7              MR. SPILLANE:  I'm going to object to the

8    characterization of the Court's order as belated.

9              THE COURT:  Sustained.

10   BY MR. PERKOVICH:

11   Q   So when we refer to the -- and we can consult the actual

12   letter if you would like in terms of the August 23 letter about

13   the inquiries with the clerk's court about the approval of the

14   budget.  When you are able to look at the September order

15   affirming the budget after the petition has been filed and you

16   reflect on the communications to the clerk's office about the

17   status of the budget, did that affect your performance in this

18   case in terms of the steps taken to review the file?

19   A   What?  I couldn't hear the last part.

20   Q   Did awaiting the order on the budget affect your review on

21   the file in terms of the time put into it?

22   A   No.  The main thing that affected our reviewing the file is

23   we didn't have the file.  As I've told you previously, we had no

24   intention of billing the Court.  So when the Court approved the

25   budget, it didn't make any difference to me.  I wasn't going to

1   charge them.

2   Q   You didn't track the time, but if you could estimate how

3   much time was spent before the petition was filed, what would

4   you estimate?

5   A   I have no idea, Joe.

6   Q   During this time frame from July 2004 to September 2005,

7   what cases other than Christeson do you recall working on?

8   A   Oh, I had probably hundreds of them.  I mean, I don't -- my

9   goodness, it was 12 years ago.

10  Q   I'm sorry.  I hate to talk over you.  You said hundreds of

11  cases?

12  A   You know, traffic cases.  Joe, I have no idea.

13  Q   Okay.  Well, to your best recollection, can you -- can you

14  name other matters of -- you know, required a lot of review or

15  were cases sort of more of smaller matters in terms of the

16  volume of cases during that, you know --

17  A   I can't -- I couldn't understand what you were saying.

18  Q   So the other cases you were working on, can you tell us what

19  kind of cases these were?  If you had to categorize in groups

20  this large number of cases, what kind of cases were you doing in

21  addition to Christeson's case during this time frame?

22  A   I have no specific recollection of the specific cases I

23  handled during this time period.  I recall working on

24  Mr. Christeson's.  Mr. Rousan's was pending.  William Weaver's,

25  I believe.  But beyond that, Joe, I don't have any recollection.

```
1   Like most sole practitioners, you represent whatever comes up,
2   you know?
3   Q   Right.  And so in 2004, 2005, did Ms. Pyatt, your assistant,
4   handle invoicing for your compensation on your different cases?
5           THE COURT:  Now, what -- now, wait a minute.  There's no
6   need to go further on this, Mr. Perkovich.  He says he didn't
7   intend to bill.  He didn't keep time records.  That's your
8   answer.  You don't need to nitpick what else he did.
9           MR. PERKOVICH:  Your Honor, if I could clarify, Your
10  Honor.
11          THE COURT:  Sure.
12          MR. PERKOVICH:  I'm sorry?
13          THE COURT:  Sure, go ahead.
14          MR. PERKOVICH:  Okay.  Okay.  Thank you.  I appreciate
15  it.  I am trying to understand how your time was spent otherwise
16  and how normally, in a case unlike this exceptional case, you
17  would maintain your business as a sole practitioner, billing
18  courts for clients and getting paid.  And in that connection, it
19  would be really helpful to understand who -- you know, the
20  portion of retained work by individuals versus the portion of
21  appointed work by presumably state or federal courts made up
22  your work then or --
23          THE COURT:  No.
24          MR. PERKOVICH:  -- a general time frame.
25          THE COURT:  This is not relevant.  Do not ask anymore
```

1    questions about he works, bills or keeps track.  That's not the

2    issue in this case.  Read the order from the 8th Circuit.

3    You're ignoring the order of the 8th Circuit.  You're an officer

4    of this court.  Now, follow what the 8th Circuit told you and me

5    and the attorneys to do.  You're not doing it.

6          MR. PERKOVICH:  Yes, Your Honor.

7    BY MR. PERKOVICH:

8    Q   If I could ask the witness to consult in documents in the

9    record, it is doc 64-3.  It's dated April 15th, and we've noted

10   it M, as in Mary.

11   A   Thank you.  Yes, I have it.

12   Q   Okay.  Can you identify the letter?

13   A   It's a letter from me to Mark Christeson dated April 13th,

14   2014, advising him the Missouri Supreme Court issued an order to

15   show cause as to why an execution date should not be set.

16   Q   You may have misspoke or I misheard.  What was the date on

17   this again, just for identification?

18   A   April 15th, 2014.

19   Q   And at that time, did you have another client under a

20   warrant of execution, do you recall?

21   A   I don't recall.

22   Q   Was Mr. Rousan under a warrant of execution at that time?

23   A   He may have been.  I don't recall.

24   Q   Do you recall when Mr. Rousan was executed by the state of

25   Missouri?

1    A    Couple years ago.  Maybe a year ago.  I don't know.  What

2    was the date?  I don't have it in front of me.

3    Q    If -- if it was -- if I told you it was April 23rd, 2014,

4    would you have any reason to --

5    A    No, no, not at all.  So he was under the warrant of death at

6    that time, yes.

7    Q    Okay.  Can you read the second paragraph of this letter?

8    A    "This request by the state of Missouri does not mean an

9    execution date will be set in your case any time in the near

10   future.  As you are no doubt aware, counsel for most of the

11   other *Zink* litigation plaintiffs have received similar requests

12   within the past few days.  It appears that the state of Missouri

13   is doing nothing more than administratively reviewing all of the

14   capital cases pending in the state."  All of the --

15   Q    That's fine.  Thank you.  As you reflect on this letter,

16   would you say that's a fair characterization of what the state

17   of Missouri was doing, administratively reviewing all of the

18   capital cases by using show cause orders not to set an execution

19   date?

20   A    The *Zink* litigation had been dismissed.  And following the

21   *Zink* litigation dismissal, all of the people that were in the

22   case received orders to show cause.  As you're no doubt aware,

23   the state of Missouri executes people -- or they were executing

24   people every 30 days.  There were a number of people before

25   Mark, and there were a number of people after Mark.

1     By saying administratively reviewing, my intent and probably

2 poor characterization, is that following everyone losing in

3 *Zink*, the state of Missouri decided we're going to issue orders

4 to show cause.  It does not mean we took it lightly.  We did

5 not, and we filed the appropriate paperwork with the case.

6 Q   When you say you did not take it lightly, can you explain?

7 A   Yeah.  We filed a response to the order to show cause and

8 spoke with Mr. Christeson about a week after this letter went

9 out.

10 Q   I see.  Do you recall sending similar correspondence to

11 Mr. Rousan?  Or what do you recall about handling his show cause

12 order?

13 A   I wouldn't comment on what I sent or didn't send to

14 Mr. Rousan.

15 Q   Okay.

16     MR. PERKOVICH:  If I may, I'd like to take a short

17 recess of five minutes.

18     THE COURT:  No, not until you finish with this witness.

19     MR. PERKOVICH:  Yes, Your Honor.

20     THE COURT:  Then we'll take a recess and see if there's

21 another witness.

22     You know, you're far afield in what the purpose of this

23 hearing is.

24     MR. PERKOVICH:  I understand.

25     THE COURT:  That's why I'm reining you in.  We've got to

1    get this moving on the issues the 8th Circuit has told us to

2    proceed on.

3        MR. PERKOVICH:   I appreciate that, Your Honor.

4    BY MR. PERKOVICH:

5    Q    I would like Mr. Butts to consult what I believe is in

6    Respondent's Exhibit 4.

7    A    Okay.

8    Q    And if we can go to page 2.

9    A    Okay.

10   Q    In that first paragraph, first full paragraph.

11   A    Okay.

12   Q    It says, and I believe you referred to this earlier, that

13   the motion for rehearing, the Rule 2915 was denied on May 11,

14   2004.  It's your understanding that that is the date of that

15   denial, correct?

16   A    Yes.

17   Q    What was the legal significance of that for calculating the

18   statute of limitations?

19   A    I believed, as I said in my -- in this motion, that

20   Mr. Christeson had 90 days from the date that the motion was --

21   for rehearing was denied, because that was the period of time

22   during which he could have filed a petition for cert.  That's

23   how we calculated the time period for the filing of his habeas

24   petition.

25   Q    And because of that effort to surmise that date, that

1  calculation, we've gotten testimony from you that your taking on

2  the case and entering your appearance, there was discussion I'll

3  characterize as generally about the timeline initially.  That

4  was the level of discussion.  Is that a fair characterization

5  of, you know, your entry into the case and collaboration with

6  Mr. Horwitz?

7  A   I don't understand your question.

8  Q   Well, earlier you said that there was discussion about the

9  general timetable.  I don't think you went so far as to say that

10  when you entered your appearance, there was an effort to get the

11  relevant dates in place and calculate the statute of

12  limitations.  I don't think you said that earlier.  But if

13  that's not the case and in July that was done, I would like you

14  to speak to that.

15  A   No.  I think I did testify that as we went forward, and

16  certainly at the early date we did look at when the pleadings

17  were filed, when the state proceedings were filed, the dates

18  that would apply, and calculated what we believed was the date

19  for filing the habeas.

20  Q   Okay.  And so at a certain point -- and it seems that the

21  testimony indicated after the file was provided, and we

22  established your records or recollection reflect September 29th,

23  2004 time frame?

24  A   No, that's not correct at all.  What I had said when we

25  initially became involved in the case, that we had reviewed the

1  pleadings -- not the pleadings, the prior case decisions in

2  Christeson's case and that we had had discussions regarding

3  potential filing date for the habeas.  Certainly as we went

4  forward, we looked at it, confirmed our initial suspicions.

5      But, you know, we did have the pleadings on May 29th, and I

6  know that we looked at the pleadings again.  So again, I don't

7  understand your question.

8  Q  I'm just clarifying.  That's fine, and I appreciate it.  I

9  wanted to revisit that one point, and you addressed it.  Thank

10  you.

11      At this point, I don't have any further questions.

12          THE COURT:  Thank you.

13          MR. SPILLANE:  I have one question.  Then I'm going to

14  sit down.

15          THE COURT:  All right.

16                    **REDIRECT EXAMINATION**

17  BY MR. SPILLANE:

18  Q  One question.  I understood you to say on cross that you had

19  three phone calls with Mr. Christeson before your initial visit.

20  Did I understand that testimony correctly?

21  A  I know Mr. Horwitz and I had talked about this, and my

22  recollection is that I talked to him a couple of times.  So that

23  a couple would be -- would be two, and Phil thought that he had

24  talked to him, thought that he had called us, which kind of

25  makes sense, because he had been receiving stuff from Mr. Swift,

1    had our numbers, could reach out and talk to us.  It wouldn't

2    have been anything lengthy.  I don't -- I believe that the

3    institutions listen to your phone calls.

4          In my recollection, it was just along the lines of, you

5    know, "Swift said you guys are going to represent me."  And,

6    "Yeah, okay, we'll come see you," or, "We're reviewing it.  As

7    soon as we're ready, we'll come see you."  But nothing else.  We

8    would not have talked about the case.

9          MR. SPILLANE:  Thank you.  I have no further questions.

10         THE COURT:  Thank you.  You may step down.

11         MR. PERKOVICH:  No, Your Honor, I have follow-up

12    questions to that if I may.

13         THE COURT:  All right.  All right.

14                      **RECROSS-EXAMINATION**

15    BY MR. PERKOVICH:

16    Q   So, Mr. Butts, these phone calls that may have happened,

17    your testimony is that they may have occurred before your visit

18    of May 27, 2005?

19    A   Yes.

20    Q   Is it your experience in representing individuals in prison

21    that the Department of Corrections records phone calls by

22    recording them, literally audio recordings as well as reflecting

23    the use of phone numbers and the actual transaction, for lack of

24    a better word, between the phone and the prison and the outgoing

25    recipients?

1    A    I think many times they were recorded.  That's why I said

2    that.  And it would have made sense that he would have called

3    us.  For some reason -- and I don't have any notes or anything

4    else on it.  My recollection is that I did speak to him a couple

5    of times.  You know, it's been 12 years, but --

6    Q    Would that not have been a collect call?

7    A    A number of times Mark called without it being collect.

8    I've also received calls from jails where there were three-way

9    calls, so I can't tell you whether it was collect or not

10   collect.

11   Q    So from the Potosi Correctional Center, which is not a jail.

12   Of course, it's a prison.

13   A    Right.

14   Q    It would not need to be a collect call with an established

15   account for you to receive a call from him?

16   A    No.  They can still make three-way calls, and people can

17   still call, right?  I mean, I -- you know, 12 years ago I have

18   no idea, but I know that people can still make calls without it

19   being collect, so...

20   Q    And is it your experience with the prison system that you

21   must arrange a call with a client?

22   A    If an individual is in an ad seg, administrative

23   segregation, they have to get permission to call.  If I want to

24   call them, because they won't just bring them to the phone, I

25   have to make arrangements to call.

1    If an individual wants to call me, my general experience has

2    been that if they can get to a phone, they can call me.  But

3    that can vary from prison to prison and from person to person.

4    And quite honestly, I don't recall what the situation was like

5    back then.  But I know that, you know, you received calls from

6    people, and it's a three way or you don't pay, so I have no idea

7    how to answer your question other than that.

8    Q    And if he were to call you, that would have been at an

9    office telephone?

10   A    Yeah, you can't -- I mean, no, now you can call cell phones.

11   But in years past, it had to be a land line.

12   Q    And do you have the same land line as you did that long ago?

13   A    No.

14   Q    No?  Do you recall the phone number that you had for your

15   office at that time?

16   A    No.

17   Q    Okay.  But that's an answerable question in the universe of

18   things?

19   A    Yeah.  You know, again, I don't know.

20   Q    I can't remember my phone number from two weeks ago, so I

21   understand that you cannot recall this.  I just wanted to

22   clarify what he would be dialing out.

23         And were conversations held between you and Phil and Mark in

24   these calls?

25   A    No.  I mean, it wouldn't be a three way among us.  Phil has

1    a different office.  And again, you know, for some reason I have

2    a recollection that I talked to Mark a couple of times.  I mean,

3    I don't -- like I said, it's been --

4    Q   You've got a certain recollection?

5    A   -- a long time ago.  You know, I look at the documents, and

6    I can tell you what we did.  Look at the documents and refresh

7    my recollection, but -- and I had never made any notes, so I

8    have no idea.

9                MR. PERKOVICH:  I have nothing further.

10               THE WITNESS:  Thank you.

11               THE COURT:  Thank you.  Let's take about ten minutes.  I

12   assume this is all the evidence, isn't it?

13               MR. SPILLANE:  That's all the evidence I have, Your

14   Honor.

15               THE COURT:  Let's take a ten minute recess, and I'll

16   hear your positions.  Thank you.

17          We all need a recess.  We've been going for two hours and

18   14 -- 13 minutes.

19          (Recess taken from 3:43 to 3:56.)

20               THE COURT:  Please be seated.

21               THE WITNESS:  Judge, do you want Mr. Horwitz and I to

22   stay?

23               THE COURT:  Oh, I'm so sorry.  I do not.  I appreciate

24   you coming in and making yourself available at short notice.

25   No, you don't need to stay.

1        THE WITNESS:  Thank you, Judge.

2        THE WITNESS:  Thank you, Your Honor.

3        THE COURT:  Court will reconvene from recess.  Are you

4   hearing me all right?

5        MR. PERKOVICH:  Your Honor, Joseph Perkovich for --

6        THE COURT:  Okay.  Mr. Perkovich and counsel in the

7   courtroom, the 8th Circuit directed us to determine whether or

8   not the counsel were derelict in this case.  It's pretty obvious

9   to me that they were not.  I don't need to hear anymore

10  arguments.  This has taken enough time.

11      I'm going to rule before I leave this courthouse.  And if

12  you want to stay on the line, it may take me 45 minutes to an

13  hour.  I'm going to rule today.  This isn't that hard an issue,

14  gentlemen.  It's the in -- you tried to make it hard, which it's

15  your job, but it's a factual question that I can easily answer.

16  Thank you.  I'll be back.

17       MR. PERKOVICH:  Your Honor?  Your Honor?

18       THE COURT:  Yes.  Yes, sir.

19       MR. PERKOVICH:  I have a couple housekeeping points.

20  First, I just want to ensure that the exhibits marked during

21  Mr. Butts' questioning have been admitted.  I believe those are

22  numbers 12 through 15, but I hope I will be corrected if I'm off

23  in this account.

24       THE COURT:  Is that what you show?

25       Yes, sir, you're correct.  Exhibits 12 through 13.  12

1  through 15.

2        MR. PERKOVICH:  15.  One, five.  Yes, Your Honor.  And I

3  just want to confirm that we will arrange to have an expedited

4  transcript of this proceeding as rapidly as it's --

5        THE COURT:  No, sir.  You are getting nothing.  I'm

6  ruling today.

7        MR. PERKOVICH:  Your Honor, respectfully, we're going to

8  request a transcript.  And if we --

9        THE COURT:  I don't need it.  No, sir, you stay here.

10  I'm going to rule today.

11        MR. PERKOVICH:  Your Honor, for the appeal.  I will have

12  to move for a transcript and that it will be expedited, given

13  that we have an execution date of January 31, sir.

14        THE COURT:  You talk to the 8th Circuit.  I'm not -- I'm

15  not staying the execution, and I'm not granting any extensions.

16  So --

17        MR. PERKOVICH:  Your Honor, I'm asking for the record.

18  That's why I need the transcript, sir.

19        THE COURT:  You talk that over with the 8th Circuit.

20  I'm not delaying it.  I don't need a transcript.  You don't need

21  a transcript.  This is --

22        MR. PERKOVICH:  Your Honor, I understand that you can

23  rule right now.  I simply want a record of today's

24  proceedings --

25        THE COURT:  Okay.

          1           MR. PERKOVICH:  -- if possible.

          2           THE COURT:  All right.  Well, I appreciate you making

          3     yourself available on short notice, but I -- I don't need this.

          4     This is just dilatory conduct on your part trying to stay the

          5     execution.  I'm not going to do it.  That's the bottom line.

          6     You have no basis for it.

          7           MR. PERKOVICH:  Respectfully, we moved for an

          8     evidentiary hearing at the outset of our involvement in the

          9     case.  We're glad to finally have a day in court to be able to

         10     speak to the Court on behalf of Mr. Christeson.  I'll leave it

         11     at that.

         12           THE COURT:  Thank you.  Are you going to stay for the

         13     ruling?

         14           MR. PERKOVICH:  Are you going to enter it in the docket?

         15           THE COURT:  Yes.  I'm going to announce it from the

         16     bench.

         17           MR. PERKOVICH:  Okay.  Well --

         18           THE COURT:  I mean, it may take me 45 minutes to an

         19     hour.

         20           MR. PERKOVICH:  May we ask your clerk to call us when

         21     you're going to do that --

         22           THE COURT:  Okay.

         23           MR. PERKOVICH:  -- instead of staying on the line?  But

         24     we would like to hear you announce it.

         25           THE COURT:  Okay.  Thank you.

1           MR. PERKOVICH:  Thank you, Your Honor.

2           THE COURT:  All right.  Be in recess.  I don't know

3    whether to ask you whether you want to stay or not.  I'm going

4    to announce my decision, try to get the --

5           MR. SPILLANE:  Well, you know what?  I think somebody

6    should be here to listen, so I'll be glad to stay.

7           THE COURT:  You don't need to stay unless you want.

8           MS. POTTS:  I will.

9           THE COURT:  Be in recess.

10    *(Recess taken from 4:00 to 4:46.)*

11           THE COURT:  Thank you.  Please be seated.

12    Court will reconvene from recess.

13           Now, ladies and gentlemen, as I understand the 8th Circuit

14    opinion, I've been -- I was directed to develop a record on the

15    actions of the original counsel so that the -- a decision on

16    Christeson's allegation of abandonment is based on more complete

17    understanding of the facts, and that was the purpose of this

18    hearing today.  And here's my findings.

19           To expedite the appellate review, the Court issues the

20    following finding from the bench.  Having considered the record,

21    the testimony and other evidence presented at this hearing and

22    pursuant to the 8th Circuit January 18th, 2017 opinion, this

23    Court hereby certifies the following supplemental finding of

24    facts and conclusions of law.

25           No. 1, the Court finds credible the testimony of

1   petitioner's former counsel, Phil Horwitz and Eric Butts. This

2   Court makes this ruling on their demeanor while testifying.

3   Their testimony is also consistent with the overall record. The

4   Court further finds that petitioner's current counsel had a full

5   and fair opportunity to test the credibility of these witnesses.

6        No. 2, the Court finds and accepts as credible Mr. Horwitz

7   and Mr. Butts' testimony that they did not abandon petitioner.

8   In particular, the Court finds and accepts as credible

9   Mr. Horwitz's and Mr. Butts' testimony that they began reviewing

10   documents and completing work on behalf of the petitioner within

11   two or three months of their appointment in July of 2004. This

12   means they started working on petitioner's case months before

13   the habeas petition was technically filed. The pre-AEDPA

14   deadline activities are further detailed in document 73, which

15   is in the record which is admitted today, which this Court

16   previously cited in its order dated March the 8th, 2016.

17        No. 3, the Court finds that Mr. Horwitz and Mr. Butts

18   adequately and continuously represented petitioner during all

19   relevant time periods.

20        No. 4, Mr. Horwitz and Mr. Butts both testified that they

21   calculated the due date of petitioner's habeas petition shortly

22   after being appointed, and further testified that their

23   calculations were based on specific cases. The Court finds

24   credible their explanation for how they calculated the due date

25   and also finds that this calculation was a reasonable

1   interpretation of the then existing case law.

2       The Court notes that both attorneys also testified that they

3   had experience in other death penalty cases prior to their

4   representation of this petitioner.

5       No. 5, the Court finds and accepts as credible Mr. Horwitz's

6   testimony that he did not believe a conflict of interest existed

7   once the habeas petition had been dismissed as untimely as

8   explained by Mr. Horwitz.  Petitioner was not entitled to relief

9   based on the existing case law.

10      No. 6, the Court finds that as a matter of law and under the

11  facts in this case, the attorneys' miscalculation does not

12  constitute abandonment, and this miscalculation does not entitle

13  this petitioner to equitable tolling or to reopen this case.

14      No. 7, in the 8th Circuit January 18th, 2017 order, it

15  stated that this Court made no finding as to the pre-AEDPA

16  deadline activity of original counsel.  As stated above, this

17  Court finds original counsel miscalculated the AEDPA deadline,

18  and that the miscalculation had legal support.  Consequently,

19  this Court finds that it is of little significance what original

20  counsel did or did not do before a deadline they did not believe

21  existed.

22      No. 8, nonetheless, as previously stated, the Court finds

23  that Mr. Horwitz and Mr. Butts diligently performed work on

24  behalf of petitioner before the AEDPA deadline, as discussed in

25  this Court's order of March the 8th, 2016 order.  Mr. Horwitz

1    and Mr. Butts also performed significant work on behalf of

2    petitioner, both before and after the date they mistakenly

3    thought the habeas petition was due.

4        No. 9, petitioner's purported ethics expert Lawrence Fox did

5    not appear at the hearing.  After again considering his written

6    opinions in light of today's hearing, the Court rejects

7    Mr. Fox's opinions on abandonment as contrary to the facts and

8    the law of this case.

9        For the reasons stated at the hearing, the Court finds that

10    Mr. Horwitz and Mr. Butts' time and billing records are not

11    relevant.  To the extent they are relevant, the Court accepts

12    the credibility of their testimony that it was not unusual for

13    them not to keep contemporaneous time records or to seek

14    reimbursement for their work on death penalty matters.  Court

15    further finds that Mr. Butts testified he did not intend to

16    charge for his services to these defendants.

17        The Court hereby incorporates and adopts by reference its

18    order dated March the 8th, 2016.

19        This is the final judgment of the Court.  And the Court

20    again denies the motion for stay of execution.

21        All right.  What else do we have?  Have you got the records

22    you need, Mr. Perkovich?

23          MR. PERKOVICH:  That's the record, Your Honor.

24          THE COURT:  Thank you.  Anything further by the

25    government?

1          MR. SPILLANE:  No, Your Honor.

2          THE COURT:  All right.  Gentlemen, thank you for getting

3     prepared and participating in short order, but it's driven by

4     the dates.

5          All right.  Thank you.  Be in recess.

6          MR. PERKOVICH:  Thank you, Your Honor.

7          *(Court adjourned at 4:53.)*

8                                    * * *

9          (End of requested transcript)

10                                   -oOo-

11          I certify that the foregoing is a correct transcript from

12     the record of proceedings in the above matter.

13

14     Date:  January 21, 2017

15

16

                                    /s/_____
17                                  Signature of Court Reporter
                                    Barbara Barnard
18

19

20

21

22

23

24

25